# Exhibit B

# MEMORANDUM OF UNDERSTANDING REGARDING INTENT TO ENTER INTO PARTNER AGREEMENT

Michael Ricatto or his designee ("Investor/Partner") and M3 Innovations Unlimited, Inc. represented by Kyle Kietrys, CEO & President, ("Company") desire to enter into this Memorandum of Understanding ("MOU") made this 2nd day of September, 2017 ("Effective Date") regarding their intent to enter into a Partnership Agreement and the terms therein for the investment into and partial equity ownership of M3 Innovations Unlimited, Inc. The Investor/Partner and the Company are jointly to be considered the ("Parties").

The purpose of this MOU is to set forth the current intent of the parties with respect to the main previously negotiated and agreed upon terms and conditions to be included in the final Partnership Agreement to be entered into between Investor/Partner and Company ("Partnership Agreement").

## RECITALS

**WHEREAS**, the Investor/Partner and Company have finalized negotiations regarding the Investor/Partner's proposed future investment into the Company through the conversion of land and Real Estate Improvements in California identified by APN numbers 3129-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 and 3129-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 ("Property") into ownership equity in the Company; and

**WHEREAS**, the Investor/Partner and Company desire to enter into this MOU in order to memorialize the current status of such negotiations as well as the good faith efforts of the Investor/Partner to purchase real estate and enter into a contingent conversion Partnership Agreement and other actions to be taken in advance of the parties development and execution of a final Partnership Agreement;

## TERMS

**1. Terms**

The parties have mutually agreed upon, as of the Effective Date of this agreement, specific pre-negotiated terms listed in Appendix A and the following terms and conditions relative to their negotiations to be included in the final Partnership Agreement:

a. Upon approval and execution of this MOU, the parties shall use reasonable efforts to enter into and finalize a Partnership Agreement to be fully reviewed, updated, approved and executed on or before the 24th day of September 2017 specifically in advance of the final Real Estate Closing.

b. Upon approval and execution of this MOU, and in advance of the finalization of the Partnership Agreement, the Company will provide the Investor/Partner and its consultants and attorneys access to the relevant company information for the purpose of completing the Partnership Agreement.

c. It is expressly understood that the terms of this MOU do not constitute a binding obligation on the parties to enter into a Partnership Agreement. Neither party shall be finally bound unless and until the Partnership Agreement is executed by the parties and delivered to each other. It is contemplated that the Partnership Agreement shall contain such other terms, covenants, conditions,

warranties and representations as are customary or appropriate in transactions of this nature as well as the pre-negotiated agreed upon terms listed in **Appendix A**.

**2. Laws:** This MOU shall be governed by the laws of the State of New York.

**3. Interpretation:** In interpreting this MOU, it shall be deemed that it was prepared jointly by the Parties with full access to legal counsel of their own. No ambiguity shall be resolved against any party on the premise that it or its attorneys were solely responsible for drafting this MOU or any provision thereof.

**4. Severability:** The unenforceability, invalidity, or illegality of any provision(s) of this MOU shall not render the other provisions unenforceable, invalid, or illegal.

**5. Integration:** This MOU represents the entire understanding of the Parties as to those matters contained herein, and supersedes and cancels any prior oral or written understanding, promises or representations with respect to those matters covered hereunder. This MOU may not be modified or altered except in writing signed by both parties hereto. This is an integrated document.

**6. Counterparts:** This MOU may be executed in counterparts, each of which shall constitute an original and all of which shall constitute one agreement.

**IN WITNESS THEREOF**, the parties hereto have executed this Memorandum of Understanding on the Effective Date written above:

Investor/Partner - Michael Ricatto or his designee

_____  9/5/17
Signature                 Date

Name: Michael Ricatto
Title: Michael Ricatto
Representing: Michael Ricatto or his designee


Company - M3 Innovations Unlimited, Inc.

_____  9/5/17
Signature                 Date

Name: Kyle Kietrys,
Title: Founder /CEO & President
Representing: M3 Innovations Unlimited, Inc.

# [Appendix A]
## Additional Agreed Upon Terms

**A) 75/25 Split and Key Money and Assets:**
1. Ricatto will pay 75% (approx. $5.02mm) of total cost of land + infrastructure + improvements, and M3 will pay 25% (approx. $1.675M key money) of total cost of land + infrastructure + improvements. Ricatto will own a 100% interest in land (2 lots) and improvements (land infrastructure, 1 GH structure, all fixtures and equip for Lot 1 GH - turn key).
2. M3 will contribute approx. $25k already spent (phase 1 environmental and lawyer P.S.A. contract fees) toward the key money balance due on September 24th;
3. All equipment is part of Ricatto's property. Not including IP, Brand, Tech and other things developed by M3 including permits and licenses. Ricatto will own all equipment having to do with a turn-key operation for another grower. M3 may remove its own specialized equipment and replace it provided GH is still 'turnkey'.

