# Exhibit E

# LEASE

Golden State Lion LLC, a California limited liability company, of which Michael Ricatto ("Ricatto") is the sole member ("**Landlord**"), and M3 Innovations Unlimited, Inc., a Delaware corporation ("**Tenant**"), enter into this Net Lease (this "**Lease**") as of the 19th day of October, 2017 (the "**Effective Date**"), with reference to the following facts:

    A.     Ricatto, as buyer, entered into the certain Real Estate Purchase Contract and Receipt for Deposit and Joint Escrow Instructions dated September 7, 2017 ("Real Estate Purchase Contract"), with First Step Plus, LLC, a California limited liability company, as seller ("**First Step Plus**"), attached hereto and incorporated herein by this reference as **Exhibit A**, which requires First Step Plus to oversee, manage, and assist Ricatto or his designee, which shall be Landlord in purchasing, constructing, and installing a building on the Premises, as more particularly described in Exhibit D of Exhibit A (the "Greenhouse"), such that the City of Adelanto will issue a certificate of occupancy for the Greenhouse (the "**Commencement Date**");

    B.     Landlord and Tenant entered into the certain Warrant To Purchase Shares of M3 Innovations Unlimited, Inc., dated October 19, 2017, attached hereto and incorporated herein by this reference as **Exhibit B** (the "**Warrant**");

    C.     Landlord desires to lease the Premises to Tenant, and Tenant desires to lease the Premises from Tenant; and

    D.     All capitalized terms that are not defined in the body of this Lease are defined on Schedule 1 attached hereto.

Landlord and Tenant agree as follows:

## Article 1

## PREMISES AND TERM

    1.1     Premises Description. Landlord leases to Tenant, and Tenant leases from Landlord, for the Term and subject to the Permitted Encumbrances the land described on **Exhibit C** attached hereto and incorporated herein by this reference (the "**Land**"), together with the building and other improvements thereon (collectively, the "**Improvements**") and all easements and other rights appurtenant thereto. The Land, the Improvements, and the rights appurtenant thereto are collectively called the "**Premises**". The state in which the Premises are located is referred to herein as the "**State**".

    1.2     Use. Tenant may use the Premises for a Permitted Use and not for any other purpose. As used herein, the term "**Permitted Use**" means any use that does not violate the Permitted Encumbrances or any Enforceable Law. As used herein, an "**Enforceable Law**" is any applicable law other than a law that is unconstitutional, invalid or whose enforcement is prohibited by applicable law at the time in question. Notwithstanding the foregoing, the parties acknowledge and agree that provided that the State of California permits use of the Premises for the cultivation and processing of cannabis under Medicinal and Adult Use Cannabis Regulation and Safety

Act ("MAUCRSA") or other laws, regulations or ordinances, any potential conflict Controlled Substance Act ("CSA"), 21 U.S.C. §801 et seq., regarding such operations shall not constitute a violation of Enforceable Law.

(a)     Tenant has an affirmative duty under this Lease to actively and regularly ascertain whether or not Tenant's use of the Premises is a Permitted Use. Tenant shall as soon as reasonably practicable provide notice to Landlord if Tenant reasonably determines that Tenant's use of the Premises may not be a Permitted Use; such notice shall include any relevant explanations and evidence for why Tenant's use of the Premises may not be a Permitted Use.

(b)     Tenant shall as soon as reasonably practicable cure any use of the Premises that is not a Permitted Use. Curing any use of the Premises that is not a Permitted Use may require Tenant to cease any use of the Premises that is not a Permitted Use and remove from the Premises any persons, property, or improvements causing Tenant's use of the Premises to not be a Permitted Use.

(c)     Upon provision of ten (10) business days' notice to Tenant, Tenant shall provide to Landlord a reasonable explanation and any reasonable evidence that Tenant's use of the Premises is a Permitted Use. Such reasonable evidence shall include but not be limited to any valid licenses or permits issued to Tenant or applicable to Premises.

(d)     The Landlord may terminate Tenant's right to possess the Premises if, five (5) business days after Landlord provides notice to Tenant that Tenant's use of the Premises is not a Permitted Use, Tenant has failed, refused, or is unable to cure any use of the Premises that is not a Permitted Use. To clarify, the termination of Tenant's right to possess the Premises pursuant to this Section 1.2 shall not alone cause termination of this Lease.

1.3     Term. This Lease shall commence upon the Commencement Date and shall end on the earliest of (a) the seventh (7th) anniversary of the Commencement Date, (b) the date sooner terminated as herein provided, (c) the date on which Ricatto or his registered assigns exercise or should have exercised his/their respective rights under the Warrant (the "Term"), and (d) material breach of the terms of (i) the Warrant by the Holder, as that term is defined in the Warrant or (ii) the Lease by the Landlord resulting in an uncured default pursuant to Section 12.3 hereof.

1.4     Lease; Non-Terminability.

(a)     The Rent, Additional Rent, and other sums and charges, except insurance premiums for insurance policies covering the Premises held in Landlord's name ("Landlord's Insurance Premiums") and for which Landlord will be responsible for payment in accordance with Section 6.6 hereof, provided herein shall be paid without notice, demand, setoff, counterclaim, recoupment, abatement, suspension, deduction, or defense, except as otherwise expressly permitted by this Lease. All expenses of operating the Premises shall be paid by Tenant, except as otherwise specifically set forth herein. All obligations to be performed by Tenant under this Lease shall be performed at Tenant's sole expense and without reimbursement or contribution by Landlord, unless otherwise expressly provided in this Lease.

(b)     Except as otherwise expressly provided in this Lease: (i) the obligations of Tenant under this Lease shall be separate and independent covenants, (ii) Rent, Additional Rent, and all other sums payable by Tenant hereunder shall continue to be payable in all events, and (iii) this Lease shall not be terminable by Tenant. WITHOUT LIMITATION OF THE FOREGOING, EXCEPT AS OTHERWISE SPECIFICALLY PROVIDED HEREIN THE RENT, ADDITIONAL RENT, AND OTHER SUMS PAYABLE HEREUNDER SHALL CONTINUE TO BE PAYABLE AND THIS LEASE SHALL NOT BE TERMINATED IF TENANT CANNOT OPERATE ITS BUSINESS IN THE PREMISES AS THE RESULT OF THE TENANT'S VIOLATION OF ANY ZONING, PARKING, OR OTHER SIMILAR ORDINANCE INCLUDING, WITHOUT LIMITATION, THE LOSS OF ANY LEGAL NONCONFORMING STATUS WITH RESPECT TO THE PREMISES. No amounts due from Landlord to Tenant shall be deducted from or offset against any amounts payable by Tenant to Landlord hereunder.

(c)     Except as specifically provided under Section 7.1 below, Tenant hereby waives any statute, and any other right at law or in equity to terminate this Lease on its own behalf and, to the extent permitted under applicable law, on behalf of any proposed subtenant, assignee, or other transferee.

(d)     This Lease is a true lease and does not represent a financing arrangement. Each party shall reflect the transaction represented hereby in all applicable books, records, and reports (including income tax filings) in a manner consistent with "true lease" treatment rather than "financing" treatment.

1.6     As-Is. Except as provided under Sections 3.5(b) and (d), the Premises are being leased "as is", and "where is" with all faults and with Tenant accepting all defects, if any, in and to the Premises. Landlord makes, and has made, no warranty of any kind, express or implied, with respect to the Premises (without limitation, Landlord makes no warranty as to the habitability, fitness or suitability of the Premises for a particular use or purpose).

1.7     Quiet Enjoyment. Throughout the Term of this Lease, and provided that no Event of Default exists, Landlord shall do no act to disturb Tenant's quiet possession and enjoyment of the Premises, and Landlord shall defend the same against any party claiming by, through or under Landlord.

1.8     Contributions.

(a)     Landlord and Tenant agree that Landlord shall contribute seventy five percent (75%) of the cost of purchasing, constructing, and installing the Greenhouse and purchasing the necessary Trade Fixtures and Equipment (as defined in Section 4.3 below) ("Greenhouse Costs") and Tenant shall contribute twenty five percent (25%) of the Greenhouse Costs (collectively the "Greenhouse Contributions") up until Landlord's aggregate Greenhouse Contributions shall reach $1,849,408.50 ("Landlord's Greenhouse Contribution Cap").

(b)     After Landlord has contributed an amount equal to Landlord's Greenhouse Contribution Cap, Tenant shall thereafter be obligated, at its sole cost and expense, to diligently

prosecute to completion the construction and installation of the Greenhouse and take all necessary steps to obtain a certificate of occupancy therefore and purchase and install any and all Trade Fixtures and Equipment necessary for the Intended Use (as such term is defined in Section 4.3 below).

(c)    Any commercially unreasonable delays in the completion of the Greenhouse, in obtaining the certificate of occupancy therefore, or the purchase and installation of Trade Fixtures and Equipment caused by either Tenant's or Landlord's failure or refusal to fund additional Greenhouse Contributions shall constitute a material default hereunder.

(d)    Landlord shall provide or cause to be provided contemporaneously to Tenant to any and all communications from the Greenhouse manufacturer. Prior to reaching the Landlord's Greenhouse Contribution Cap, Tenant's portion of the Greenhouse Contributions shall be paid to Landlord within seven (7) business days after such written notice from Landlord and evidence of requested reimbursement. If Landlord anticipates making payments to the Greenhouse manufacturer in excess of the Landlord's Greenhouse Contribution Cap, Landlord shall provide Tenant sixty (60) days' advance written notice of same ("Excess Notice Period") and Tenant's portion of the Greenhouse Contributions following the Excess Notice Period shall be paid to Landlord within seven (7) business days after such written notice from Landlord and evidence of requested reimbursement.

