# Exhibit A

**REAL ESTATE PURCHASE CONTRACT AND RECEIPT FOR DEPOSIT AND JOINT ESCROW INSTRUCTIONS**

This REAL ESTATE PURCHASE CONTRACT AND RECEIPT FOR DEPOSIT AND JOINT ESCROW INSTRUCTIONS (the "Agreement") is made and entered into this 7th day of September, 2017, by and between First Step Plus, LLC, a Nevada limited liability Company ("Seller"), and Michael Ricatto or his designated entity ("Buyer"). Buyer and Seller are sometimes referred to herein individually as a "Party" and collectively as the "Parties."

**Recitals**

A.  Seller is the former owner of a 7.2 acre parcel of land (formerly Assessor Parcel Number 3129-251-33) located in Industrial Park III of the City of Adelanto and zoned industrial and light manufacturing by the City of Adelanto (the "Property"). The Property was subdivided into six parcels of land pursuant to Parcel Map 19782 recorded on 7/12/2017 in Book 248 Pages 73 & 74. The legal description and assessor parcel number for each parcel is as follows:

(i)     Parcel 1 APN 3129-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 : Legal Description PARCEL MAP 19782 PARCEL 1 BOOK 248 PAGE 73
(ii)    Parcel 2 APN 3129-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 : Legal Description PARCEL MAP 19782 PARCEL 2 BOOK 248 PAGE 73
(iii)   Parcel 3 APN 3129-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:  Legal Description PARCEL MAP 19782 PARCEL 3 BOOK 248 PAGE 73
(iv)    Parcel 4 APN 3129-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:  Legal Description PARCEL MAP 19782 PARCEL 4 BOOK 248 PAGE 73
(v)     Parcel 5 APN 3129-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 : Legal Description PARCEL MAP 19782 PARCEL 5 BOOK 248 PAGE 73
(vi)    Parcel 6 APN 3129-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:   Legal Description PARCEL MAP 19782 PARCEL 6 BOOK 248 PAGE 73

B.  Each Lot within the Overall Property is depicted in the Site Plan for the Overall Property attached hereto as *Exhibit A*. Collectively, the Lots are referred to as the "Overall Property."

C.  Buyer wishes to purchase Parcel 1 and Parcel 6 from Seller (the "Purchased Lots") subject to the terms and conditions of this Agreement.

D.  Seller is agreeable to selling the Purchased Lots to Buyer subject to the terms and conditions of this Agreement.

NOW, THEREFORE, in consideration of the foregoing recitals, the promises and covenants of the Parties in this Agreement, and other good and valuable consideration, the receipt and sufficiency of which the Parties acknowledge, the Parties agree as follows:

**AGREEMENT**

**Section 1. Definitions and Incorporation by Reference**

The "Recitals" set forth above and all Exhibits attached to this Contract are incorporated into this Contract.

**Section 2. Purchase and Sale**

A.  **Purchase Price for Purchased Lots with Infrastructure Improvements**: The purchase price for Purchased Lots is $3,165,836.00 (the "Purchase Price"). The Purchase Price shall be paid by Buyer as follows:

1

(a) **Buyer's Initial Deposit**. On September 8, 2017, Buyer will deposit the sum of $200,000.00 in Current Funds with Chicago Title and Escrow located at 560 E Hospitality Ln Ste 100, San Bernardino, CA 92408 (the "Escrow Agent").

(b) **Escrow Fees in the Event of Termination**. In the event (i) Buyer terminates this Agreement pursuant to the provisions of Sections 6 or Section 9 of this Agreement or (ii) Seller terminates this Agreement pursuant to the provisions of Section 2.A.(d) of this Agreement, Buyer shall be responsible for all fees and charges owed by Buyer and Seller to Escrow Agent.

(c) **Return of Buyer's Initial Deposit**. In the event (i) Buyer terminates pursuant to Section 6 or Section 9 of this Agreement, or (ii) Seller terminates pursuant to Section 2.A.d. of this Agreement, Escrow Agent shall return the Initial Deposit to Buyer less any fees or charges owed to Escrow Agent pursuant to Section 2A(b) of this Agreement.

(d) **Termination by Seller for Buyer's Failure to Make the Initial Deposit**: In the event Buyer fails to make the Initial Deposit under Section 2.A.(a). of this Agreement, this Agreement shall automatically terminate and be of no further form, force or effect, other than Buyer's obligation under Section 2.B.(b) of this Agreement, and the Parties shall be released from their obligations with respect to this Agreement.

(e) **Buyer's Initial Deposit Shall be Applied to the Purchase Price**. Buyer's Initial Deposit will be applied against the Purchase Price in the event the transaction contemplated by this Agreement closes as hereinafter set forth.

(f) **Balance of Purchase Price**. The balance of the Purchase Price is $2,965,836.00, and will be paid in Current Funds, and deposited by Buyer with Escrow Agent at least one (1) Business Day prior to the date scheduled for the Close of Escrow or earlier in the discretion of Buyer.

## Section 3. Effective Date

This Agreement shall become effective on September 7, 2017 (the "Effective Date").

## Section 4. Closing

A. The Close of escrow shall occur on or before September 18, 2017

B. The Close of Escrow will be evidenced by (i) payment in Cash or Current Funds to Seller of the balance of the Purchase Price required to be paid pursuant to Sections 2.A.f. of this Agreement, and (ii) delivery of the closing documents referenced in Section 5 of this Agreement.

C. Upon closing of this transaction, Buyer shall have the right to possession of the Purchased Lots subject to Seller's covenant with Buyer to perform and complete the Infrastructure Improvements and Building Improvements described in Exhibits B and C in accordance with the provisions of Section 16. herein.

## Section 5. Deliveries at Closing

A. **Deliveries by Buyer**. On or before the Closing Date, Buyer shall deliver to Escrow Agent the following:

(i) Proof of Buyer's authority and authorization to enter into this Contract, and such proof of the power and authority of the individuals signing this Contract on behalf of Buyer to act for and bind Buyer, as may reasonably be required by Seller.

B. **Deliveries by Seller**. On or before the Closing Date, Seller will deliver to Escrow Agent the following:

2

(i) A duly executed and acknowledged Grant Deed for each of the following lots: Parcel 1 and Parcel 6.

(ii) Proof of Seller's authority and authorization to enter into this Agreement, and such proof of the power and authority of the individuals signing this Agreement on behalf of Seller to act for and bind Seller, as may reasonably be required by Buyer.

(iii) A duly executed FIRPTA (Foreign Investment in Real Property Tax Act) Affidavit indicating that Seller is not a foreign person.

## Section 6. Title

A.  **Monetary Liens**. Notwithstanding anything else in this Contract, Seller agrees to remove all Monetary Liens from the Purchased Lots at its sole cost prior to Closing. Seller shall not have any obligation to remove any exceptions to title except for Monetary Liens, unless Seller so elects as provided herein. Buyer will have three (3) business days after receipt of the preliminary title report from Escrow Agent to review and approve or disapprove the preliminary report or commitment for issuance of the Title Policy for the Purchased Lots by giving written notice delivered to Seller on or before expiration of the three (3) business day period (the "Title Objection Notice"). If Buyer reasonably determines that any matters indicated as exceptions in such Title Report (other than Monetary Liens that Seller has already agreed to remove and the standard printed exclusions or exceptions) materially impair Buyer's contemplated use of the Purchased Lots or the value of the Purchased Lots, Buyer will be entitled to object to such matter.

B.  **Title Objection Notice.** After receipt of Buyer's Title Objection Notice, if any, Seller will (except with respect to any Monetary Lien) elect in a writing delivered to Buyer to either: (i) eliminate the matters to which Buyer has objected, (ii) cause the Title Company to insure over said matters at Seller's sole cost, or (iii) notify Buyer, in writing, that Seller (in the exercise of its sole discretion) is unable or unwilling to eliminate said matters or cause the Title Company to insure over said matters ("Title Objection Response"). Seller shall provide its Title Objection Response within three (3) business days of receipt of Buyer's Title Objection Notice. Seller's failure to deliver notice to Buyer of Seller's election will be deemed an election of option (iii). If Seller elects option (iii), then Buyer will have until the expiration of two (2) business days after receipt of Seller's Title Objection Response to deliver to Seller written notice of Buyer's election to either terminate this Contract and related Escrow or to waive Buyer's objections and proceed with the contemplated purchase. Buyer's failure to deliver notice to Seller of Buyer's election as specified herein will be deemed an election to waive Buyer's objections.

C.  **Supplements to Title Report**. Escrow Agent will cause any supplement to the Title Report that may be issued from time to time by Title Company with new title exception(s) not previously reviewed by Buyer ("New Exceptions") to be delivered to Buyer and Seller accompanied by legible copies of all such New Exceptions as soon as reasonably possible. Buyer will have five (5) business days from the date of receipt of any such supplemental Title Report(s) in which to disapprove any New Exceptions or title defects listed thereon except for any Monetary Liens, which will be deemed to have been timely disapproved and objected to by Buyer ("Supplemental Objection(s)"). Unless Buyer provides Seller with a Supplemental Objection of any such New Exception or title defect within such three  (3) business day period, the applicable New Exception or title defect shown thereon will be deemed approved, excluding Monetary Liens. In event that Buyer objects to or disapproves any New Exception contained thereon, the same procedure for Title Objection Notice and Title Objection Responses as detailed above will be used by the Parties hereto.