**B) Line of Credit to (M3 Innovations) (services company (non-plant-touching company):**
1. Ricatto will provide a $2mm, 30 month, Line of Credit to M3;
2. M3 will pay 3%/annum on any unused portion and will begin accruing interest the day the money is segregated for M3;
3. Payments for interest on unused portions are paid monthly and begin in month 13;
4. M3 will pay 12%/annum on any used portions and will accrue as withdrawn;
5. Payments for interest and principal on used portion are paid monthly and are deferred until month 13 and fully amortize by month 30;
6. M3 may also choose to pay off the LOC earlier than 30 months, without penalty;
7. The LOC would be collateralized by any finished inventory M3 may have on hand;
8. This LOC would only be used for Business Expenses.

**C) Ricatto's Investment Conversion Option to (M3 Innovations) (services company (non-plant-touching company):**
1. Ricatto has the right at any time during the life of the lease to convert Ricatto's investment in Lot 1 and all improvements (approx. $5.02mm) into 33% equity ownership in M3 Innovations (M3)
2. Should M3 achieve $50mm in Aggregate Revenue (total accumulated revenue) by month 36, then Ricatto is obligated to convert his investment into 33% equity ownership in M3.

**D) Ricatto NNN Lease to (M3 Innovations) (services company (non-plant-touching company):**
1. Ricatto will lease the land and all infrastructure, fixtures and equipment including GH 1 to M3;
2. M3 has the right to sublease the land (lot 1) and all improvements, infrastructure, fixtures and equipment to its managed entities - M3 Biodynamics and to M3 Elixirs; that will be the license and permit holders.
3. M3 has option to sublease and improve the land (lot 2) at any time over the first 24 months;
4. For Lot 1 Building lease there would be rent free for 12 months after occupancy (Occ. est. Jan. 2018);
5. Lot 1 lease term is for 7 years with payments beginning on the 13th month after occupancy (Occ. est. Jan. 2018). $28/SF/annum on 27,125 SF. 3% increases annually. M3 has

right to sublease (to a company unrelated to M3) after month 36 should Ricatto choose not to convert, provided M3 is in good standing;
6. M3 has the option to land lease Lot 2 within the first 24 months after signing original lease agreement. The terms for a Lot 2 land lease will be co-terminus with Lot 1 lease - no extension option, 12 months deferred rent, payments starting on the beginning of the 13th month after signing original lease agreement. 3% annual increases above base year rent (at the current Adelanto market land lease rate, defined by the average of three broker opinions).
7. M3 has the right to purchase Lot 2 for $1.6m once they have $3.6m in Retained Surplus and within 24 months of the closing of M3 and Ricatto's partnership agreement. Retained Surplus is defined as the retained earnings after payments to investors according to pay-out schedule and all business expenses, and debt service.
8. M3 is responsible for all repairs. Ricatto will take insurance payments for the property off the monthly lease payments.
9. M3 may use Lot 2 for temporary use of containers at any time from Ricatto in the first 24 months after the closing of M3 and Ricatto's partnership agreement (closing est. Sept. 24th, 2017).
10. Lot 1 is defined as Parcel 1 on final subdivision Map being Parcel A on the Site Plan with APN 3129-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, Legal Description: Parcel Map 19782 Parcel 1 Book 248 page 73.
11. Lot 2 is defined as Parcel 6 on final subdivision Map being Parcel F on Site Plan with APN 3129-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, Legal Description: Parcel Map 19782 Parcel 6 Book 248 page 73.
12. Ricatto leases to M3 lot 1 as a building lease and lot 2 as a land lease, if leased.

### E) Travel and Inspection:
1. M3 agrees to pay for Ricatto or any representative monthly travel costs to inspect building plans to ensure they are being executed as promised until 36 months or until Ricatto exercises his option to convert his investment into 33% equity interest, whichever comes first. There will be a $1500 stipend per trip at a maximum of once per month for a maximum of 36 months unless conversion occurs.

### F) Board Seats:
1. Ricatto's investment earns 2 board seats in (M3 Innovations) (services company (non-plant-touching company).

### G) Ricatto representative on Site:
1. One apprentice job at $22.5/hour. 40 hour week. Ricatto's representative will be treated like any other employee and must abide by and follow M3 rules, code of conduct and be a responsible member of the team to keep the job.

### H) Timing:
1. On or before September 6th EOD Ricatto agrees to pay 75% of total cost to developer, as payments needed. For initial land acquisition Ricatto agrees to pay 75% (approx. $1.875mm - see PA for exact $ amt.) for land + 75% (approx. $375k) for common area infrastructure build-out) for total Ricatto payments of $2.25mm to developer.

### I) Force Majeure:
1. Clause in which we work together to overcome any such event. (This clause is to accommodate unseen situations that may arise for all parties)

**J) September 24th Closing Commitment:**
1. M3 promises to pay key money installment, 25% of all costs-to-date (Sept.24,2017) where some payments may be in lockstep with Debet-Schalkes capital needs schedule, (approx. $760k (land acquisition & infrastructure) + approx. $425k (Greenhouse deposit), at closing of M3-Ricatto partnership agreement on September 24th, Time of Essence.
2. Should M3 not have the key money payment, Ricatto has the right to assume an additional 18% equity ownership and 51% control of the Board of Directors at the time of Ricatto's conversion option.
3. If M3 cannot contribute 25% of all costs-to-date on Sept. 24th then M3 has the right to extend a 1-week grace period.

KTK

Weed Dert

MOU m3