## Article 2

## RENT

2.1    <u>Rent</u>. Beginning on the first anniversary of the Commencement Date (the "**Rent Commencement Date**"), Tenant shall pay to Landlord as fixed monthly rent for the Premises an amount equal to $63,292.00 due in advance on or before the first (1st) day of each calendar month of the Term and payable by Tenant to Landlord in lawful money of the United States of America at the address of Landlord set forth in <u>Section 15.7</u> below or at such other address as may be designated by Landlord from time to time ("**Rent**"). On the first anniversary of the Rent Commencement Date and each subsequent anniversary of the Rent Commencement Date thereafter, Rent shall increase by three percent (3%).

2.2    <u>Pro Rata Portions of a Month</u>. If the Rent Commencement Date occurs on a date other than the first day of a month or a calendar year, the Rent for such month shall be prorated on the basis of the actual days in such month.

2.3    <u>Additional Rent</u>. All amounts payable by Tenant to Landlord under the terms of this Lease other than the Rent are collectively called "**Additional Rent**". Tenant's obligation to pay all forms of Additional Rent shall commence as of the Commencement Date.

2.4    <u>Late Payments</u>. If any installment of Rent or any Additional Rent is not paid within five (5) business days of the date on which such Rent or Additional Rent becomes due, Tenant shall pay Landlord interest on such past due payment at the Default Rate accruing from the due date of such payment until the same is paid in full. The "**Default Rate**" shall mean the sum of (i) the prime rate of interest from time to time as published in the *Wall Street Journal*, plus (ii) four

percent (4%) per annum, provided that in no event shall such rate exceed the maximum rate of interest permitted by applicable law.

2.5    Reimbursement of Expenses. Tenant shall reimburse Landlord, within seven (7) business days after written demand by Landlord, for any reasonable out-of-pocket expenses (including reasonable attorneys' fees) paid or incurred by Landlord after the Commencement Date as the result of any request by Tenant for any action, approval, or consent by Landlord, but not for those items for which the Landlord is expressly responsible under this or any other ancillary agreement governing cost sharing in relation to the Premises.

## Article 3

## UTILITIES; TAXES; LEGAL COMPLIANCE

3.1    Utilities. Tenant shall pay or cause to be paid when due all charges for all public or private utility services to or for the Premises during the Term, including, without limitation, all charges for heat, light, electricity, water, gas, telephone service, cable service, internet service, garbage collection, sanitary sewer service and storm sewer or other drainage service.

3.2    Impositions.

(a)    Commencing on the Commencement Date and continuing during the Term, Tenant shall pay all Impositions to the extent properly allocable to the Term. As used herein, the term "**Impositions**" shall mean the following: (i) all taxes or assessments of every kind and nature assessed against or imposed upon the Premises which are measured by the value of real property, (ii) all taxes or assessments of every kind and nature assessed against or imposed upon the leasehold estate of Tenant under this Lease, (iii) all taxes or assessments of every kind and nature assessed against or imposed upon the gross amount of the Rent or Additional Rent, including without limitation, any sales tax, use tax, gross receipts tax, occupancy tax or excise tax levied by any governmental body on or with respect to the Rent or Additional Rent, (iv) all fees, contributions, charges and other amounts payable pursuant to any Permitted Encumbrance, (v) all permit fees, inspection fees, license fees or similar charges attributable to the Tenant's business operations at the Premises, and (vi) all other public charges and/or taxes whether of a like or different nature, even if unforeseen or extraordinary, imposed upon or assessed against the Premises or the Tenant's business operations therein. Notwithstanding the foregoing, if any of the following are imposed on Landlord, they shall be excluded from Impositions and shall be paid by Landlord (except to the extent they are imposed in substitution for any Imposition which would otherwise be payable by Tenant as provided hereunder): inheritance, estate, succession, transfer, gift, or capital stock tax, or any income taxes or other taxes on Landlord's net income (as opposed to any tax assessed against gross receipts) arising out of or related to the ownership of the fee title to the Premises.

(b)     Tenant shall pay the Impositions to the respective taxing authorities or to the other payees thereof prior to the date such Impositions become delinquent, and shall provide Landlord with copies of paid receipts evidencing the payment of such Impositions within seven (7) business days after Landlord's written request. If any Imposition is not paid by Tenant as provided in the immediately preceding sentence, Landlord, after giving Tenant at least seven (7) business days written notice thereof, may (but shall not be obligated to) pay the unpaid Imposition, including any penalties and interest thereon, in which event Tenant shall be obligated to reimburse Landlord on demand for any amount so paid by Landlord plus interest thereon at the Default Rate on the unreimbursed portion of the amount so paid from the date of payment by Landlord until Landlord shall have been reimbursed in full.

(c)     If by law any Imposition may at the option of the taxpayer be paid in installments, Tenant may exercise such option, and shall pay all such installments and interest thereon, if any. At the end of the Term, Tenant shall deposit with Landlord an amount sufficient to pay Tenant's pro rata share of all Impositions for the calendar year in which the Lease terminates. Impositions applicable to any period prior to the Commencement Date or subsequent to the expiration or earlier termination of the Term shall be prorated between Landlord and Tenant based on the number of actual days elapsed during the applicable period of assessment.

3.3     Permitted Contests. Tenant, at its sole expense, may, by appropriate legal proceedings conducted in good faith and with due diligence, contest the amount or validity of any Imposition, if:

(a)     Such proceedings operate to suspend the collection thereof from Landlord and the Premises;

(b)     Tenant shall have furnished such security, if any, as may be required in the proceedings;

(c)     Tenant shall give Landlord reasonable notice of, and information pertaining to, such contest and regular progress reports with respect thereto;

(d)     No Event of Default shall exist; and

(e)     If such Imposition is secured by a lien on the Premises, then Tenant shall have removed such lien by bonding or otherwise.

Tenant shall promptly and diligently prosecute each such contest to a final conclusion. Landlord shall cooperate as requested by Tenant including, without limitation, timely providing all documents or information in its possession requested by Tenant, as reasonably required to enable Tenant to prosecute any such contest. Tenant shall indemnify, defend, and hold Landlord harmless from and against all Claims arising in connection with any such contest and shall, promptly after the final determination of such contest, pay all amounts which shall be imposed therein, together with all penalties, fines, interest, and expenses.

3.4　Compliance with Laws and Permitted Encumbrances. Tenant shall not, during the Term, allow any nuisances to exist or be maintained on the Premises or violate any Permitted Encumbrance that is likely to have a material adverse effect on Landlord or any Enforceable Law.

3.5　Environmental Matters.

During the Term, except as set forth in Section 3.5(b) below, Tenant shall be solely responsible for its compliance with Environmental Laws applicable to the Premises, including the performance of all actions required by any governmental authority having jurisdiction over the Premises with respect to Hazardous Materials, or as necessary to comply with Environmental Laws with respect to Hazardous Materials released on, in or under the Premises during the Term. Tenant shall be solely responsible for the release of Hazardous Materials on, in, or under the Premises during the Term except as the result of the negligence or misconduct of Landlord or its agents or contractors.

Landlord shall be solely responsible for the release of Hazardous Materials on, in or under the Premises: (i) during the Term as the result of the negligence or misconduct of Landlord or its agents or contractors; and (ii) before or after the Term.

Tenant shall indemnify, defend, and hold harmless, Landlord and its officers, directors, managers, agents (acting within the scope of such agency) and Affiliates from and against all Claims arising directly or indirectly from the release of Hazardous Materials for which Tenant is responsible pursuant to Section 3.5(a) hereof.

Landlord shall indemnify, defend, and hold harmless, Tenant and Tenant's officers, directors, managers, agents (acting within the scope of such agency) and Affiliates from and against all Claims arising directly or indirectly from the release of Hazardous Materials for which Landlord is responsible pursuant to Section 3.5(b) hereof.

Landlord and Tenant shall supply to the other, as promptly as possible, and, in any event, within ten (10) business days after receipt of same, copies of all Claims or notices of violation of any Environmental Law, relating in any way to the Premises or Tenant's use thereof.

## Article 4

## REPAIRS AND ALTERATIONS TO PREMISES

4.1　Tenant's Repair and Maintenance Obligations. During the Term, Tenant, at its expense, shall maintain the Premises (including the foundation, roof and structure of the Improvements) in good condition, repair, and cleanliness, reasonable wear and tear excepted. **TENANT ACKNOWLEDGES THAT LANDLORD IS NOT OBLIGATED TO MAKE ANY REPAIRS WHATSOEVER TO THE PREMISES OR TO REPLACE ANY COMPONENT OF THE PREMISES.**

4.2　Alterations to Improvements.

(a)　Tenant shall not perform work on the Premises (an "**Alteration**") that is a Major Alteration without the written consent of Landlord, which consent shall not be unreasonably

withheld or conditioned. Tenant may undertake Alterations that are not Major Alterations without Landlord's written consent so long as such Alterations are completed in accordance with Section 4.2(d) below. At the expiration or earlier termination of this Lease, all Alterations and all fixtures installed therein shall become the property of Landlord (except as provided in Section 4.3 below).

(b) For purposes of this Lease, **"Major Alterations"** shall mean: (i) Alterations which affect the foundation or footprint of the Improvements; or (ii) Alterations which involve the structural elements of the Improvements, such as a load-bearing wall, structural beams, columns, supports, or roof; or (iii) Alterations costing over $100,000.00.

(c) Major Alterations shall be made by a licensed contractor and according to plans and specifications prepared by an architect or engineer and approved by Landlord, which approval shall not be unreasonably withheld, conditioned or delayed.