D.  **Title Policy**. Buyer will be issued a California Land Title Association Standard Coverage Policy form policy of title, insuring Buyer in the maximum dollar amount insurable by Chicago Title and Escrow provided said amount does not exceed the amount of the Purchase Price and which shows fee title to the Purchased Lots vested in Buyer subject only to the Permitted Exceptions. The Title Policy will be issued by Chicago Title and Escrow or other nationally recognized title insurer acceptable to Seller. The premium for such Policy, excluding the costs of any endorsements, and any costs for the issuance of the Preliminary Report will be paid by Seller and Buyer in accordance with the provisions of Section 10 of this Agreement. A copy of Seller's Grant Deeds to Buyer and of any other instruments to be reflected in the Title Policy must be submitted to Buyer within a reasonable time-period prior to the Closing Date for Escrow Agent's approval. If Seller fails to deliver title as herein provided or Buyer is not able to obtain the

3

above-specified Buyer's Title Policy, Buyer at its option may terminate this Contract by written notice to Seller.

### Section 7. Taxes and Assessments

Real property taxes and assessments against the Purchased Lots shall be prorated based on the most recent tax statement for the Property as of 12:01 a.m. on the actual day of the Close of Escrow, based on a 365-day year. At least three (3) business days prior to the Closing Date, Escrow Agent must deliver to Seller and Buyer a tentative proration schedule setting forth a preliminary determination of proration's. If any information needed for the proration of any item is not available, the parties will re-prorate such item after Closing and payment will be made promptly to the party entitled thereto. After Closing, Seller will remain solely responsible for and will promptly pay before delinquency on any real property taxes or assessments relating to periods prior to the Closing Date.

### Section 8. Escrow

The Parties acknowledge that prior to the Effective Date, Seller opened an escrow with Chicago Title and Escrow Company located at 560 E Hospitality Ln Ste 100, San Bernardino, CA 92408 and Chicago Title and Escrow assigned title order number P7101712827 to this Transaction (the "Escrow Agent"). On the Effective Date, (i) Seller and Seller will each deliver to Escrow Agent, a copy of this Agreement signed in counter-part by each Party. On September 8, Buyer shall deposit the Initial Deposit of $200,000 with Escrow Agent pursuant to Section 2.A.a. of this Agreement. Upon receipt of the Initial Deposit, Escrow Agent shall (i) send written acknowledgment to Buyer and Seller in the form of a receipt for the Initial Deposit, and (ii) acknowledge that Escrow Agent agrees to act as Escrow Agent under the terms and provisions hereof. The terms and conditions set in this Agreement will constitute both an agreement between Seller and Buyer and escrow instructions to Escrow Agent. Each party shall also deliver additional escrow instructions (the "Additional Instructions") to the extent reasonably necessary to the Escrow Agent provided that such separate instructions do not conflict with this Agreement. If there are any conflicts between the terms of this Agreement and the Additional Instructions, this Agreement shall prevail and govern. The Additional Instructions will not modify or amend the provisions of this Agreement unless otherwise set forth in a separate written document signed by both Buyer and Seller.

### Section 9. Due Diligence Period

"Due Diligence Period" shall mean the period starting from the Effective Date until 5.00 p.m. Pacific Standard Time on September 14, 2017. Buyer may, at any time during the Due Diligence Period, terminate this Agreement in its sole and absolute discretion for any or no reason, by sending to Seller and Escrow Agent written notice via email indicating Buyer's election to so terminate the Agreement (the "Due Diligence Termination Notice"). Buyer's failure to deliver to Seller the Due Diligence Termination Notice via email prior to the expiration of the Due Diligence Period shall be deemed as an election to waive its Due Diligence rights under this Agreement and proceed with the contemplated transaction.

### Section 10. Closing Costs and Adjustments

A.   Seller will pay all City and County documentary transfer taxes payable related to the sale of the Purchased Lots.

B.   Buyer and Seller will each pay one-half (1/2) of all premiums for the Buyer's Title Policy including the costs of additional endorsements.

C.   Buyer and Seller will each pay one-half (1/2) of all escrow fees related to the sale of the Purchased Lots.

D.   Unless specified elsewhere in this Contract, all other closing costs related to the transaction will be paid by the parties in the manner consistent with customary practice for the County.

4

E.  Escrow Agent will notify Buyer and Seller in writing of their respective shares of such costs at least three (3) business days prior to the Closing Date in the form of an estimated closing statement.

## Section 11. Broker Commissions

Buyer represents and warrants to Seller that Buyer has not dealt with any other real estate broker or finder connected to this transaction. Buyer hereby agrees to indemnify, defend and hold Seller harmless from and against claim for any commission or other compensation by a real estate broker or finder other than that which is alleged to be owing because of the agreement or alleged agreement of Buyer to pay any such commission. Upon the occurrence of the Close of Escrow, Seller agrees to pay a commission of $289,200.00 to Seller's real estate broker, George Spizzirri D/B/A Pacific Cove Real Estate (the "Seller's Broker"), pursuant to a separate agreement between Seller and the Seller's Broker. Escrow Agent is authorized to release these funds to Seller's Broker out of the proceeds due Seller at Closing.

## Section 12. Seller's Remedies for Breach by Buyer

**THE PARTIES AGREE THAT IN THE EVENT BUYER FAILS TO DEPOSIT THE FUNDS REQUIRED OF BUYER PURSUANT TO THE PROVISIONS OF SECTION 2.A.f. OF THIS AGREEMENT, SELLER SHALL GIVE BUYER WRITTEN NOTICE OF SUCH FAILURE ("DEFAULT NOTICE") AND IF BUYER FAILS TO CURE SUCH DEFAULT WITHIN FIVE (5) BUSINESS DAYS) AFTER BUYER'S RECEIPT OF SUCH DEFAULT NOTICE, THEN THIS AGREEMENT SHALL AUTOMATICALLY TERMINATE, BE OF NO FURTHER FORCE AND EFFECT, AND ALL OF BUYER'S INITIAL DEPOSIT SHALL BE RELEASED TO SELLER AND RETAINED BY SELLER AS LIQUIDATED DAMAGES PURSUANT TO SECTIONS 1671 AND 1677 OF THE CALIFORNIA CIVIL CODE.  THE PARTIES FURTHER AGREE THAT THE AMOUNT OF LIQUIDATED DAMAGES SHALL COMPRISE SELLER'S SOLE REMEDY AT LAW OR EQUITY, AND SELLER WAIVES ANY RIGHT TO SEEK SPECIFIC PERFORMANCE OR ANY OTHER DAMAGES FROM BUYER.**

BUYERS INITIALS             SELLERS INITIALS _____

## Section 13. Representations

A.  Each representation set forth below shall survive Closing and shall not be merged into the Grant Deeds.

B.  **By Seller**. Seller hereby represents to Buyer that to Seller's actual knowledge, with no duty of investigation, that:

   (a)  Seller owns the Property in fee simple absolute;

   (b)  Each person signing this Agreement on behalf of Seller has full power and authority to bind Seller, and that all necessary documents evidencing such power and authority shall be provided to the Escrow Agent and Buyer at or before Closing;

   (c)  Seller is a "United States Person" within the meaning of Section 7701(a)(30) of the Internal Revenue Code of 1986, as amended;

   (d)  There are no pending, or to the best of Seller's knowledge, threatened suits, actions, proceedings or claims that would in any way affect the right, power, or authority of Seller to execute, deliver, or perform this Agreement, or that would materially impact the use of the Property and Seller has no knowledge of any facts which could give rise to any such suits, actions, proceedings or claims;

   (e)  Except as expressly disclosed to Buyer in writing prior to the Effective Date, there are no governmental actions pending to take all or a portion of the Property or any interest therein by eminent domain, and Seller has not received written notice from any governmental authority that any such eminent domain proceedings are threatened; to Seller's knowledge, there are no governmental proceedings pending to modify the current zoning

ordinance applicable to the Property or any part thereof, and Seller has not received written notice that any such zoning change proceedings are threatened;

(f) There are no pending, threatened or contemplated filings by Seller as debtor in any bankruptcy or reorganization proceedings under the laws of the United States, nor has Seller made any assignment for the benefit of its creditors, nor are any assets of Seller subject to any attachment, execution or other judicial seizure;

(g) Seller has not alienated, encumbered, transferred, optioned, assigned, transferred, or otherwise conveyed its interest or any portion of its interest in the Property or any portion thereof (except the Existing Leases), nor has the Seller entered into any agreement (other than this Agreement) to do so;

(h) Seller has full capacity, right, power and authority to enter into this Agreement and to perform its obligations hereunder;

(i) There are no contracts to purchase the Property or any part thereof, options to purchase the Property or any part thereof, or rights of first refusal to purchase the Property or any part thereof currently in existence other than this Agreement;

(j) Except as expressly disclosed to Buyer in writing prior to the Effective Date, the Improvements and the Property are in conformity with all current applicable zoning and building requirements on the Project; and

All representations, warranties and covenants of Seller in this Agreement are made as of the date of the Close of Escrow.