(d) If Landlord gives its prior written consent to any Alteration, or if such consent is not required, Tenant agrees that in connection with such Alteration: (i) the fair market value of the Premises shall not be lessened in any material respect after the completion of the Alteration, or its structural integrity impaired; (ii) the Alteration shall not in the aggregate reduce the gross floor area of the Improvements; (iii) all work shall be performed in a good and workmanlike manner and shall be expeditiously completed in compliance with applicable laws and the Permitted Encumbrances; (iv) Tenant shall promptly pay all expenses of the Alteration and shall discharge or bond off all liens filed against any of the Premises arising out of the same; (v) Tenant shall procure and pay for all permits and licenses required in connection with the Alteration; (vi) upon completion of the Alteration, Tenant shall promptly provide Landlord with (A) evidence of full payment to all laborers and materialmen contributing to the Alteration, (B) if the Alteration required Landlord's consent, a certificate executed by Tenant or its contractor certifying the Alteration to have been completed in conformity with the plans and specifications, (C) a certificate of occupancy (if the Alteration is of such a nature as would require the issuance of a certificate of occupancy), and (D) any other documents or information reasonably requested by Landlord; (vii) prior to the commencement of the Alteration, Tenant shall furnish to Landlord certificates evidencing the existence of (x) workmen's compensation insurance in statutory amounts covering all persons employed for such work (including Tenant's contractors and subcontractors), builder's risk insurance covering all physical loss and other risks covered by the usual extended coverage and "all risk" endorsements, and (y) comprehensive general liability and property damage insurance naming Landlord, its designees, Landlord's managing agent, any mortgagee or superior lessor or other party or person whose name is furnished by Landlord to Tenant, and Tenant as insureds with coverage of at least $3,000,000.00 single limit and such other types and amounts of insurance as Landlord may reasonably require; and (viii) before commencement of any work, Tenant shall execute and file or record (or cooperate with Landlord in the execution and filing as to any notices to be signed by Landlord) as appropriate, a "Notice of Non-Responsibility," or any equivalent notice, if any, permitted under applicable law in the State.

4.3 Trade Fixtures, Equipment and Other Assets.

a. Trade Fixtures and Equipment. Upon the expiration of the Term, provided that no Event of Default exists, Tenant shall be entitled to remove its Trade Fixtures and Equipment from

the Premises, but Tenant shall promptly repair any damage to the Premises which is caused by such removal. The term **"Trade Fixtures and Equipment"** shall mean all of Tenant's tangible personal property, equipment, and trade fixtures which can be removed without material damage to the Premises and which are not essential to the performance of the cultivation activity described in Conditional Use Permit 16-51 referenced in Section 12.3 (the "Intended Use") and shall include, without limitation, upgrades to turnkey greenhouse equipment, light fixtures (provided they are replaced with light fixtures sufficient for the Intended Use), all processing equipment, e.g., testing, curing, extraction and packaging equipment. Trade Fixtures and Equipment shall not include (i) any of tangible personal property, equipment, and trade fixtures for which Landlord contributed seventy five percent (75%) or more of the purchase price for; or (ii) any items which cannot be removed and replaced without material damage to the Premises or which are essential to the Intended Use, including, without limitation, plumbing systems and fixtures, toilets, windows, window coverings, heating, ventilation and air conditioning systems, electrical systems, security systems, surveillance systems, parking control systems, and other similar fixtures and systems. If the parties agree that the Intended Use of the Premises cannot be accomplished without the purchase of additional equipment, Landlord and Tenant agree to purchase the additional equipment, with Landlord contributing 75% and Tenant contributing 25% to the cost of same, unless Landlord has already contributed an amount equal to Landlord's Greenhouse Contribution Cap, in which instance Tenant shall be responsible for obtaining such additional equipment at Tenant's sole cost and expense.

      b. <u>Intellectual Property</u>. Each party will retain all rights in any software, ideas, concepts, know-how, processes, development tools, techniques or any other proprietary material or information that it owned or developed prior to the date of this Agreement, or that it acquires or develops after the date of this Agreement without use or incorporation of the Intellectual Property of the other party.

      c. <u>Licenses and Permits</u>. As between the Landlord and the Tenant, Tenant shall own all interests and rights in any licenses, permits or other permissions required for or of assistance in its operations at the Premises and under no circumstances shall Landlord challenge or cause to be challenged Tenant's interests or rights in such licenses, permits or other permissions, except with regards to the following permits issued by the Planning Commission of the City of Adelanto, San Bernadine County, California ("Planning Commission") which Landlord shall own: (a) Conditional Use Permit 16-15 approved September 6, 2016 by the Planning Commission; and (b) the Conditional Use Permit 16-31 approved on November 15, 2016 by the Planning Commission to the extent such permits were granted for the Premises.

    4.4    <u>Surrender Upon Termination</u>. Subject to the terms of this Lease, upon expiration or earlier termination of this Lease, Tenant shall deliver the Premises to Landlord in reasonably good repair and condition, ordinary wear and tear excepted.

**Article 5**

**DAMAGE OR DESTRUCTION**

5.1     Notice of Damage. If the Improvements are damaged or destroyed by fire or other casualty (**"Casualty"**), Tenant shall deliver prompt written notice thereof to Landlord.

5.2     Tenant's Obligation to Repair.

(a)     If a Casualty occurs, then Tenant shall promptly complete Restoration at Tenant's sole expense. All casualty insurance proceeds disbursed to Tenant shall be used by Tenant solely for Restoration. Tenant shall promptly commence and diligently and continuously carry out the Restoration to full completion as soon as reasonably possible. The Restoration shall be performed by Tenant in a good and workmanlike manner, in accordance with applicable law and the Permitted Encumbrances.

(b)     Prior to such Restoration, Tenant shall deliver its good faith estimate of the cost thereof, which shall be subject to the approval of Landlord, which approval shall not be unreasonably withheld. The approved Restoration estimate shall be used by the parties to calculate any excess costs of Restoration to be funded by Tenant as herein provided, but shall not be a limitation upon the full application of Net Insurance Proceeds to all reasonable costs of Restoration incurred by Tenant in the manner set forth herein. The insurance proceeds for any such Casualty shall first be applied to pay all of Landlord's reasonable out-of-pocket expenses and attorney's fees incident to the collection thereof; the balance of such insurance proceeds after deduction for such costs (**"Net Insurance Proceeds"**) shall be held by Landlord and disbursed in accordance with this Section 5.2(b). If the approved Restoration estimate is equal to or less than $100,000.00, then the Net Insurance Proceeds shall be disbursed to Tenant for Restoration as long as no Event of Default has occurred which remains uncured. The cost of Restoration shall be paid first out of Tenant's own funds to the extent that the approved Restoration estimate exceeds the Net Insurance Proceeds. Any Net Insurance Proceeds remaining after final payment has been made for the Restoration and after Tenant has been reimbursed for any portions it contributed to the cost of Restoration shall be paid to (or retained by) Tenant, or if an Event of Default exists, to Landlord to the extent necessary to cure any existing monetary default. If the cost of Restoration shall exceed the Net Insurance Proceeds, the deficiency shall be paid by Tenant. Tenant shall not be entitled to disbursements of the Net Insurance Proceeds if an Event of Default has occurred and is continuing, provided however that Landlord shall allow Restoration to be performed and continue and shall be obligated to make disbursements from the Net Insurance Proceeds to any contractors performing the Restoration. If the cost of Restoration exceeds $100,000.00, the Net Insurance Proceeds shall be paid out from time to time to Tenant as the work progresses (less any cost to Landlord of recovering and paying out such proceeds, including, without limitation, reasonable attorneys', trustees' or escrow fees relating thereto and costs allocable to inspecting the work and the plans and specifications), subject to each of the following conditions:

(i)     At the time of any disbursement, no mechanics' or materialmen's liens shall have been filed and remain undischarged or unbonded.

(ii)    Disbursements shall be made from time to time in an amount not exceeding the hard and soft cost of the work and costs incurred since the last disbursement upon receipt of reasonable evidence of cost and payment so that Landlord can verify that the amounts disbursed from time to time are represented by work that is completed in place or delivered to the site and free and clear of mechanic's lien claims.

(iii)    Each request for disbursement shall be accompanied by partial or final lien wavers, as applicable, from any contractor or subcontractor performing such work and a certificate of Tenant describing the work, materials or other expenses, for which payment is requested, stating the cost incurred and stating that Tenant has not previously received payment for such work or expense and the certificate to be delivered by Tenant upon completion of the work shall, in addition, state that the work has been substantially completed and complies with the applicable requirements of this Lease.

(iv)    No disbursement made prior to final completion of any item of work shall cause the aggregate amount disbursed with respect to such item of work to exceed 90% of the value of the portion of such item of work which has been completed.

(v)    Net Insurance Proceeds held by Landlord in accordance with this Section 5.2 shall be held in a separate federally insured interest bearing account. Any interest earned on the Net Proceeds shall be a part of the Net Insurance Proceeds, and shall be disbursed in accordance with this Lease.

5.3    <u>No Abatement</u>. No Rent, Additional Rent, or other amounts payable under this Lease shall be abated during any period the Premises are untenantable, in whole or in part, as the result of any Casualty.