C. **By Buyer**. In the event Buyer assigns his interest in this Agreement to a designated entity, Buyer hereby represents and warrants to Seller that each person signing this Agreement on behalf of Buyer has full power and authority to bind Buyer, and that all necessary documents evidencing such power and authority will be provided to the Escrow Agent and Buyer at closing.

**Section 14. Notices**

Wherever in this Agreement one party hereto is required or permitted to give a notice, request, demand, consent or approval to the other, such communication will be given in writing and will be delivered either personally, by an overnight courier service with signed proof of receipt, or forwarded by certified mail, postage prepaid, return receipt requested, addressed as follows:

To Seller:

Attn: Manooch Khanbeigi
First Step Plus, LLC
195 S. Heath Terrace
Anaheim Hills, CA 9280

To Seller's Attorney:

George Spizzirri,
806 E. Avenida Pico, Ste I-313
CA Bar # 277865
San Clemente CA, 92673
Tel: 949-218-4785
Cell: 949-244-0620
Email: georgespizzirri@gmail.com

To Buyer:

Mr. Michael Ricatto
82-28 Abingdon Road

Kew Gardens, NY 11415
mike@ricatto.com

To Buyer's Attorney:


Daniel Seidenstein
JAN IRA GELLIS, P.C.
137 Fifth Avenue
New York, New York 10010
Telephone: (212) 460 5757
Fax: (212) 409 8453
Email: danseidenstein@gelmel.com


Either party may change its address for notice by written notice given to the other in the manner hereinabove provided. Any such communication will be deemed to have been duly given (i) on the date personally delivered or delivered by courier service or, (ii) if delivered by mail as provided above, upon receipt or refusal of receipt.

## Section 15. Post-Closing Agreements

In consideration of Buyer purchasing Parcel 1 and Parcel 6, Seller and Buyer shall enter into the following agreements after the Close of Escrow pursuant to Section 4 of the Agreement (the "Post-Closing Agreements"):

A.  After this Agreement closes in accordance with the provisions of Section 4 of the Purchase Agreement, the Parties agree to enter into negotiations to reach an agreement that shall be entitled, *Declaration of Covenants, Conditions and Restriction and Establishment of Easements Affecting the Overall Property including the Purchased Lots* (the "CC&R Declaration"). The purpose of the CC&R Declaration is for the Parties to declare their interests, as the same may from time to time appear in and to the Lots comprising the Overall Property including the Purchased Lots, concerning how the Lots will be held, transferred, sold, leased, occupied and conveyed under the CC&R Declaration's shared parking and shared maintenance provisions for all Lots within the Overall Property. However, in the event the Parties fail to reach a definitive CC&R Declaration by December 1, 2017, the Parties covenant and agree to execute and record no later than December 6, 2017, the proposed CC&R Declaration for the Overall Property, which is attached hereto as *Exhibit B.*

B.  Seller shall, at Seller's sole cost and expense, perform or cause to be performed with respect to the Overall Property, each act required to make each Lot within the Overall Property including the Purchased Lots, acceptable for the issuance of building permit and upon completion of construction of a permitted building, acceptable for issuance of a certificate of occupancy by the City of Adelanto, as more particularly described in *Exhibit C,* attached hereto.

C.  Seller shall, at Buyer's sole cost and expense, covenant and agree to oversee, manage and assist Buyer in purchasing, constructing, and installing a building on Parcel 1, as more particularly described in *Exhibit D,* attached hereto.


## Section 16. Miscellaneous

a. **Captions.** The headings and captions contained in this Agreement are inserted only as a matter of convenience and for reference and do not define, limit or describe the scope or intent of this Agreement or any provision herein contained.

b. **Time of Essence**. Time is of the essence of this Agreement.

c. **Business Day**. The term business day shall mean any day, Monday through Friday, but excluding any such day on which the United States Mail is not delivered.

d. **Construction**. This Agreement has been negotiated by the efforts of the parties and their respective counsel, and the principle of construction against the draftsmen will have no application in the construction and interpretation of this

7

Agreement.

e. **Governing Law**. This Agreement will be interpreted, construed and governed by and in accordance with the laws of the State of California.

f. **Entire Agreement**. This Agreement together with any document or instrument which is attached hereto as an exhibit or which is to be executed pursuant to this Agreement constitute the entire agreement between the Parties hereto with respect to the subject matter hereof. Any previous or concurrent negotiations or understandings with respect to the subject matter hereof are hereby superseded and integrated into this Agreement and shall have no bearing on the construction or interpretation of this Agreement.

g. **Amendments and Assignment**. This Agreement may not be modified, amended or assigned except by a writing duly executed and delivered by Seller and Buyer.

h. **Third Party Beneficiaries**. This Agreement is intended to be for the sole benefit of Seller, the other Released Parties, Buyer and their respective successors and assigns. No other person, firm, corporation, partnership, or other legal entity shall have any right, title, interest or claim to any matters covered herein, or the right to demand performance of this Agreement.i.

i. **Counterparts**. This Agreement may be executed in one or more counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument. Facsimile signatures will be effective for purposes of execution of this Agreement.

j. **Further Assurances**. Each Party to this Agreement shall reasonably cooperate with the other in such ways, and execute such additional documents, as may reasonably be requested by such other Party in order to more fully carry out the objectives of this Agreement.

k. **Attorney's Fees**. In the event of any dispute arising out of this Agreement, the prevailing Party shall be entitled to recover from the other Party its attorney's fees and court costs.

l. **Reasonable Consent**. Any consent required to be provided by either party to this Agreement shall not be unreasonably withheld, conditioned or delayed.

m. **Deemed Approval**. For any matters contained in this Agreement requiring the Buyer's approval, in the event Buyer fails to provide approval within the time framework established, such approval shall be deemed to have been given. Buyer's silence shall be deemed approval.

n. **Survival.** The representations, warranties, covenants, exhibits, and other terms of this Agreement will survive the Closing, the delivery of the grant deeds, and the payment of all required sums and will not be deemed to have merged in the grant deeds delivered to Buyer at the Closing.

o. **Assignment.**  Buyer may assign this Agreement to a limited liability company or corporation of its choosing at any time prior to Closing.

IN WITNESS WHEREOF, the undersigned have executed this Agreement this 7th day of September 2017.

**SELLER:**

FIRST STEP PLUS, LLC, a California limited liability company

By: _____

Name: _____

Its: _____

**BUYER**

Michael Riccato or his Designated Entity

By: _____

Name: _michael Ricatto_

8

Its: _____

**RECEIPT OF ESCROW INSTRUCTIONS AND ACCEPTANCE BY ESCROW AGENT:**

CHICAGO TITLE AND ESCROW COMPANY hereby acknowledges that it has received a fully executed counterparts of the foregoing Real Estate Purchase Contract and Receipt for Deposit and Joint Escrow Instructions ("Agreement") and agrees to act as Escrow Agent under the Contract and to be bound by and perform the terms thereof as such terms apply to Escrow Agent.

Dated: _____

By: _____

Its: _____

9

# EXHIBIT A

## Site Plan for the Overall Property



# EXHIBIT B

## Declaration of Covenants, Conditions and Restrictions

**DECLARATION OF COVENANTS, CONDITIONS AND RESTRICTIONS AND ESTABLISHMENT OF EASEMENTS AFFECTING LAND**

THIS DECLARATION OF COVENANTS, CONDITIONS AND RESTRICTIONS AND ESTABLISHMENT OF EASEMENTS AFFECTING LAND (this "Agreement") is made as of the *[date]* by and between First Step Plus, LLC, a California Limited Liability Company ("First Declarant") and *[name of second declarant]* ("Second Declarant").

### Recitals

A. First Declarant is the fee simple owner of that certain real property referred to herein as the First Declarant Parcels, located in the City of Adelanto, County of San Bernardino (the "County"), State of California (the "State"), and consisting of Assessors Parcel Map Numbers _____, _____, _____, and _____, more fully described on Exhibit A to this Agreement; Second Declarant is the fee simple owner of that certain real property located in the City of Adelanto, County of San Bernardino, State of California referred to herein as the Second Declarant Parcel, consisting of Assessors Parcel Map Numbers ____, and _____, which is situated adjacent to the First Declarant Parcel, as indicated and more fully described on Exhibit B to this Agreement. The First Declarant Parcel and the Second Declarant Parcel are each individually referred to herein as a "Parcel" and collectively as the "Property". Schedule I to this Agreement contains definitions of capitalized terms that may not be otherwise defined in the Agreement. The Schedule and Exhibits are incorporated in the Agreement.

B. First Declarant and Second Declarant have hereby established certain easements, covenants, restrictions, liens and charges (collectively, the "Restrictions") as are hereinafter set forth, by which all the Property will be held, exchanged, leased, sold and conveyed.

C. Each of the Restrictions (i) is imposed upon each parcel of land now or hereafter comprising all or any portion of the Property as a mutual equitable servitude in favor of all parcels comprising the Property, (ii) creates reciprocal rights and obligations between and among each owner of such parcels, and (iii) creates a privity of contract and estate between and among the owners of such parcels and their heirs, successors and assigns.

D. Each of the Restrictions are intended and will run with the land and each parcel of land now or hereafter comprising all or any portion of the Property is and will be affected and burdened by the covenant of its owner for the benefit of the other parcels in the Property and their respective heirs, successors and assigns.