## Article 6

## INSURANCE

6.1    <u>Insurance Maintained by Tenant</u>. Tenant shall maintain, provide or cause to be provided, at its sole cost and expenses, the following insurance:

(a)    Special form insurance with respect to the Improvements insuring against any peril now or hereafter included within the classification "All Risk" or "Special Perils" (including, without limitation, fire, lightning, windstorm, hail, terrorism, explosion, riot, riot attending a strike, civil commotion, vandalism, aircraft, vehicles and smoke), in each case: (i) in an amount equal to one-hundred (100%) of the Full Replacement Cost; (ii) in an amount sufficient so that no co-insurance penalties shall apply; (iii) providing for no deductible in excess of five percent (5%) of the Full Replacement Cost; (iii) at all times insuring against at least those hazards that are commonly insured against under a "special causes of loss" form of policy, as the same shall exist on the Commencement Date, and together with any increase in the scope of coverage provided under such form after the Commencement Date; (iv) if the structure or use of the Premises is legal nonconforming, providing coverage for contingent liability from operation of building laws, demolition costs and increased cost of construction endorsements together with an ordinance

or law coverage endorsement; (v) naming Landlord as "loss payee" as its interest may appear; and (vi) providing coverage for certified acts of terrorism as defined by the Terrorism Risk Insurance Act of 2002 or any successor act;

(b)     Commercial general liability insurance against claims of personal injury or death and property damage caused by an occurrence upon, in or about the Premises, affording a minimum coverage of not less than $2,000,000.00 combined single limit (per occurrence), with an aggregate annual limit of $2,000,000.00 and an umbrella coverage of $3,000,000.00, and naming Landlord as an "additional insured";

(c)     Loss of rents or business interruption insurance covering all risks required to be insured against under Section 6.1(a) (d) and (e) in an amount sufficient to cover all Rent and Additional Rent payable under this Lease for the period of any interruption in Tenant's business, not to exceed twelve (12) months;

(d)     As long as any construction is taking place on the Premises, builder's risk insurance in the full amount of the cost of the proposed Improvements; and

(e)     Flood insurance if the Premises are located in a flood zone.

All insurance policies required to be maintained by Tenant hereunder shall be with insurance companies with a Standard & Poor's claims paying ability rating of not less than "A", authorized to do business in the State. All insurance policies shall: (i) with the exception of the worker's compensation insurance coverage, provide for a waiver of subrogation by the insurer as to claims against Landlord and its employees and agents; (ii) provide that the policy of insurance shall not be cancelled or materially modified without at least thirty (30) days' prior written notice to Landlord; and (iii) provide that the insurer shall not deny a claim because of the negligence of Landlord or Tenant.

6.2     Certificates. Within twenty (20) days of request by Landlord, Tenant shall provide Landlord with insurance certificates evidencing the insurance required under Section 6.1 to be maintained by Tenant.

6.3     Landlord's Acquisition of Tenant's Insurance. If Tenant at any time during the Term fails to procure or maintain any insurance required under this Sections 6.1-6.5 or to pay the premiums therefor, Landlord shall have the right to procure the same and to pay any and all premiums thereon, and any amounts paid by Landlord in connection with the acquisition of insurance shall be immediately due and payable as Additional Rent, and Tenant shall pay to Landlord upon demand the full amount so paid and expended by Landlord, together with interest thereon at the Default Rate from the date of such expenditure by Landlord until repayment in full by Tenant.

6.4     Waiver of Subrogation. Landlord releases Tenant and its officers, directors, managers, and agents, and Tenant releases Landlord and its officers, directors, managers, and agents, from any liability for damage or destruction to the Premises or any Trade Fixtures and Equipment whether or not caused by the act or omission of, respectively, Tenant or any of its officers, directors, manager or agents, or Landlord or any of its officers, directors, managers or

agents, and hereby waives all claims against the others for damage, loss, or injury resulting from Casualty, but only to the extent covered by insurance (or, with respect to a claim against Landlord or its officers, directors, managers or agents, to the extent the same would have been covered by insurance had Tenant maintained the insurance required under this Lease).

6.5     Blanket Policies.  Any insurance provided for in this Article may be effected by a blanket policy or policies of insurance, or under so called "all-risk" or "multi peril" insurance policies, provided that the amount of the total insurance available with respect to the Premises shall provide coverage and indemnity at least equivalent to separate policies in the required amounts, and provided further that in other respects, any such policy or policies shall comply with the provisions of this Article. Any increased coverage provided by individual or blanket policies shall be satisfactory, provided the aggregate liability limits covering the Premises under such policies shall otherwise comply with the provisions of this Article.

6.6     Landlord Reimbursement.  Landlord shall reimburse Tenant for all Landlord's Insurance Premiums as set forth in Section 1.4(a) hereunder.  Tenant shall document and substantiate such premium payments, including an itemized list of all premiums paid and receipts for premiums paid. Landlord shall reimburse Tenant on a monthly basis by deducting the amount owed to Tenant from the monthly payment of Rent for all premiums paid for which Tenant submitted documentation five (5) business days prior to the due date for such monthly payment of Rent by Tenant.

## Article 7

## CONDEMNATION

7.1     Total or Substantial Taking.  As used herein, the term **"Taking"** or **"taken"** shall mean the exercise by any governmental or quasi-governmental authority of the right of eminent domain pursuant to any constitutional or statutory authority, or any private purchase in lieu thereof. If all of the Premises should be subjected to a Taking, this Lease shall terminate on the date physical possession is taken by the condemning authority. If a partial Taking occurs such that the remaining portion of the Premises is not suitable for Tenant's continued use of the Premises for its then current use or that otherwise materially impairs Tenant's profitability, then this Lease shall, at Tenant's option, terminate and the Rent shall be abated during the unexpired portion of this Lease, effective on the later of: (a) the date physical possession is taken by the condemning authority or (b) thirty days after Tenant gives Landlord notice of termination.  Any election by Tenant to terminate this Lease in accordance with this Section 7.1 shall be evidenced by a written notice of termination delivered to Landlord no later than sixty (60) days after the date physical possession of the Premises is taken by the condemning authority.

7.2     Partial Taking.  If a partial Taking occurs which does not give rise to Tenant's termination rights set forth in Section 7.1 above, or if Tenant elects not to terminate this Lease as provided in Section 7.1 above with respect to any Taking, then (a) the Rent for the unexpired portion of this Lease shall be equitably apportioned according to the square footage of the Premises so taken and this Lease, in all other respects, shall remain in full force and effect. The Landlord, at its own cost and expense, shall restore the remaining portion of the Premises to its condition prior to such

taking, subject however, to the applicable provisions of any mortgage then encumbering the Premises to which this Lease is or shall be subject, and provided that Landlord shall not be required to expend more than the net proceeds of any condemnation award received as a result of such taking and which are not required to be paid to a mortgagee.

7.3     Collection and Disposition of Condemnation Proceeds.

(a)     All compensation awarded or paid for a Taking of the Premises shall be paid to Landlord, and subject to the remaining provisions of this Section 7.3, Tenant assigns its interest in any such compensation to Landlord. Notwithstanding the foregoing, Landlord shall have no interest in any compensation made, and Tenant shall have the right to seek and prosecute any claim directly against the condemning authority for Tenant's moving and relocation expenses, for the loss of Tenant's Trade Fixtures and Equipment, and for the loss of Tenant's business if a separate award for such items is made to Tenant and such award will not reduce the amount payable to Landlord (and Tenant may seek awards for such items if such conditions are satisfied).

(b)     If this Lease is not terminated under Section 7.1 above, then so long as no Event of Default exists: (a) Landlord shall make such compensation, net of the out-of-pocket expenses paid or incurred by Landlord to recover such compensation (the "**Net Award**"), available to Tenant to pay the cost of Restoration and (b) any Net Award remaining after reimbursement to Tenant for the cost of Restoration shall be apportioned between Tenant and Landlord as follows: Tenant's share of the remaining Net Award shall be equal to: (i) the remaining Net Award multiplied by (ii) the Market Capitalization Rate (as determined under the provisions of **Exhibit E** attached hereto) after the Taking and after completion of Restoration multiplied by (iii) the present value of annual payments of $1.00 for the balance of the Term based on a discount rate equal to the Market Capitalization Rate; Landlord's share shall be equal to the remaining Net Award less Tenant's share.

7.4     Temporary Taking.  If the whole or any part of the Premises or of the Tenant's interest under this Lease is subjected to a Taking for temporary use or occupancy, Tenant shall continue to pay, in the manner and at the times herein specified, the full amounts of the Rent and Additional Rent, and this Lease shall continue and, except only to the extent that Tenant may be prevented from so doing pursuant to the terms of the order of the condemning authority, Tenant shall perform all of its other obligations under this Lease, as though such Taking had not occurred. Notwithstanding the foregoing, in the event any temporary taking will exceed thirty (30) days, or occurs during the last year of the Lease, then in either such instances, Tenant may terminate the Lease by thirty (30) days written notice to Landlord. In the event of a temporary Taking that does not extend beyond the Term, Tenant shall be entitled to receive the entire amount of any award made for such Taking, whether paid by way of damages, rent or otherwise. If a temporary Taking extends beyond the Term, then the award for such Taking shall be apportioned between the Landlord and the Tenant with Tenant receiving a share of the award equal to the amount of the award multiplied by the fraction whose numerator is the number of days remaining in the Term and whose denominator is the number of days of the temporary Taking and with Landlord receiving the balance of the award. For purposes of calculating the number days in the remaining Term, no Renewal Term shall be counted unless at the time of such calculation, Tenant has exercised its right to extend the Term by such Renewal Term.

## Article 8

## INSPECTION BY LANDLORD AND TENANT ESTOPPEL

8.1     Inspection of Premises.  Landlord and Landlord's agents and representatives shall be entitled, from time to time, upon twenty-four (24) hours prior written notice to Tenant (or without notice in the event of a bona fide emergency), to enter upon the Premises at reasonable times for the purpose of inspecting the same (and permitting prospective lenders and purchasers to inspect the Premises) and during the last six (6) months of the Term as defined in Sections 1.3(a) or (b) hereof, of this Lease, for the purpose of showing the Premises to prospective tenants.  In exercising such rights to access the Premises, Landlord and Landlord's agents and representatives shall use reasonable efforts to avoid any interference with Tenant's use of the Premises.

8.2     Tenant Estoppel. Within 15 days after request by Landlord, Tenant shall execute and deliver to Landlord a written statement addressed to Landlord (or to a party designated by Landlord) in the form attached as **Exhibit D**.