E. First Declarant and Second Declarant will hereafter hold, lease and convey title to the land comprising the Property, subject to the covenants, conditions, easements and restrictions set forth in this Agreement.

### Agreement

NOW, THEREFORE, First Declarant and Second Declarant hereby covenant, agree and declare that all of their interests, as the same may from time to time appear in and to the land comprising the Property, will be held, transferred, sold, leased, occupied and conveyed subject to the following covenants, conditions, easements and restrictions which are hereby declared to be for the benefit of said interest in the Property, and the Owner of said

ll

interest and their Occupants, heirs, successors and assigns. These covenants, conditions, easements and restrictions will run with the Property on every part thereof or interest therein and will be binding upon all parties having or acquiring any right or title in said interests or any part thereof and are and will be imposed upon the Property now or hereafter subject to this Agreement, and every part thereof or interest therein, as a servitude in favor of each and every portion thereof as the dominant tenement or tenements.

## Article I
## Easements

### Ingress and Egress.

1.1. Ingress and Egress. Each Owner with respect to its Parcel hereby grants to each other Owner as grantee, for the benefit of each other Owner and their respective Occupants, customers and invitees and for the benefit of the Parcels owned by such grantee a non-exclusive easement appurtenant to each grantee's Parcel to effect ingress and egress by vehicular and pedestrian traffic upon, over, across and through the Access Area located within grantor's Parcel. Without limiting the generality of the foregoing, Second Declarant hereby grants to First Declarant a non-exclusive easement over, across and through the entry driveway into the Property from the *[name of street]*, as indicated on Exhibit A, including any future reconfiguration thereof ("Entry Driveway"), for ingress and egress to and from the First Declarant Parcel, for the benefit of First Declarant, its Occupants, customers and invitees. This Section 1.1 will not create any rights in any parties other than the Owners, and no Owner will have the right to grant easements for ingress, egress, **parking** or use of the Common Area to any third party who is not an Owner or Occupant or a customer or invitee of an Owner or Occupant.

### Parking.

1.2. Parking. Each Owner, with respect to its Parcel, hereby grants to each other Owner as grantee, for the benefit of each other Owner, and their respective Occupants, customers and invitees of the Property and for the benefit of the Parcels owned by such grantee and as a burden on the grantor's Parcel, a non-exclusive easement appurtenant to each grantee's Parcel for vehicular **parking** upon the Common Area of such Parcel for the purpose of access to the Property. All employees of each Owner or Occupant must **park** only on the Parcel of that Owner or Occupant.

### Utility Lines.

1.3. Utility Lines. Each Owner, as grantor with respect to its Parcel, hereby grants each other Owner as grantee, for the benefit of each other Owner and its Parcel, non-exclusive easements appurtenant to the Parcel owned by the grantee, under, through and across the Common Area of the Parcel owned by the grantor for the installation, maintenance, repair and replacement of water drainage systems or structures, water mains, storm drains, sewers, water sprinkler system lines, telephone or electrical conduits or systems, gas mains, transformers and other facilities for utilities necessary for the orderly development and operation of the Common Area and each Building in the Property. The rights granted pursuant to such easements will be exercised in such manner as to cause the least interference with the rights of other Owners and with the normal operation of the Property. Except in an emergency, the right of any Owner to enter upon the Parcel of another Owner for the exercise of any right pursuant to such easements will be conditioned upon obtaining the prior written consent of such other Owner, subject to Section 8.15 of this Agreement. All such systems, structures, mains, sewers, conduits, lines and other facilities, with the exception of transformers, for utilities will be installed and maintained below the surface or ground level of such easements. In the event an Owner deems it necessary to cause the installation of a storm drain, electric line, sewer or other Utilities across the Common Area of any other Parcel subsequent to the initial paving and improving thereof, the Owner thereof agrees not to unreasonably withhold the granting of any necessary additional easements, provided that in no event will such installation be permitted if it would unreasonably interfere with the normal operation of any business of the Property; and provided further, the Owner making or causing such installation will, at its expense, completely restore to the previously existing or better condition all Common Area Improvements and surfaces disrupted as a result of such installation. In the event it should be necessary to grant any of the foregoing easements and rights to local utility companies as a condition of

III

their providing or continuing service, such rights will be granted at no cost so long as the Owners required to execute such instruments deem the terms and conditions of such a grant to be reasonably acceptable.

## Drainage Easement.

1.4. Drainage Easement. Each Owner grants to each other Owner a non-exclusive easement over its Parcel for surface water drainage over and through the existing drainage patterns and storm water drainage systems or such other drainage patterns that may be established from time to time among the Parcels in accordance with this Agreement. Nothing herein will prevent an Owner from relocating the drainage patterns established upon such Owner's Parcel, subject to this Agreement.

## Transfer of Rights to Tenants.

1.5. Transfer of Rights to Tenants. Notwithstanding anything to the contrary herein, an Owner may transfer and assign the easement rights contained in this Article I of this Agreement to its Occupants so long as any such Owner remains liable for any breach of the obligations of an Owner set forth in this Agreement.

## Article II
## Common Area; Maintenance

## Common Area Use.

2.1. Common Area Use. The Common Area will be used for:

(a) **Parking** of motor vehicles, and pedestrian and vehicular ingress and egress by Occupants, their agents, employees, customers and other invitees, to and from Buildings, Common Area and adjacent public streets;

(b) **Parking** stalls, private streets, seating areas and sidewalks (excluding Service Facilities), walls, ramps, driveways, lanes, curbs, gutters, flagpoles, bike racks, newspaper sales racks, public telephones, bus stops and similar facilities for accommodating public transportation, traffic control areas, signals, traffic islands, landscaped areas, traffic and **parking** lighting facilities and monument signs with appropriate underground electrical connections, and all things incidental thereto;

(c) Public utility installations serving Buildings or the Common Area which will, if reasonably possible, be underground;

(d) Security gates controlling ingress and egress by Occupants, their agents, employees, customers and other invitees including delivery and service vehicles to and from Buildings, Common Area and adjacent public streets;

(e) Delivery of goods, wares, merchandise and the retention of services to Owners and Occupants of the Property;

(f) Perimeter walls, security fences, security cameras and security gates;

(g) If required by Law, recycling facilities or pickup points; and

(h) Lighting standards and any other landscaping or Common Area Improvements as may be required by Law or as may be consented to by the Owner(s) of the Parcels.

In addition, the Common Area may be used for the following purposes: (i) in connection with the construction and maintenance of utility lines so long as such activity is undertaken in strict compliance with the requirements of Section 1.3 of this Agreement; and (ii) for any other use required by Law. No Building, barricade, structure or other Improvements may be placed, erected or constructed within the Common Area on any Parcel except trash

IV

enclosures, pylon and other free-standing signs (to the extent not herein prohibited) and directional signs, bumper guards or curbs, paving, landscaping and landscape planters, lighting standards, driveways, sidewalks, walkways, **parking** stalls, columns or pillars supporting roof overhangs, and any other Improvements as may be required under Laws or are otherwise permitted by this Agreement.

### 2.2. Maintenance of Common Area.

(a) Owner will, at its own expense, cause the Common Area located on its Parcel to be maintained at all times in a safe, good and clean condition and repair, including, without limitation, the following:

(i) Maintaining the paved surfaces in a level, smooth and evenly covered condition with the type of surfacing material originally installed or such substitute as will in all respects be equal or superior in quality, use and durability including seal coating the **parking** lot within such Owner's Parcel not less frequently than once each five (5) years;

(ii) Removing all papers, debris, filth and refuse, and thoroughly sweeping the area to the extent reasonably necessary to keep the area in a clean and orderly condition and removing trash and litter from areas within the Property where such trash and litter emanated from such Owner's Parcel;

(iii) Placing, keeping in repair, and replacing appropriate directional signs, markers, lines and **parking** stall lines, where necessary;

(iv) Operating, keeping in repair, and replacing such artificial lighting facilities as will be reasonably required;

(v) Maintaining all landscaped areas and repairing automatic sprinkler systems or water lines and replacing shrubs and other landscaping as is necessary;

(vi) Maintaining and repairing any and all walls and utilities; and

(vii) Maintaining free and unobstructed access to and from its Parcel and the adjoining portions of the Property and to and from its Parcel and the streets adjacent thereto.

The Owner or Occupant undertaking such work will take all measures necessary to minimize any disruption or inconvenience caused by such work. Such work will be accomplished by the Owner or Occupant undertaking it in a reasonable manner so that any damage or adverse effect which might be caused by such work to any other Owner or Occupant or to any Parcel (including the Parcel on which the work is being accomplished) is minimized. The Owner or Occupant undertaking such work will repair at its own cost any and all damage caused by such work and will restore the affected portion of any Parcel (including the Parcel upon which such work is performed) to a condition which is equal to or better than the condition which existed prior to the beginning of such work. In addition, the Owner or Occupant undertaking such work will pay all costs and expenses associated therewith and will indemnify, protect, defend and hold all other Owner(s) and Occupants from all liabilities, damages, losses, costs, expenses or claims arising out of, in connection with or attributable to the performance of such work. Except in cases of emergency (in which event concurrent notice or no notice appropriate under the circumstances will be all that is required), all such work which causes disruption or inconvenience to any other Owner or Occupant or to any Parcel (including the Parcel on which the work is being accomplished) will be undertaken only after giving all Owners fifteen (15) days prior written notice of the work to be undertaken, the scope and nature of the work, the duration of the work and the area in which the work is to be performed.