## Article 9

## INDEMNIFICATION

9.1     Tenant Indemnity.

(a)     Without limitation of the other indemnity provisions set forth in this Lease but subject to Section 6.4 above and Sections 9.2(b) and 9.3 below, Tenant shall indemnify, defend (with counsel approved by Landlord, which approval shall not be unreasonably withheld), hold harmless, and reimburse Landlord from, against, and for any Claims brought by third parties which may be asserted against or suffered or incurred by Landlord by reason of: (i) Tenant's breach of this Lease as proven by adjudication by a court with proper jurisdiction; (ii) any accident, injury, or damage to person or property which occurs on the Premises during the Term or which results from the gross negligence or willful misconduct of Tenant or its agents, invitees, or contractors; (iii) any violation of applicable law or the Permitted Encumbrances at or on the Premises or by Tenant or any of Tenant's agents, contractors, or employees; or (iv) Tenant's use or occupancy of the Premises.

(b)     Tenant's obligation to defend Landlord under Section 9.1(a) extends to any Claims alleging the occurrence of one or more of the acts or events described in subsections (ii) or (iii) of Section 9.1(a), whether or not such allegation is ultimately proven. Thus, for the avoidance of doubt, if a third party claims injuries from an accident allegedly occurring at the Premises during the Term, Tenant must defend Landlord against such Claim whether or not the accident is ultimately proven to have occurred at the Premises.

9.2     Landlord Indemnity.  Subject to Section 6.4 and Section 9.3, Landlord shall indemnify, defend, hold harmless and reimburse Tenant, from, against and for any Claim which may be asserted against or imposed upon Tenant by reason of the negligence or misconduct of Landlord or its officers, directors, managers, agents, contractors, or Affiliates.

9.3     Excluded Claims. Notwithstanding any provision in this Lease to the contrary: (a) Landlord shall have no obligation to defend, indemnify or hold harmless the Tenant (or its officers, directors, managers, agents or Affiliates) for, from and against any Claim arising from gross negligence or willful misconduct of Tenant or its officers, directors, managers, agents, contractors, or Affiliates, nor shall have any liability for indirect, consequential or punitive damages, and (b) Tenant shall have no obligation to defend, indemnify, or hold harmless the Landlord (or its officers, directors, managers, agents, or Affiliates) for, from, or against any Claim arising from gross negligence or willful misconduct of Landlord or its officers, directors, managers, agents, contractors or Affiliates, nor shall have any liability for any indirect, consequential or punitive damages.

## Article 10

## ASSIGNMENT, SUBLETTING, LENDERS, AND EASEMENTS

10.1    Assignment by Tenant.

(a)     Except as otherwise provided in this Article 10, Tenant may assign this Lease or sublet the Premises in whole or in part without Landlord's prior written consent (i) to an Affiliate of Tenant or (ii) to any person, if Landlord has not exercised its rights under the Warrant within thirty-six (36) months of the Commencement Date. No such assignment or sublease shall operate to release Tenant from liability under this Lease or to reduce any of its obligations hereunder. Landlord shall have the right to collect Rent and Additional Rent directly from any assignee, or upon an Event of Default a subtenant of Tenant, without releasing or limiting the liability of Tenant hereunder, except to the extent of Tenant's liability for the Rent and Additional Rent collected by Landlord directly from such assignee or subtenant.

(b)     Notwithstanding anything herein to the contrary, Tenant may not assign or sublet the Premises if: (i) such assignment or sublease would cause any part of the Premises to become "tax exempt use property" within the meaning of Section 168(h) of the Internal Revenue Code, (ii) any direct or indirect beneficial interest in the assignee or subtenant is owned by a person listed on the Specially Designated Nationals and Blocked Persons List maintained by the Office of Foreign Assets Control, Department of the Treasury, or on any other list of terrorists or terrorist organizations maintained pursuant to any of the rules and regulations of such office or pursuant to any other applicable Executive Order unless such ownership is through a United States publicly traded entity, (iii) such sublease or assignment is not for a Permitted Use, or (iv) an Event of Default exists.

(c)     In connection with and on or prior to the effective date of any assignment or sublease which is permitted hereunder, Tenant shall give Landlord written notice of such transaction together with the following, as applicable: (i) a copy of the assignment or sublease, and the name, address, and telephone number of the assignee or subtenant, (ii) in the case of an assignment of the Lease, a written assignment executed by the assignee in which the assignee assumes and agrees to perform all of the provisions of this Lease on the part of the Tenant to be performed from and after the date of such assignment; (iii) complete detailed financial information on any entity merging with or acquiring the assets or capital stock of Tenant; (iv) copies of all

relevant merger or purchase and sale agreements relating to such a transaction; (v) such evidence as Landlord may reasonably require with respect to the existence and good standing of the applicable entities and their authority to consummate the corresponding transaction, including, without limitation, the applicable organizational documents; (vi) a new insurance policy and binder naming the assignee or subtenant; and (vii) such documents and other items as Landlord shall reasonably require to confirm Tenant's compliance with the conditions to consummating such transaction. In addition, promptly after any such assignment or sublease, Tenant shall reimburse Landlord for all reasonable out-of-pocket expenses incurred by them in connection with such transactions, including reasonable attorneys' fees and costs.

10.2    Assignment by Landlord.    In the event of the transfer and assignment by Landlord of its interest in this Lease to a person expressly assuming Landlord's obligations under this Lease, which transfer and assignment shall only be permitted in accordance with the terms and conditions of the Warrant, Landlord shall thereby be released from any further obligations hereunder, and Tenant agrees to look solely to such successor in interest of Landlord for performance of such future obligations. In addition, promptly after any security given by Tenant to secure performance of Tenant's obligations hereunder shall be assigned and transferred by Landlord to such successor in interest and Landlord shall thereby be discharged of any further obligation relating thereto.

10.3    Landlord Financing.    Subject to the provisions of this Section 10.3, Tenant's leasehold estate hereunder shall automatically be subject and subordinate to the lien of any deed of trust, deed to secure debt or mortgage covering Landlord's interest in the Premises (a "**Mortgage**"), given in favor of any lender providing first-mortgage financing to Landlord ("**Lender**"); provided, however, that in consideration of such subordination, and as a condition precedent thereto, the Lender agrees that so long as no Event of Default exists: (i) Tenant's leasehold estate and right of possession hereunder shall not be disturbed, nor shall this Lease be affected in any manner, by any default under such Mortgage or by any foreclosure or other enforcement action under such Mortgage, or by any sale in lieu thereof; (ii) the purchaser at such foreclosure sale or pursuant to a deed in lieu thereof shall be bound to Tenant for the Term, the rights of Tenant hereunder shall expressly survive, and this Lease shall in all respects continue in full force; and (iii) Tenant shall not be named as a party defendant in any such foreclosure suit, except as may be required by applicable law and (iv) Landlord shall cause Lender to execute a non-disturbance agreement for the benefit of Tenant upon such terms that are reasonably acceptable to Tenant and such Lender and any subordination hereunder shall only become effective after the Lender has executed and delivered such agreement in favor of Tenant. Upon request by Landlord, Tenant shall execute a subordination, non-disturbance, and attornment agreement for the benefit of any Lender upon such terms that are reasonably acceptable to Tenant and such Lender and are not inconsistent with this Section 10.3.

10.4    Tenant Financing.

(a)    Personal Property.    Notwithstanding anything herein to the contrary, Tenant may grant liens upon and security interests in Tenant's Trade Fixtures and Equipment. Accordingly, Landlord waives its landlord's lien (whether statutory or common law) upon the Trade Fixtures and Equipment. Landlord shall execute any commercially reasonable agreement,

consent, waiver or other instrument requested by Tenant or any lienholder which may be required in connection with such waiver.

      (b)   Leasehold Mortgages. Anything herein to the contrary notwithstanding, Tenant may grant leasehold mortgages upon its leasehold estate. Landlord shall execute any commercially reasonable consent, estoppel certificate, recognition agreement or similar agreement requested by Tenant's leasehold mortgagee in order to evidence Landlord's consent, which agreement shall include provisions (i) granting notice and cure rights to such leasehold mortgagee with respect to Tenant defaults hereunder, and (ii) granting succession rights to such leasehold mortgagee pursuant to which Landlord shall agree that upon any termination of this Lease after an Event of Default, Landlord shall upon request by the leasehold mortgagee enter into a new lease agreement, in form and content substantially identical to this Lease (including all financial covenants), with Tenant's leasehold mortgagee for the balance of the unexpired Term, including renewal options, provided that Tenant's leasehold mortgagee: (A) has cured all defaults under the Lease which can be cured by the payment of money (excepting any amount payable as a result of acceleration of rent by Landlord) (B) makes such request within 30 days of such termination (C) will cause the Premises to be operated as a Permitted Use and (D) pays all of Landlord's reasonable attorney's fees in connection with such new lease.

      10.5   Easements. During the Term, except as may otherwise be expressly provided for herein, Landlord shall not grant, convey, or enter into any easement or other interest in the Premises or enter into any restriction relating to the Premises, without procuring Tenant's prior written consent, such consent not to be unreasonably withheld. Upon request by Tenant, Landlord shall grant, convey, and enter into any easement affecting the Premises, provided that any such easements do not materially and adversely affect the Premises or impose any personal liability on Landlord (unless Tenant agrees to indemnify Landlord for such liability). Landlord shall, at no cost to Landlord, promptly execute such documents as may be reasonably required in connection with Tenant's granting of any such easements, and shall otherwise reasonably cooperate with Tenant in connection therewith, but Landlord shall incur no cost or expense in connection with such cooperation unless Tenant agrees to reimburse Landlord for such amount.