(b) Building and Outdoor Seating Area Maintenance. Each Owner will, at its sole cost and expense, maintain its Building and Service Facilities in first class order, condition and repair, including, without limitation, periodic painting of the exterior of the Building, maintaining the sidewalks adjacent to the Building, and making other

v

repairs necessary to keep the Building and Service Facilities in first class order, condition and repair. In addition, each Owner whose Parcel contains outside seating areas for eating establishments will ensure that such seating does not interfere with pedestrian or vehicular traffic.

(c) Owner's Right to Cure or Abate. If any Owner (a "Defaulting Owner") violates this Section 2.2 or permits or suffers any Occupant of its Parcel to violate this Section 2.2, then in addition to any other remedy provided for in this Agreement, any Owner (each or together, as applicable, the "Creditor Owner") may demand by written notice (the "Default Notice") that the violation be cured. If the Defaulting Owner does not cure the violation of a monetary obligation within ten (10) days after delivery of the Default Notice, or if such non-monetary default is of a kind that cannot reasonably be cured within thirty (30) days and the Defaulting Owner does not within such thirty (30) day period commence to cure such default and diligently thereafter prosecute such cure to completion, then the Creditor Owner (and its agents and employees) will have the right to (i) pay any sum owed by the Defaulting Owner to the person entitled thereto, (ii) enter upon the Parcel of the Defaulting Owner (or any portion of the Common Area owned by the Defaulting Owner) and summarily abate, remove or otherwise remedy any Improvement, thing or condition which violates this Section 2.2, and (iii) enter upon the Parcel of the Defaulting Owner (or any portion of the Common Area owned by the Defaulting Owner) and perform any obligation of the Defaulting Owner to be performed thereon. The Defaulting Owner will, within ten (10) days of written demand by any other Owner, accompanied by appropriate supporting documentation, reimburse the Creditor Owner for all costs and expenses incurred by the Creditor Owner in undertaking any of the actions permitted by clauses (i) through (iii) in the preceding sentence, including without limitation, wages, benefits and overhead allocable to the time expended by any employee of the Creditor Owner in taking such actions, together with interest thereon accruing from the date such costs and expenses were advanced or incurred by the Creditor Owner, at the Default Interest Rate (as herein defined). For purposes of this Agreement, the "Default Interest Rate" is the rate equal to the lesser of: (i) four percent (4%) per annum in excess of the "Prime Rate," or (ii) the highest lawful rate. The "Prime Rate" will be the rate announced as such from time to time by Bank of America or its successor.

<strong>Common Area Utilities.</strong>

2.3. Common Area Utilities. Common Area artificial lighting facilities, water lines and other utilities will be separately metered to the Parcel on which they are located. Lighting for the Common Area (other than lighting necessary for security of the Property) will remain on each day until at least midnight (unless to do so is contrary to any Law, in which event the standard so prescribed will be adhered to while in effect). Lighting representing not less than twenty-five percent (25%) of full intensity of the Common Area lighting system, uniformly distributed throughout the Common Area, will remain on each day after midnight until dawn for security purposes, unless to do so is contrary to any Law, in which event, the standard so prescribed will be adhered to while in effect. If "special" lighting (other than lighting necessary for security of the Property) is required or if regular lighting is required for a time later than the foregoing by any Owner or Occupant of the Property, then the electricity to service such lighting requirements will, if reasonably feasible, be separately metered and all expenses thereof will be paid by such Owner(s) or Occupant(s) that require the special service.

<strong>Article III</strong><br/><strong>Restrictions</strong>

<strong>Use Types.</strong>

3.1. Use Types. The types of uses permitted in the Property will be of a retail and/or commercial nature found on comparable Property of similar size in the metropolitan marketing area in which the Property is located. All uses in the Property must comply with all requirements imposed by the City.

<strong>Exclusive Use.</strong>

3.2. Exclusive Use. So long as Second Declarant continuously and without interruption conducts the business of cultivating marijuana and/or manufacturing marijuana in its Buildings, First Declarant will continuously and without interruption conduct the business of cultivating and/or manufacturing marijuana in its Buildings.

## Article IV
## Signs

### Pylon Sign.

4.1. Pylon Sign. If permitted by the City of Adelanto, each Owner shall have, in accordance with this Section 4.1, the right to install an identification panel or panels on the freestanding pylon sign ("Pylon Sign") situated at the entrance to the Property. Each Owner shall be entitled to its Proportionate **Share** of space on the Pylon Sign. Each Owner, with respect to its Parcel, as grantor, hereby grants to each other Owner, as grantee, easements under, through and across the Common Area of the Property for the purpose of accessing the Pylon Sign and for installation and/or maintenance of utility lines to service the Pylon Sign. Each Owner will pay its Proportionate **Share** of the costs of maintenance, insurance, repair and replacement of the Pylon Sign (but not the panel or panels thereupon, which shall be each Owner's respective responsibility as to the Owner's panel(s)).

## Article V
## Indemnification and Insurance

### Indemnification.

5.1. Indemnification. Each Owner ("Indemnifying Party") hereby indemnifies, holds harmless and defends the other Owner ("Indemnified Party(ies)") from and against all claims, damages, expenses (including, without limitation, reasonable attorney's fees and reasonable investigative and discovery costs), liabilities and judgments on account of injury to persons, loss of life, or damage to property occurring on its Parcel, caused by (i) the business activities of the Occupants and Owners, and (ii) the active or passive negligence or willful misconduct of the Indemnifying Party, its agents, servants or employees; provided, the Indemnifying Party does not indemnify the Indemnified Party against any injury, loss of life, or damage which is caused by the active or passive negligence or willful misconduct of the Indemnified Party, the other Owners in the Property, or their agents, servants or employees. The parties' obligations with respect to indemnification hereunder will remain effective, notwithstanding the expiration or termination of this Agreement, as to claims arising or accruing prior to the expiration or termination of this Agreement.

### Liability Insurance Coverage and Limits for Owners.

5.2. Liability Insurance Coverage and Limits for Owners. Each Owner agrees to maintain, and/or cause to be maintained, at no cost to the other Owners, commercial general liability insurance insuring its interests against claims for personal injury, bodily injury, death and property damage occurring on, in or about the Property and the ways immediately adjoining the Property, with a "Combined Single Limit" (covering personal injury liability, bodily injury liability and property damage liability) of not less than Four Million Dollars ($4,000,000.00) for total claims for any one occurrence.

### Waiver of Certain Rights.

5.3. Waiver of Certain Rights. With respect to any loss or damage that may occur to the Property (or any improvements thereon) or the respective property of the Owners therein, arising from any peril customarily insured under a fire and extended coverage insurance policy, regardless of the cause or origin, excluding willful acts but including negligence of the Owners, their agents, servants or employees, the Owner suffering such loss hereby releases the other Owner from all claims with respect to such loss; and the Owners each agree that their respective insurance companies will have no right of subrogation against the other Owner on account of any such loss, and each Owner will procure from its respective insurers under all policies of fire and extended coverage insurance a waiver of all rights of subrogation against the other Owners which the insurers might otherwise have under such policies.

### Policy Requirements.

VII

5.4. Policy Requirements. Insurance coverage required by this Agreement may contain the following elements, so long as the required coverage is not diminished, the required limits are not reduced, and the elements thereof are otherwise commercially reasonable: an Owner's insurance program may include blanket, layered, umbrella, conventional and/or manuscript forms of policies, as well as retention levels and loss reserves which are charged against earnings or otherwise funded, and commercially reasonable deductibles.

## Performance of Indemnity Agreements.

5.5. Performance of Indemnity Agreements. All policies of liability insurance will insure the performance by the Owner insured thereunder of the indemnity agreements contained herein. Each Owner will promptly notify the other Owner of any asserted claim with respect to which such Owner is or may be indemnified against hereunder and will deliver to such other Owner copies of process and pleadings.

## Article VI
## Damage or Destruction; Condemnation

### Damage or Destruction.

6.1. Damage or Destruction. In the event any Building in the Property is damaged or destroyed by fire or other casualty or any other cause whatsoever, the Owner of the Parcel upon which such Building is located will, in its discretion, either tear down or rebuild the damaged Building. However, if an Owner determines to tear down a damaged Building, that Owner will either promptly rebuild a new building on the same location or leave and maintain the Parcel of land on which the Building was located in a smooth, level condition, free and clear of all refuse and weeds and sealed against dust by paving, lawn or other cause whatsoever, the Owner of the Common Area so damaged or destroyed will forthwith proceed with due diligence to restore such Common Area to a condition to permit vehicular **parking** (in the manner required by this Agreement) and free and safe vehicular and pedestrian access and circulation in the Property and to and from all streets adjacent thereto.