## Article 11

## LIENS

      11.1   Mechanic's and Other Liens. At all times during the Term, Tenant shall indemnify, defend, and hold Landlord harmless from and against all liens and claims of liens for labor, services, materials, supplies, or equipment ("**Mechanic's Liens**"), performed on or furnished to the Premises at the direction or order of Tenant and for which Tenant is financially liable. For avoidance of doubt, Tenant is not financially liable for those infrastructure and building improvements set forth in that certain Real Estate Purchase Contract and Receipt for Deposit and Joint Escrow Instructions between First Step Plus, LLC and Michael Ricatto, dated September 7, 2017. Should any Mechanic's Lien or other lien, charge, or encumbrance of any kind be recorded against the Premises by reason of Tenant's acts or omissions because of a claim against Tenant, Tenant shall cause the same to be cancelled or discharged of record by bond or otherwise within twenty-five (25) days after notice to Tenant by Landlord.

11.2 <u>Landlord's Rights and Tenant's Right to Contest</u>. If Tenant shall fail to cancel or discharge said lien or liens within the time provided pursuant to <u>Section 11.1</u>, then Landlord may, at its sole option, cancel or discharge the same, and upon Landlord's demand, Tenant shall promptly reimburse Landlord for its reasonable, out-of-pocket costs incurred as a result of such failure. Tenant may contest any claim secured by any lien so long as: (i) it discharges the lien from the Premises in accordance with <u>Section 11.1</u> and (ii) the contest is conducted diligently, in compliance with applicable laws, and by proceedings sufficient to prevent enforcement of the matter under contest against Landlord or the Premises.

### Article 12

### DEFAULT

12.1 <u>Event of Default</u>. The occurrence of any of the following shall constitute an "**Event of Default**" hereunder:

(a) Tenant shall fail to pay when due any installment of Rent or Additional Rent or any other obligation under this Lease involving the payment of money and such failure shall continue unremedied for a period of five (5) days after Landlord gives Tenant notice of such failure (provided that Landlord shall not be obligated to deliver notice to Tenant pursuant to this <u>Section 12.1(a)</u> more than two (2) times in any calendar year, and any subsequent failure by Tenant to pay any sum described in this <u>Section 12.1(a)</u> within five (5) days of its due date shall constitute an immediate Event of Default).

(b) Tenant shall fail to maintain the insurance required to be maintained under <u>Section 6.1</u> or shall breach its obligations under <u>Section 11.1</u>.

(c) Tenant shall fail to comply with any provision of this Lease, other than as described in subsection (a) or (b) above, and shall not cure such failure within thirty (30) days after notice thereof from Landlord, except that if the failure is not reasonably capable of cure within said 30-day period and Tenant promptly commences efforts to cure such failure, an Event of Default shall not exist so long as Tenant diligently prosecutes such efforts to completion.

(d) Tenant shall make a transfer in fraud of creditors or shall make an assignment for the benefit of creditors.

(e) Tenant shall file a petition under the federal Bankruptcy Code, as amended, or under any similar law or statute of the United States or any state thereof, or Tenant shall be the subject of proceedings filed against Tenant under any such laws by any person other than Landlord, and such proceedings are not discharged within ninety (90) days after commencement.

(f) A receiver or trustee shall be appointed for the Premises or for all or substantially all of the assets of Tenant by any person other than Landlord and such receiver or trustee is not discharged within ninety (90) days following the date of appointment.

(g)     Tenant fails to cure a default under Section 1.8 herein, within thirty (30) days after notice thereof from Landlord, except that if the failure is not reasonably capable of cure within said 30-day period and Tenant promptly commences efforts to cure such failure, an Event of Default shall not exist so long as Tenant diligently prosecutes such efforts to completion.

12.2    Remedies for Tenant's Default.

(a)     Upon the occurrence and continuance of an Event of Default, Landlord shall continue this Lease in effect and recover Rent and Additional Rent as it becomes due pursuant to Section 1951.4 of the California Civil Code. To clarify, the occurrence and continuance of an Event of Default shall not alone cause termination of this Agreement.

(b)     Mention in this Lease of any particular remedy shall not preclude Landlord from any other remedy at law or in equity, including, without limitation, the right of injunction.

12.3    Landlord's Default and Tenant's Remedies. Landlord shall be in default of this Lease if: (i) in the case of a default which can be cured by payment of money, such default continues for fifteen (15) days after notice to Landlord without cure or (ii) in the case of a default which cannot be cured by payment of money, it continues either for thirty (30) days after notice, or such longer time is reasonably necessary so long as Landlord initiates such cure within the aforementioned thirty (30) day period and thereafter prosecutes such cure to completion in a reasonable amount of time and provided the Premises remains suitable for Tenant's then current use or otherwise does not materially impair Tenant's profitability. In the event of a Landlord default that remains uncured after the applicable cure period, Tenant will have recourse to all legal and equitable remedies then available to Tenant including but not limited to the termination of the Lease, such as to cause the Warrant to no longer be exercisable.

12.5    Mitigation. If there is a default by one party which continues beyond applicable notice and cure periods, the non-defaulting party shall use commercially reasonable efforts to mitigate its damages.

12.6    Right to Perform. Except as otherwise expressly provided in this Lease, if Tenant shall fail to perform any of Tenant's obligations under this Lease following receipt by Tenant of Landlord's written notice of default, and after the expiration of all applicable cure periods, and if such default is capable of being cured by Landlord, then Landlord, without thereby waiving the default, and in addition to any other right or remedy of Landlord, may perform the same at the expense of Tenant, in which event Tenant shall pay to Landlord the reasonable, out-of-pocket expenses incurred by Landlord in connection with the performance thereof, together with interest at the Default Rate from the date incurred by Landlord until paid by Tenant. Such sum shall be due within thirty (30) days after receipt by Tenant of a statement (including reasonable evidence thereof) of the amount of such expenses.

## Article 13

## EXPANSION OPTION

13.1    Expansion Option and Premises.  For good and valuable consideration in the amount of $100.00, provided that Tenant is not than in default of this Lease or in the Credit Line between Tenant and Landlord's principal entered into of even date herewith, Tenant shall have the option to expand the Premises (the "**Expansion Option**") to include, subject to the Permitted Encumbrances, the land described on **Exhibit F** attached hereto and incorporated herein by this reference (the "**Expansion Land**"), together with the infrastructure improvements thereon as required under the Real Estate Purchase Contract (collectively, the "**Expansion Improvements**") and all easements and other rights appurtenant thereto, upon provision of five (5) business days' notice to Landlord of Tenant's election to exercise the Expansion Option anytime between the Commencement Date and the second anniversary of the Commencement Date.  The Expansion Land, the Expansion Improvements, and the rights appurtenant thereto are collectively called the "**Expansion Premises**", and unless the context indicates otherwise, any references to the Premises shall also include the Expansion Premises.

13.2    Expansion Rent.  Should Tenant exercise the Expansion Option, beginning on the Rent Commencement Date (or date that Tenant exercised the Expansion Option if Tenant exercises the Expansion Option after the Rent Commencement Date), Tenant shall pay to Landlord as fixed monthly Rent for the Expansion Premises an amount equal to the Expansion Rent due in advance on or before the first (1st) day of each calendar month of the Term and payable by Tenant to Landlord in lawful money of the United States of America at the address of Landlord set forth in Section 15.7 below or at such other address as may be designated by Landlord from time to time. "**Expansion Rent**" shall mean an amount of monthly rent equal to amount mutually agreed upon by the parties; provided, however, that if the parties are unable to reach an agreement within fifteen (15) days of Tenant's exercise of the Expansion Option, Expansion Rent shall be an amount of monthly rent equal to the fair market value of monthly rent for the Expansion Premises as determined by two reputable independent appraisers, one of which being chosen by Landlord and one of which being chosen by Tenant.  However, if such appraisers' valuations differ by an amount greater than ten percent (10%) of the lower appraised value, the two independent appraisers originally appointed by Landlord and Tenant shall mutually appoint a third reputable independent appraiser to determine Expansion Rent and Expansion Rent shall be equal to (i) the amount of such third appraisal, if the amount of such third appraisal falls between the first two appraisals, or (ii) the average of the amount of the third appraisal and the amount of the original appraisal closest to the amount of the third appraisal.  In connection with any determination of Expansion Rent pursuant to this Section 13.2, time will be of the essence, and the parties requesting such valuations shall use commercially reasonable efforts to obtain such valuations at the earliest practicable date, and the determination of Expansion Rent pursuant to this this Section 13.2 shall be conclusive and binding on the parties hereto and their respective heirs, successors and assigns.

13.3    Expansion Premises Subletting and Assignment.  Notwithstanding Section 10.1 above of this Lease, Tenant may assign this Lease or sublet the Expansion Premises in whole or in part without Landlord's prior written consent to any person, so long as Tenant complies with and satisfies the requirements contained in Article 10 of this Lease.

## Article 14

### EXPANSION PREMISES PURCHASE OPTION

14.1    Expansion Premises Purchase Option.  Provided that Tenant is not than in default of this Lease or in the Credit Line between Tenant and Landlord's principal entered into of even date herewith, Tenant shall have the option to purchase the Expansion Premises for the sum of $1,600,000.00 ("Expansion Purchase Option") at any time (i) after Tenant has accumulated **"Retained Surplus"**, in an amount equal to or greater than $3,600,000.00 and (ii) prior to the second anniversary of the Commencement Date, upon provision of five (5) business days' notice to Landlord of Tenant's election to exercise the Expansion Purchase Option.  Closing of such purchase shall take place on or before the thirtieth (30th) day after Tenant gives notice of exercise to Landlord.  Landlord shall convey by grant deed, and Tenant shall accept, fee simple title to the Premises free and clear of all mortgages, security interests, claims, liens, restrictions, and other encumbrances other than the Permitted Exceptions and any encumbrances created or caused by Tenant or created by Landlord with Tenant's written consent.  Tenant shall pay all transfer taxes, title insurance premiums, escrow charges, and recording fees arising from the closing of such sale. Each party shall be responsible for its own legal fees arising from such sale.