### Condemnation.

6.2. Condemnation. In the event the whole or any part of the Property is taken by right of eminent domain or any similar authority of Law, the entire award for the value of the land and Improvements so taken will belong to the Owner(s) of the property so taken or to their tenants, as their interest may appear, and no other Owner of land in the Property will claim any portion of such award by virtue of any interest created by this Agreement; provided, however, any such other Owner may file a collateral claim with the condemning authority over and above the value of the land and Improvements being so taken to the extent of any damage suffered by such Owner resulting from the severance of the area so taken provided such collateral claim does not diminish the amount recoverable by the Owner(s) of the property so taken. In the event of a partial taking, the Owner(s) of the portion of the Property so condemned will restore the remaining portion of the Property owned by such Owner(s), including Improvements in the Common Area, as nearly as possible to the condition existing just prior to such condemnation, without contribution from the Owners of the area not so taken and any condemnation accrual necessary therefore will be held in trust and applied for such purpose; provided, however, that if any Mortgagee (including any beneficiary under a deed of trust) of any property in the Property makes the requirement pursuant to a provision in a mortgage or other security instrument that the portion of the award representing compensation for severance damage to property not taken, be paid to the Mortgagee, then the party required to make such payment to such Mortgagee will not be obligated to apply such portion of the award to restoration, except to the extent necessary to clear and pave for **parking** and restore Common Area facilities.

## Article VII
## Taxes

Each Owner will pay or cause to be paid directly to the tax collector when due, the Real Property Taxes assessed against the property owned by such Owner, including the portion of the Common Area owned by such Owner.

An Owner will have the right, at its own cost and expense, and in its own name, to contest or protest or seek to have reviewed, reduced, equalized or abated any real property tax or other special tax or assessment levied upon its Parcel by first paying such tax or assessment and thereafter filing a claim for refund or pursuing such other remedy as may be available under and in accordance with State Law.

**Article VIII**
**General Provisions**

**Notices.**

8.1. Notices. Any notice or demand given or served by one Owner to another Owner will not be deemed to have been duly given or served unless in writing and personally delivered or forwarded by postage prepaid certified or registered mail, return receipt requested, or by another commercially recognized means of delivery addressed as follows:

To First Declarant:

*[Notice address of first declarant]*

With a copy to:

*[Notice address of counsel]*

To Second Declarant:

*[Notice address of second declarant]*

Notices and demands will be deemed effective upon receipt. The person and place to which notices are to be given may be changed by written notice the other Owners.

**Attorney's Fees.**

8.2. Attorney's Fees. In the event legal proceedings are brought or commenced to enforce any of the terms of this Agreement against any Owner or other person with an interest in the Property, the successful party in such action

IX

will be entitled to receive and will receive from the defaulting Owner, a reasonable sum as attorney's fees and costs, to be fixed by the court in the same action.

## Duration.

8.3. Duration. Except as otherwise provided herein, this Agreement will remain in full force and effect for a term of sixty-five (65) years from the date hereof; provided, however, the term of this Agreement will automatically and without further notice continue in full force and effect for successive terms of five (5) years unless at least one (1) year prior to the expiration of the initial term or any such five (5) year extension, there will be recorded an instrument conforming to the provisions of Section 8.4 of this Agreement.

## Modification.

8.4. Modification. Except as otherwise provided herein, this Agreement may not be modified in any respect whatsoever or rescinded, in whole or in part, except by a writing executed by First Declarant or its successor as the Owner of the First Declarant Parcel and Second Declarant or its successor as the Owner of the Second Declarant Parcel, and duly recorded.

## Not a Public Dedication.

8.5. Not a Public Dedication. Nothing herein contained will be deemed to be a gift or dedication of any portion of the Property to the general public or for any public purposes whatsoever, it being the intention of the Owners that this Agreement will be strictly limited to and for the purposes herein expressed.

## Severability.

8.6. Severability. If any term or provision of this Agreement or the application of it to any person or circumstance will to any extent be invalid and unenforceable, the remainder of this Agreement or the application of such term or provision to persons or circumstances other than those as to which it is invalid or unenforceable will not be affected thereby, and each term and provision of this Agreement will be valid and will be enforced to the extent permitted by Law.

## Pronouns.

8.7. Pronouns. When required by context, the singular will include the plural, and the neuter gender will include a person, corporation, firm, association, or other business arrangement.

## Captions.

8.8. Captions. The captions in this Agreement are for convenience only and do not constitute a part of the provisions hereof.

## Not a Partnership.

8.9. Not a Partnership. The provisions of this Agreement are not intended to create, nor will they be in any way interpreted to create, a joint venture, a partnership, or any other similar relationship between the Owners.

## Governing Law.

8.10. Governing Law. This Agreement will be construed and enforced in accordance with and governed by the Law of the State of California.

X

## No Presumption.

8.11. No Presumption. This Agreement will be interpreted and construed only by the contents hereof and there will be no presumption or standard of construction favor of or against any Owner.

## Inurement.

8.12. Inurement. This Agreement and the easements, covenants, benefits and obligations created hereby will inure to the benefit and be binding upon each Owner and its successors and assigns, provided, (i) if any Owner conveys all of its interest in any Parcel owned by it, such Owner will thereupon be released and discharged from any and all further obligations under this Agreement as fee owner of the property conveyed by it if the buyer assumes in writing all of such obligations, and (ii) no such sale will release such Owner from any liabilities, actual or contingent, existing as of the time of such conveyance.

## Estoppel Certificate.

8.13. Estoppel Certificate. Upon request by an Owner, the other Owner will issue to a prospective lender of such requesting Owner or to a prospective purchase of such requesting Owner's interest, an estoppel certificate stating:

(a) whether the Owner knows of any default by the requesting Owner under this Agreement, and if there are known defaults, specifying the nature thereof;

(b) whether this Agreement has been assigned, modified or amended in any way (and if it has, then stating the nature thereof); and

(c) that to Owner's knowledge this Agreement as of that date is in full force and effect.

## Compliance by Tenants.

8.14. Compliance by Tenants. Any Occupancy Agreement entered into after the date hereof must provide that the terms of such Occupancy Agreement will be subject in all respects to the provisions of this Agreement. Any Owner who enters into such an agreement will be responsible for assuring compliance by such Occupant with this Agreement. Notwithstanding anything to the contrary herein, an Owner hereunder may cause its Occupants to fulfill the obligations of an Owner hereunder provided that Owner will be responsible for assuring compliance by such Occupant with this Agreement and Owner will remain liable for any breach of obligation hereunder.

## Reasonable Consent.

8.15. Reasonable Consent. Except as otherwise specifically provided in this Agreement, if an Owner is required to give its consent or approval to any action on the part of the other Owner, the consent or approval will not be unreasonably withheld or delayed. Except where other time periods to give or deny consent are provided in this Agreement, consent will be deemed granted at the end of the tenth (10th) business day following delivery of a request for consent, provided such request specifically refers to this Section 8.15 of this Agreement and states that consent will be deemed granted at the end of the tenth (10th) business day from delivery of the request, unless a written denial of consent stating the specific reason for denial is delivered before the end of the tenth (10th) business day after delivery of the request for consent. In the event the requested consent is unreasonably withheld, the other party will be entitled to specific performance and will have such other remedies as are reserved to it under this Agreement or at Law.

## Alternative Dispute Resolution.

8.16. Alternative Dispute Resolution. Any claim or dispute arising out of or relating to this Agreement, regardless of the nature of the claim or dispute, will be settled by the parties hereto pursuant to this Section 8.16.

(a) Mediation. If any claim or dispute arising out of or relating to this Agreement is not settled by direct discussions within ten (10) days after notice of the claim or dispute, the parties agree first to try in good faith to settle the claim or dispute by non-binding mediation administered by the American Arbitration Association ("AAA") under its Commercial Mediation Rules.

(b) Binding Arbitration. If the parties fail to settle a claim or dispute through mediation, it will be settled by binding arbitration administered by the AAA under its Commercial Arbitration Rules. Judgment on the award rendered by the Arbitrator(s) may be entered in any court having jurisdiction thereof.

(c) Provisional Relief. Nothing in this Section 8.16 will prevent either party from applying for or obtaining a provisional judicial remedy regarding any claim or dispute. Notwithstanding such application, the final resolution of the claim or dispute will be mediated or arbitrated under this Section 8.16 and failure by either party to comply with any law will not be deemed to waive such party's rights to mediate or arbitrate under this Section 8.16.

IN WITNESS WHEREOF, this Agreement has been executed as of the date first above written.

FIRST DECLARANT:

*[Name of first declarant, and capacity, if appropriate]*

By:

_____

Name:

_____

Its:

_____

By:

XII

_____

Name:

_____

Its:

_____

SECOND DECLARANT:

*[Name of second declarant, and capacity, if appropriate]*

By:

_____

Name:

_____

Its:

_____

By:

_____

XIII

Name:

_____

Its:

_____

*[Attach notarial acknowledgment]*

**Schedule I**
**Definitions**

Unless the context clearly indicates otherwise, the following terms used in this Agreement are defined as follows:

1. "Access Area" means the access area or drive areas depicted on Exhibit A, including any future reconfiguration thereof, and such other driveways and areas as may be established from time to time as areas within Parcels over which reciprocal access easements between or among adjacent Parcels are necessary or beneficial for ingress and egress to and from such Parcels or the Improvements thereon.