## Article 15

### RICATTO'S EXERCISE OF RIGHTS UNDER WARRANT

15.1    Ricatto's Rights and Obligations under the Warrant.  Subject to the terms and conditions of the Warrant, Ricatto shall have either the right or the obligation to transfer or cause to be transferred Landlord's ownership interest in the Premises to Tenant.

## Article 16

### MISCELLANEOUS

16.1    No Partnership. Nothing contained herein or in any instrument relating hereto shall be construed as creating a partnership or joint venture between Landlord and Tenant or between Landlord and any other party, or cause Landlord to be responsible in any way for debts or obligations of Tenant or any other party.

16.2    Time of the Essence.  Time is expressly declared to be of the essence of this Lease.

16.3    Lease Construed as a Whole.    The language in all parts of this Lease shall in all cases be construed as a whole according to its fair meaning and neither strictly for nor against Landlord or Tenant.

16.4     <u>Severability.</u>  If any provision of this Lease (other than those relating to payment of Rent and Additional Rent) or the application thereof to any person or circumstances shall to any extent be invalid or unenforceable, the remainder of this Lease, or the application of such provision to persons or circumstances other than those as to which it is invalid or unenforceable, shall not be affected thereby, and each provision of this Lease shall be valid and be enforced to the fullest extent permitted by law.

16.5     <u>Survival.</u>  Each provision of this Lease which may require the payment of money or the performance of obligations by Tenant after the expiration of the Term hereof or its earlier termination shall survive such expiration or earlier termination.  In addition, all indemnity obligations of Landlord and Tenant under this Lease arising during the Term of this Lease shall survive the termination of this Lease.

16.6     <u>Amendment.</u>  This Lease may be amended only in writing, signed by both Landlord and Tenant.

16.7     <u>Notices.</u>  Any notice to be given or to be served upon any party hereto in connection with this Lease must be in writing, and may be given by a party or its attorney by (i) express mail with proof of delivery; (ii) personal delivery of written notice; or (iii) electronic mail with read receipt.  Any such notice shall be deemed to have been given when delivered to and received by the party to whom it is addressed.  Such notices shall be given to the parties at the following addresses or to such other address as a party may from time to time designate by written notice to the other party:

|                |                                         |
|----------------|-----------------------------------------|
| Landlord:      | Mr. Michael Ricatto                     |
|                | 82-28 Abingdon Road                     |
|                | Kew Gardens, NY 11415                   |
|                | Email: michael@ricatto.com              |
|                |                                         |
|                | Daniel Seidenstein                      |
|                | JAN IRA GELLIS, P.C.                    |
|                | 137 Fifth Avenue                        |
|                | New York, New York 10010                |
|                | Telephone: (212) 460 5757               |
|                | Fax: (212) 409 8453                     |
|                | Email: danseidenstein@gelmel.com        |
|                |                                         |
| Tenant:        | M3 Innovations Unlimited, Inc.          |
|                | Attn: Mike Zachara                      |
|                | 4 Edgewood Dr.                          |
|                | Summit, NJ 07901                        |
|                |                                         |
|                | Green Wise Consulting                   |
|                | Attn: Pamela N. Epstein, Esq.           |
|                | 710 N. El Centro Ave., Unit 111         |
|                | Los Angeles, CA 90038                   |

16.8   Attorneys' Fees. In any proceeding or controversy associated with or arising out of this Lease or a claimed or actual breach thereof, or in any proceeding to recover the possession of the Premises, or in any bankruptcy proceeding or appeal involving this Lease or the Premises, the prevailing party shall be entitled to recover from the other party all costs and reasonable attorneys' fees incurred in connection with such matter; provided, however, that if prior to commencement of a trial, the non-prevailing party offered to pay an amount equal to or in excess of such judgment (determined without reference to costs and attorneys' fees), then the prevailing party shall not be entitled to any award of costs or attorneys' fees associated with such legal action.

16.9   Governing Law. This Lease shall be construed according to and governed by the internal laws (without regard to conflict of laws principles) of the State.

16.10   Exhibits and Schedule. The Exhibits and Schedule hereto are hereby incorporated by reference herewith.

16.11   Successors and Assigns. All of the provisions of this Lease shall inure to and be binding upon the Landlord and Tenant and their respective successors and assigns.

16.12   Entire Agreement. Except for the Warrant and that certain Real Estate Purchase Contract and Receipt for Deposit and Joint Escrow Instructions between First Step Plus, LLC and Michael Ricatto dated September 7, 2017, this Lease contains the final and complete expression of the parties relating in any manner to the leasing, use and occupancy of the Premises and other matters set forth in this Lease. No prior agreements or understanding pertaining to the same shall be valid or of any force. This Lease shall not be modified except in a writing signed by Landlord and Tenant.

16.13   No Waiver Implied. No waiver of any default hereunder shall be implied from any omission by either party to take any action on account of such default if such default persists or is repeated and no express waiver shall affect any default other than the default specified in the express waiver and then only for the time and to the extent therein stated. The acceptance by Landlord of Rent with knowledge of the breach of any of the covenants of this Lease by Tenant shall not be deemed a waiver of any such breach. One or more waivers of any breach of any provision of this Lease shall not be construed as a waiver of any subsequent breach of the same provision. The consent, by Landlord or Tenant, as the case may be, to any act by the other party requiring consent shall not be deemed to waive or render unnecessary Landlord's or Tenant's consent, as the case may be, to any subsequent similar acts by the other party.

16.14   Limited Liability. The liability of Landlord to Tenant for any default by Landlord under the terms of this Lease shall be limited to the interest of Landlord in the Premises, including rents, profits, and insurance, condemnation and sales proceeds therefrom; and Landlord shall not be liable for any deficiency. In no event shall Landlord or any partner, member or shareholder of Landlord be personally liable for any of the obligations of Landlord hereunder. In no event shall Tenant or any partner, member or shareholder of Tenant be personally liable for any of the obligations of Tenant hereunder.

16.15   Holding Over.  If Tenant remains in possession of the Premises after the expiration of this Lease and without the execution of a new Lease, Tenant shall be deemed to be occupying the Premises as a tenant from month to month at a monthly rent equal to 150% of the Rent payable during the last full calendar month of the Term, and otherwise subject to all the provisions of this Lease insofar as the same are applicable to a month-to-month tenancy.  Nothing contained in this Section 15.16, or this Lease shall be construed as a grant of Landlord's permission for Tenant to remain in possession of the Premises after the expiration of this Lease without the execution of a new Lease.

16.16   Memorandum of Lease.  A memorandum of this Lease shall be executed by Landlord and Tenant and recorded in the official records of the county where the Premises are located.  All recording fees and taxes with respect to such memorandum shall be borne by Tenant.

16.17   Travel and Inspection.  Subject to the provisions of this Section 16.17, Tenant shall reimburse Landlord's representative for monthly economy class travel costs from New York City to the Premises, for purposes of inspecting at any time prior to the earlier of (i) the third anniversary of the Effective Date; or (ii) the date Landlord exercises its rights under the Warrant. Notwithstanding the foregoing, Tenant shall not be responsible for reimbursing Landlord's representative for any amounts exceeding $1,500 per month.

16.18   Landlord Representative.   Tenant shall employ a representative selected by Landlord ("Landlord's Representative") at a rate of $22.50 an hour for a minimum of 40 hours per week.  Landlord's Representative shall be subject to all of Tenant's employment rules and codes of conduct.

**[Signature page follows]**

## SIGNATURE PAGE TO NET LEASE

**IN WITNESS WHEREOF,** Landlord and Tenant have caused this Lease to be executed and delivered, effective as of the Effective Date.

**LANDLORD:**

GOLDEN STATE LION LLC, a California limited liability company

_____

**TENANT:**

M3 INNOVATIONS UNLIMITED, INC., a Delaware corporation

By: _____ Kyle Kietrys, CEO

## SIGNATURE PAGE TO NET LEASE

**IN WITNESS WHEREOF,** Landlord and Tenant have caused this Lease to be executed and delivered, effective as of the Effective Date.

**LANDLORD:**

GOLDEN STATE LION LLC, a California limited liability company

**TENANT:**

M3 INNOVATIONS UNLIMITED, INC., a Delaware corporation

By: Kyle Kietrys, CEO

"**Additional Rent**" is defined in Section 2.3.

"**Affiliate**" shall mean any entity which a party to this agreement controls or which controls a party or is under common control with a party, where "control" means an ownership interest in excess of 50%. Affiliates of Tenant shall also include unrelated entities operating on the Premises, including but not limited to M3 Biodynamics, Inc. and M3 Elixirs, Inc.

"**Alteration**" is defined in Section 4.2.

"**Casualty**" is defined in Section 5.1.

"**Claims**" means causes of action, claims, damages, demands, losses, judgments, liabilities and expenses (including reasonable attorneys' fees and costs).

"**Commencement Date**" is defined in the opening paragraph of this Lease.

"**Default Rate**" is defined in Section 2.4.

"**Enforceable Law**" is defined in Section 1.2.