2. "Building" means any structural Improvement on any Parcel which is enclosed by exterior walls, floor and roof and is designed for human occupancy and the conduct within of activities and business by the Owner or Occupant of such Improvements.

3. "City" means the City of Adelanto, California and any individual departments or agencies thereof asserting jurisdiction over the Property.

4. "Common Area" means all real property within the Property upon which there are no Buildings or outdoor areas existing or under construction which are devoted to the exclusive use of any Owner or Occupant, specifically excluding any Service Facilities.

5. "Effective Date" means the date that this Agreement is recorded in the offices of the County Recorder.

6. "Improvement(s)" means all Buildings, Service Facilities, outbuildings, **parking** or loading areas, **parking** garages (if any), roadways, walkways, curbs, gutters, storage areas, trash enclosures, security facilities, fences, walls, poles, signs, exterior lighting, exterior air conditioning equipment, hedges, berms, mass or large plantings, landscaping, trees, shrubs, sewer lines and sewer pipes, water lines and water pipes, electrical lines and electrical conduit and other utility lines, pipes, and conduits, lighting standards and fixtures, stairways, ramps and all other structures of any kind or appurtenances thereto located above or below the ground within the exterior boundaries of the Property, and any replacements, additions, repairs or alterations thereto of any kind whatsoever.

7. "Indemnified Party" means the party described in Section 5.1 of this Agreement.

8. "Indemnifying Party" means the party described in Section 5.1 of this Agreement.

XIV

Case 1:18-cv-08404-KPF   Document 3-1   Filed 09/17/18   Page 25 of 32

9. "Law(s)" means any statute, constitution, ordinance, resolution, regulation, rule, administrative order or requirement of any municipal, county, state, federal or other governmental agency or authority having jurisdiction over the Property in effect as of the Effective Date or which may thereafter be enacted, adopted, amended or modified.

10. "Mortgage" means any duly recorded mortgage or deed of trust encumbering a Parcel.

11. "Mortgagee" means and refers to the mortgagee or beneficiary under any Mortgage.

12. "Occupancy Agreement" means a lease, sublease, assignment agreement, ground lease or other agreement between an Owner and any Occupant that entitles an Occupant to conduct its business in the Property and utilize the Common Area in connection with its occupancy.

13. "Occupant" means any person, firm, corporation, association or other legal entity entitled to occupy and utilize any portion or portions of the Property for the conduct of its business pursuant to an Occupancy Agreement.

14. "Owner" means (i) the person or persons holding fee title to any portion of the Property, or (ii) the Occupant entitled to occupy all of a Parcel under an Occupancy Agreement for a fixed original term of thirty (30) years or longer if the fee owner elects in a written notice to the other Owners that such Occupant is to be considered an Owner of such Parcel for purposes of this Agreement during the term of the Occupancy Agreement, or (iii) the ground lessee under a long term ground lease (i.e. 30 or more years in duration or the Occupant of the Parcel that is the subject of the ground lease if so designated by the ground lessee pursuant to subsection (ii) hereof.

15. "Person" means any individual, partnership, firm, association, corporation, trust, governmental agency, administrative tribunal or any other form of business or legal entity.

16. "Proportionate **Share**" means a fraction, (a) the numerator of which will be the square footage of the Building(s) situated upon the Owner's Parcel, and (b) the denominator of which is the total square footage of the Buildings within the Property.

17. "Real Property Tax(es)" means any form of real or personal taxes, assessments, fees, charges, levies, penalties, impositions or taxes of every kind and nature whatsoever, assessed or levied or imposed by any authority having the direct or indirect power to tax, including, without limitation, any City, County, State or federal government, or any improvement or assessment district of any kind or nature whatsoever, whether or not consented to or joined in by Owner, against the Parcel or any legal or equitable interest or Owner therein or any personal property of Owner used in the operation thereof, or the ownership, leasing, operation, management or occupancy of the Parcel, whether now or hereafter imposed, and whether or not now customary or in the contemplation of the parties on the date of this Lease, excepting only inheritance or estate taxes and taxes measured by the net income of Owner. Real Property Taxes will include without limitation general and special assessments, service payments in lieu of taxes, excises, possessory interest taxes, business or license taxes or fees, gross receipts taxes, transit assessments or fees, child care subsidies fees and/or assessments, job training subsidy fees and/or assessments, open space fees and/or assessments, housing subsidies and/or housing fund fees or assessments, public art fees and/or assessments, and any other fees or assessments imposed in connection with the environmental, sociological or fiscal effects of the Parcel or the ownership, leasing, operation, management or occupancy of the Parcel, any tax, fee or excise on the use or occupancy of the Parcel or any part thereof, or in connection with the business of renting space in the Parcel, any other tax, fee or other excise, however described, that may be levied or assessed as a substitute for, or as an addition to, in whole or in part, any other Real Property Taxes.

18. "Service Facilities" means any loading dock areas (including ramps related thereto), trash areas, areas for drive-through facilities, patio seating areas, sidewalks immediately adjacent to Building and other facilities which are or become used exclusively by a single Owner or Occupant.

XVI

# EXHIBIT C

## The Infrastructure Improvements

Within five (5) business days following the Closing of the Sale by Seller to Buyer of Parcel 1 and 6 (the "Purchased Lots"), Seller shall, at Seller's sole cost and expense, commence to perform or cause to be performed with respect to the Overall Property including the Purchased Lots, the infrastructure work required by the Final Precise Grading Plan approved by the City of Adelanto on July 17, 2017 to make each Lot within the Overall Property including the Purchased Lots, acceptable for the issuance of building permit by the City of Adelanto and upon completion of construction of a permitted building in accordance with its approved  plans and specifications, acceptable for issuance of a certificate of occupancy by the City of Adelanto (the "Infrastructure Work").

Seller covenants and agrees to the following:

A.  To engage, retain, contract with, supervise, coordinate, and discharge all persons reasonably required to complete the Infrastructure Work to the Overall Property and the Purchased Lots, including without limitation intended, attorneys, civil engineers, electrical engineers, grading contractor(s), paving contractor(s), security fencing and gates contractor(s), sprinkler contractor(s), security camera contractor(s), general contractor(s), and any other sub-contractor(s) Seller, in its absolute and sole discretion, deems essential to fulfilling its obligations under this Agreement. Construction contracts may be entered into by Seller based on time, labor, and material; a stipulated amount; or a guaranteed maximum cost; whichever basis is more appropriate in the commercially reasonable discretion of Seller.

B.  To require all persons retained, engaged, and contracted with pursuant to Section 3(B) below to maintain insurance coverage against such perils and with such limits as may be reasonably requested by Seller prior to the time that their respective services are contracted for.

C.  To procure insurance coverage for the Improvements to the Overall Property including the Purchased Lots notwithstanding Seller's duties as described in paragraph 3(D) below. At all times, Seller shall maintain in full force and effect comprehensive public liability insurance, with limits of not less than $3,000,000.00, contingent liability insurance and builder's risk insurance and/or hazard insurance (whichever forms of hazard insurance are applicable). Buyer shall be named as an additional insured on the public liability and contingent liability insurance policies and evidence that such coverage is in effect and paid for shall be delivered to Buyer prior to commencement of construction of the Improvements to the Overall property including the Purchased Lots and at least thirty (30) days prior to the date that any existing coverage is slated to expire.

D.  That Seller or any contractor(s) acting on behalf of Seller shall procure, or cause to be procured, all permits, approvals, and other governmental authorizations required by law for the completion of the Infrastructure Work.

E.  To make reasonable efforts to cause the completion of the Infrastructure Work to be performed in a reasonable manner.

F.  To make reasonable efforts to cause the Infrastructure Work to be performed in a good, workmanlike manner, and in accordance with all applicable law and other governmental requirements.

G.  To prepare and amend from time to time a schedule for the completion of the Infrastructure Work, which shall include (i) reasonable dates for completing the Utilities Sewer, Water and Electrical layout; (ii) the Water Quality Management Plan ("WQMP"); (iii) the Service Water Intake Protection Plan ("SWIPP"); (iv) the Site Hydrology Plan; (v) the Soil Engineering and Perk Test; and (vi) the

XVII

Flood site rainwater recovery and design plan; i.e., the commencement and substantial completion of all Infrastructure Work to the Overall Property.

H.  To immediately notify the City of Adelanto and Buyer in writing when the Seller deems the Infrastructure Work for all Lots within the Overall Property to be complete, and to request from the City of Adelanto a final inspection date to determine if there are any items that must be completed or repaired prior to the City of Adelanto's acceptance of the Infrastructure Improvements as completed (the "Request for Final Infrastructure Inspection"). The Request for Final Infrastructure Inspection shall contain the following representations:

(a)  The interior street surface, curbs, gutters, sidewalks, sanitary sewer, storm drain, water lines and street lights within the subdivision have been installed in accordance with the Final Precise Grading Plan and accepted by the City of Adelanto;

(b)  The telephone, electrical, natural gas, and any other utilities which are designated for installation within the common utility trenches have been installed in accordance with the Final Precise Grading Plan and are operational;

(c)  All utilities, including high pressure gas lines, have been installed in conformance with in accordance with the Final Precise Grading Plan;

(d)  All off-site improvements necessary to provide access to and serve the development of the subdivision have been completed in accordance with the Final Precise Grading Plan and are operational.