"**Environmental Laws**" means all federal, state, local, or municipal laws, rules, orders, regulations, statutes, ordinances, codes, decrees, or requirements of any government authority regulating, relating to, or imposing liability or standards of conduct concerning air, soil or water pollution, or occupational or environmental conditions on, under, or about the Premises, as now in effect, including without limitation, the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA) and the Superfund Amendments and Reauthorization Act of 1986 (SARA) [42 U.S.C.A. §§ 9601 et seq.]; the Resource Conservation and Recovery Act of 1976 (RCRA) and the Solid Waste Disposal Act [42 U.S.C.A. §§ 6901 et seq.]; the Clean Water Act, also known as the Federal Water Pollution Control Act (FWPCA) [33 U.S.C.A. §§ 1251 et seq.]; the Toxic Substances Control Act (TSCA) [15 U.S.C.A. §§ 2601 et seq.]; the Hazardous Materials Transportation Authorization Act (HMTA) [49 U.S.C.A. §§ 5101 et seq.]; the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA) [7 U.S.C.A. §§ 136 et seq.]; the Clean Air Act (CAA) [42 U.S.C.A. §§ 7401 et seq.]; the Safe Drinking Water Act (SDWA) [42 U.S.C.A. §§ 300f et seq.]; the Surface Mining Control and Reclamation Act of 1977 (SMCRA) [30 U.S.C.A. §§ 1201 et seq.]; and the Emergency Planning and Community Right-to-Know Act of 1986 (EPCRA or EPCRTKA) [42 U.S.C.A. §§ 11001 et seq.]; the California laws regarding the underground storage of hazardous substances [Health & Saf. Code, §§ 25280 et seq.]; the Hazardous Substance Account Act [Health & Saf. Code, §§ 25300 et seq.]; the California laws regarding hazardous waste control [Health & Saf. Code, §§ 25100 et seq.]; the Safe Drinking Water and Toxic Enforcement Act of 1986 [Health & Saf. Code, §§ 25249.5 et seq.]; and the Porter-Cologne Water Quality Control Act [Wat. Code, §§ 13000 et seq.].

"**Event of Default**" is defined in Section 12.1.

**"Full Replacement Cost"** means the actual replacement cost of the Improvements, exclusive of costs of excavations, foundations, underground utilities and footings, with a waiver of depreciation.

**"Hazardous Materials"** means: (a) Those substances included within the definitions of "hazardous substance," "hazardous waste," "hazardous material," "toxic substance," "solid waste," or "pollutant or contaminant" in CERCLA, RCRA, TSCA, HMTA, or under any other Environmental Law; (b) Those substances listed in the United States Department of Transportation (DOT) Table [49 C.F.R. 172.101], or by the Environmental Protection Agency (EPA), or any successor agency, as hazardous substances [40 C.F.R. Part 302]; (c) Other substances, materials, and wastes that are or become regulated or classified as hazardous or toxic under federal, state, or local laws or regulations; and (d) Any material, waste, or substance that is: (i) a petroleum or refined petroleum product (ii) asbestos (iii) polychlorinated biphenyl (iv) designated as a hazardous substance pursuant to 33 U.S.C.A. § 1321 or listed pursuant to 33 U.S.C.A. § 1317 (v) a flammable explosive, or (vi) a radioactive material.

**"Impositions"** is defined in Section 3.2.

**"Improvements"** is defined in Section 1.1.

**"Intellectual Property"** means any domestic letter patent, patent, patent application, patent license, software or know-how license, trade name, common law or other trademark, service mark, license of trademark, trade name and/or service mark, trademark registration and application, service mark registration and application, copyright registration and application, or trade secret.

**"Land"** is defined in Section 1.1.

**"Landlord"** is defined in the opening paragraph of this Lease.

**"Lease"** is defined in the opening paragraph of this Lease.

**"Loan"** means the loan secured by the Mortgage.

**"Loan Documents"** means the Mortgage and all other documents securing or governing the Loan.

**"Major Alteration"** is defined in Section 4.2.

**"Market Capitalization Rate"** is defined in Exhibit E.

**"Mechanic's Liens"** is defined in Section 11.1.

**"Net Award"** is defined in Section 7.3(b).

**"Net Insurance Proceeds"** is defined in Section 5.2.

**"Permitted Encumbrances"** means any easement, declaration, covenant, condition, restriction, lien or other agreement (other than the Mortgage or the Loan Documents) encumbering title to the

Premises as of the Commencement Date or entered into after the Commencement Date by Tenant or with Tenant's consent.

"**Permitted Use**" is defined in Section 1.2.

"**Premises**" is defined in Section 1.1.

"**Rent**" is defined in Section 2.1.

"**Restoration**" means repair or reconstruction of the damaged Improvements and Premises, to the extent practicable, to substantially the condition such Improvements and Premises were in immediately before any Casualty or Taking.

"**Retained Surplus**" shall mean the retained earnings after payments to investors according to payout schedule and all business expenses, and debt service.
"**State**" is defined in Section 1.1.

"**Taking**" is defined in Section 7.1.

"**Tenant**" is defined in the opening paragraph of this Lease.

"**Term**" is defined in Section 1.3.

"**Trade Fixtures and Equipment**" is defined in Section 4.3.

**EXHIBIT A**

**REAL ESTATE PURCHASE CONTRACT AND RECEIPT FOR DEPOSIT AND JOINT
ESCROW INSTRUCTIONS**

**[Page intentionally left blank]**

**EXHIBIT B**

**WARRANT**

**[Page intentionally left blank]**

Exhibit B to Net Lease between Michael Ricatto and M3 Innovations Unlimited, Inc.

## EXHIBIT C

### LEGAL DESCRIPTION

PARCEL MAP 19782 PARCEL 1 BOOK 248 PAGE 73

APN: 3129-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

*KTK*

## FORM OF TENANT ESTOPPEL CERTIFICATE

TO:

RE:     Net Lease (the "**Lease**") dated October ____, 2017, between Michael Ricatto, an individual, or his assignee ("**Landlord**"), as Landlord, and the undersigned ("**Tenant**"), as Tenant, covering the premises legally described as _____ (the "**Premises**").
All terms not otherwise defined herein shall have the meaning given in the Lease.

The undersigned, as Tenant, does hereby certify the following:

1.      The Lease is in full force and effect.

2.      Except as set forth above, there are no amendments to the Lease.

3.      The commencement date of the Lease is _____ ____, 20___ and the expiration date is _____ ____, 20___.

4.      Tenant has not sublet the Premises and has not assigned, transferred or hypothecated any of its rights or interests under the Lease, except for _____.

5.      All rents and other charges required to be paid under the Lease by Tenant have been paid through _____.

6.      There exists at this time no charges, liens, claims, or offsets against rent due under the Lease.

7.      The current fixed monthly rent due under the Lease is $_____.00. No advance rental has been made under the Lease, and there is no security deposit.

8.      As of the date hereof, there are not any existing defaults in the performance of Tenant's obligations under the Lease and to Tenant's knowledge, there are not any existing defaults under the Lease by Landlord in the performance of its obligations.

9.      Tenant has options or rights of first refusal to purchase the Premises, or part thereof, or all or any part of the real property of which the Premises are a part.

10.     To Tenant's knowledge, there are no pending condemnations against the Premises.

11. Tenant has taken all necessary corporate action to authorize the execution of this Tenant Estoppel Certificate, and the persons who executed this Tenant Estoppel Certificate on behalf of Tenant were duly authorized to do so.


DATED as of _____


By:_____

## EXHIBIT E

### Determination of Market Capitalization Rate

(a)     The term **"Market Capitalization Rate"** means the market capitalization rate of the Premises as determined under this Exhibit E.

(b)     If there is a partial Taking and a portion of the Net Award remains after completion of Restoration, then within 30 days after completion of Restoration, Landlord shall provide Tenant with a written statement setting forth Landlord's estimate of the then applicable market capitalization rate of the Premises. Tenant shall have twenty (20) days after receipt of Landlord's estimate to either accept or reject it written notice to Landlord, with Tenant's failure to timely respond being deemed an acceptance. Any rejection shall include Tenant's estimate of the market capitalization rate. If Tenant accepts, or is deemed to have accepted, Landlord's estimate, then Landlord's estimate shall be deemed to be the Market Capitalization Rate and the remaining Net Award shall apportioned using such Market Capitalization Rate in accordance with the apportionment formula set forth in Section 7.3(b) of the Lease. If Tenant timely rejects Landlord's estimate, then the matter shall automatically become subject to binding arbitration as follows:

(i)     Within fourteen (14) days after Tenant's timely delivery to Landlord of Tenant's written objection to Landlord's estimate, Landlord and Tenant shall each select a real estate broker licensed in the State, having no ongoing relationship with either Landlord or Tenant, and who shall be neutral and unbiased, as arbitrator. Each arbitrator shall have had at least seven (7) years' experience within the previous ten (10) years as a real estate broker specializing in similarly situated commercial buildings within a fifty (50) mile radius of the Premises, with working knowledge of current rental rates and practices in such market.

(ii)     Upon selection, Landlord's and Tenant's arbitrators shall work together in good faith to agree upon the market capitalization rate for the Premises. The rate chosen by such arbitrators shall be binding on both Landlord and Tenant, and shall be the Market Capitalization Rate to be used in apportioning the remaining Net Award. If either Landlord or Tenant fails to appoint an arbitrator within the fourteen (14) day period referred to above, the arbitrator appointed by the other party shall be the sole arbitrator for the purposes hereof. If the two arbitrators cannot agree upon the market capitalization rate within twenty (20) days after their appointment, then, within ten (10) days after the expiration of such twenty (20) day period, the two arbitrators shall select a third arbitrator meeting the aforementioned criteria.  Once the third arbitrator has been selected as provided for above, then, as soon thereafter as practicable but in any case within fourteen (14) days, the third arbitrator shall make his or her determination of which of the two estimates (by Landlord and by Tenant) most closely reflects the market capitalization rate for the Premises, and the rate set forth in the estimate selected by such third arbitrator shall be binding on both Landlord and Tenant, and shall be used in apportioning the remaining Net Award using the apportionment formula set forth in Section 7.3(b) of the Lease. The non-prevailing party shall pay for the costs and fees of any arbitrator and counsel engaged by the prevailing party in connection with such arbitration.

## EXPANSION PREMISES LEGAL DESCRIPTION

PARCEL MAP 19782 PARCEL 6 BOOK 248 PAGE 73

APN: 3129-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

KTIC