(e)  All parcels within the Overall Property are ready for the construction of buildings (e.g., that the Parcels are graded and compacted) and in compliance with City of Adelanto standards applicable to Parcels intended for improvements with a slab-ready foundation;

(f)  Compaction and other completed parcel soils conditions were prepared and compacted in accordance with the applicable recommendations of the soils engineer and the requirements of the Final Precise Grading Plan;

(g)  The interior streets, curbs, gutters, and sidewalks which serve the Overall Property, the underground improvements associated therewith (but not including any connection from the Lot line to the proposed building) and conduit for utilities have been completed in accordance with the Final Precise Grading Plan, and

(h)  All other improvements required by the City of Adelanto to obtain a building permit for each parcel within the Overall Property including the Purchased Lots, have been completed in accordance with all plans and specifications as approved by the City of Adelanto including the Final Precise Grading Plan, such that the Buyer or Seller may obtain building permits for each of their respective Lots and, upon completion of each building on each Lot including the Purchased Lots in accordance with each buildings approved plans and specifications, obtain a certificate of occupancy from the City of Adelanto for that particular building. Upon learning of the Final Infrastructure Inspection Date from the City of Adelanto, Seller shall no later than three (3) business days prior to the Final Infrastructure Inspection Date, notify Buyer of the Final Infrastructure Inspection Date. Both Buyer and Seller shall make their respective representatives available during the Final Inspection. In the event the City of Adelanto at the time of the Final Inspection deems the Infrastructure Improvements complete, Seller's duties to perform further Infrastructure Improvements shall be deemed complete. However, if at the time of the Final Inspection, the City of Adelanto's inspector enumerates items in writing that must be completed or repaired prior to the City of Adelanto's acceptance of the Infrastructure Improvements as complete (the "Infrastructure Punch List"), Seller shall complete or repair all Infrastructure Punch List items as soon as is reasonably practical to do so. The Infrastructure Punch List shall be deemed completed after receiving written assurance from the City of Adelanto that Infrastructure Punch

XVIII

List have been satisfactorily performed and that the Infrastructure Improvement are complete. In such event, Seller duties to perform further infrastructure Improvements shall be deemed complete.

(i)     Seller represents and warrants that the Infrastructure Work will be substantially complete by April 28, 2018 (the "Infrastructure Completion Date"). If the Infrastructure Work is not substantially complete by the Infrastructure Completion Date, then Seller shall pay to Buyer liquidated damages in the amount of $ 550.00 for each day it takes to complete the Infrastructure Work. Payment of liquidated damages will end on whichever of the following dates occurs first: (i) on the date Seller obtains written assurances from the City of Adelanto that Seller has substantially completed the Infrastructure Work, (ii) on the date the City of Adelanto issues a Certificate of Occupancy for Parcel 1, or (iii) on the date the City of Adelanto provides written assurances that it will not withhold issuance of a Certificate of Occupancy for Parcel 1 because of the Infrastructure Work.

# Exhibit D

## The Building Improvements

At Buyer's sole cost and expense, Seller covenants and agrees for the benefit of Buyer to oversee, manage and coordinate the purchase, construction, and installation of a building structure on Parcel 1 without fee or further compensation other than the consideration paid by Buyer to purchase Lots1 and 6, and further provided Buyer has, by October 5, 2017, entered in a contract to purchase the building structure identified in paragraph D below (the "Building Construction"). In the event Buyer fails to execute a contract to purchase the building structure in accordance with the provisions of paragraph D below by October 5, 2017, Seller shall be under no further obligation to perform any duties in connection with the Building Improvements herein.

A.  Buyer, at Buyer's sole cost and expense, shall make available as needed on a timely basis, all of the funds required to purchase, construct and install the building structure described in paragraph C below.

B.  Seller acknowledges and agrees that if one or more of Seller's Lots (i.e., Lot B, C, D or E) is purchased by a third party under contract terms that require the Installation Contractor (see paragraph D below) to construct and install the building structure described in paragraph C below, Buyer shall have priority in the construction and installation of its building structure over and against the said third party purchaser.

C.  Seller shall arrange for Buyer to enter into a contract to purchase, from Sunray, LCC ("Sunray"), a 28,000 square foot Venio Type 8.0 building structure manufactured by *Debets-Schalke*. Buyer acknowledges that the current estimated cost to purchase the building structure with defused glass is $768,430.00.

D.  Seller shall arrange for Buyer to enter into a construction and installation contract with South Point Construction ("Installation Contractor"), a California licensed general contractor approved by Sunray for constructing and installing Venio Type 8.00 building structures in California, to construct and install the building structure purchased by Buyer from Sunray, LLC (the "Installation Contract"). Buyer acknowledges that the current estimated cost to construct and install the building structure is $ 674,849.00.

E.  Buyer and Seller acknowledge that Southern California Edison ("SCE's") informed Seller that at the present time, SCE cannot offer electrical utility services for any lot within the Overall Property including the Purchased Lots. Consequently, Buyer intends to generate its own electrical power via an electrical generator system for the Purchased Lots. Although Seller agrees to oversee, manage and coordinate the purchase and installation of any electrical generator system Buyer, in its sole discretion, deems suitable for use at Buyer's facility, Buyer acknowledges that Sellers has no knowledge or experience with electrical generators or generator systems and therefore cannot offer Buyer any advice or direction concerning the proper operation and suitability of the electrical generator system to be purchased by Buyer.

F.  Seller shall arrange for Buyer to contract with a sprinkler contractor to provide the labor and material needed to install a fire-sprinkler system within the Building Improvements in the event the County of San Bernardino Fire Department requires Seller to equip the building structure with a fire sprinkler system. Buyer acknowledges that the current estimated cost to construct and install the sprinkler system is $70,000.00.

G.  Seller shall use its best efforts to require all persons retained, engaged, and contracted with by Buyer, to maintain insurance coverage against such perils and with such limits as may be reasonably requested by Buyer prior to the time that their respective services are contracted for.

H.  At all times herein, Buyer shall maintain in full force and effect comprehensive public liability insurance, with limits of not less than $1,800,000.00, contingent liability insurance and builder's risk insurance and/or hazard insurance (whichever forms of hazard insurance are applicable). Seller shall be named as an additional insured on the public liability and contingent liability insurance policies and evidence that such

XX

coverage is in effect and paid for shall be delivered to Buyer prior to commencement of construction of the Building Improvements, and at least thirty (30) days prior to the date that any existing coverage is slated to expire. The current estimated cost is $9,000.00 annually.

I. Seller shall use its best effort to arrange for any contractor(s) retained, engaged or contracted with by Buyer to procure, or cause to be procured, all permits, approvals, and other governmental authorizations required by law for the construction and installation of the building structure.

J. Excluding the electrical generator system purchased by Buyer, Seller shall make reasonable efforts to cause the design and construction of the Building Construction to be performed in a good, workmanlike manner, and in accordance with all applicable law and other governmental requirements.

K. Seller shall prepare and amend from time to time a schedule for the completion of the Building Construction and the issuance by the City of Adelanto of a Certificate of Occupancy.

L. After completion of the Infrastructure Work needed to make Parcel 1 acceptable to the City of Adelanto for issuance of a Building Permit, Seller shall assist Installation Contractor and Buyer to apply for, and obtain a building permit for Parcel 1. Buyer acknowledges that the current estimated cost for building permit fees for the City of Adelanto is $109,672.00 per building.

M. Upon completion of the Building Construction, Seller shall arrange for Buyer and Installation Contractor to inform the City of Adelanto in writing that Installation Contractor and Buyer deems the Building Improvements acceptable for issuance of a Certificate of Occupancy by the City of Adelanto, and to request a final building inspection be conducted by the City of Adelanto to determine if there are any items that must be completed or repaired before the City of Adelanto will issue a Certificate of Occupancy for the building structure constructed on Lot A (the "Request for Final Building Inspection Date").

N. At the time for the Final Inspection by the City of Adelanto, Buyer, Seller and Installation Contractor shall make their respective representatives available for the Final Inspection. If the City of Adelanto at the time of the Final Inspection approves the issuance of Certificate of Occupancy for Lot A, Seller's duties to Buyer to oversee, manage and coordinate the purchase, construction and installation of the Building Improvements shall be deemed complete. However, if the City of Adelanto at the time of the Final Inspection determines that there are Building Structure defects that must be completed or repaired prior to the City of Adelanto's issuing a Certificate of Occupancy for Parcel 1 (the "Building Punch List"), Seller shall assist Buyer in taking all steps reasonably calculated to have Installation Contractor complete or repair all Building Punch List items as soon as is reasonably practical to do so. Upon completion by the Installation Contractor of the work required to be done under the Building Punch List, Seller shall request that the City of Adelanto re-inspect the Building Construction on Parcel 1 to determine if the Building Punch List has been completed or repaired to the satisfaction of the City of Adelanto. Seller's duties to oversee and coordinate the purchase, construction and installation of the Building Improvements shall be deemed complete if the City of Adelanto issues a Certificate of Occupancy for Parcel 1, or in the alternative, Seller obtains written assurances from the City of Adelanto that it will not withhold issuance of a Certificate of Occupancy based upon the Building Punch List.

XXII