UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MICHAEL RICATTO,<br><br>                    Plaintiff,<br><br>          -v.-<br><br>M3 INNOVATIONS UNLIMITED, INC.,<br>KYLE KIETRYS, and JOHN AND JANE<br>DOES 1-10,<br><br>                    Defendants. | 18 Civ. 8404 (KPF)<br><br>**<u>OPINION AND ORDER</u>** |

KATHERINE POLK FAILLA, District Judge:

Plaintiff Michael Ricatto and Defendant M3 Innovations Unlimited, Inc.

("M3") contemplated entering into a business relationship to buy and develop

property in California.  In furtherance of that relationship, Plaintiff and M3

entered into a series of agreements and contracts.  After the agreements had

been entered into but before they had been fully performed, relations between

Plaintiff and M3 soured, prompting Plaintiff to file this preemptive lawsuit

against M3 and its CEO, Kyle Kietrys (together, "Defendants").  In brief, Plaintiff

claims that Defendants breached, anticipatorily repudiated, and fraudulently

induced Plaintiff to enter into certain of the parties' agreements, all in

contravention of New York state law.  In response, Defendants filed

counterclaims against Plaintiff, alleging in relevant part that it was in fact

Plaintiff who breached the operative agreements.

Defendants now move for judgment on the pleadings pursuant to Federal

Rule of Civil Procedure 12(c), both as to Plaintiff's claims and as to their own

counterclaim for breach of contract.  For the reasons that follow, Defendants'

motion is granted in part and denied in part; the Court dismisses all of Plaintiff's claims, but refrains from granting judgment as a matter of law on Defendants' counterclaim.

## BACKGROUND[1]

### A.  Factual Background

### 1.  The Agreements

During the weeks leading up to September 7, 2017, Plaintiff and Defendants discussed a potential partnership to purchase a plot of land and develop it as a facility to purchase and process cannabis under California's Medicinal and Adult Use Cannabis Regulation and Safety Act, Cal. Bus. & Prof. Code §§ 26000-26211.  (Am. Compl. ¶ 13).  To that end, on September 2, 2017, Plaintiff and M3 entered into a written Memorandum of Understanding Regarding Intent to Enter into a Partnership Agreement (the "MOU").  (*Id.* at

---

[1]  This Opinion draws its facts from Plaintiff's Amended Complaint ("Am. Compl." (Dkt. #26)), the well-pleaded allegations of which are taken as true for purposes of this motion, and the exhibits attached to the Amended Complaint.  These exhibits include the actual text of: (i) the Memorandum of Understanding Regarding Intent to Enter Into Partner Agreement; (ii) the Line of Credit Agreement; (iii) the Promissory Note; and (iv) the Lease.  (Am. Compl., Ex. B, C, D, E).  The Court may consider these attachments to the pleadings. *See, e.g.*, *Goel* v. *Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) (finding that district courts may consider "documents appended to the complaint or incorporated in the complaint by reference" when assessing the sufficiency of a pleading (quoting *Concord Assocs., L.P.* v. *Entm't Props. Tr.*, 817 F.3d 46, 51 n.2 (2d Cir. 2016))).  Where relevant, the Opinion also draws from Defendants' Answer to the Amended Complaint and Counterclaims ("Countercl." (Dkt #32)), and Plaintiff's Answer to the Counterclaims ("Answer to Countercl." (Dkt. #37)).  As discussed more fully below, the Court may consider all pleadings in reviewing a motion for judgment on the pleadings.  *See Roberts* v. *Babkiewicz*, 582 F.3d 418, 419 (2d Cir. 2009).

For convenience, the Court refers to Defendants' Amended Memorandum of Law in Support of the Motion for Judgment on the Pleadings as "Def. Br." (Dkt. #36), Plaintiff's Memorandum of Law in Opposition to the Motion for Judgment on the Pleadings as "Pl. Opp." (Dkt. #38), and Defendants' Reply Memorandum of Law in Support of the Motion for Judgment on the Pleadings as "Def. Reply" (Dkt. #39).

¶ 14).  The purpose of the MOU was to "set forth the current intent of the parties with respect to the main previously negotiated and agreed upon terms and conditions to be included in the final Partnership Agreement."  (Am. Compl., Ex. B at 1).  The MOU set forth certain terms that were expected to be included in a final Partnership Agreement:

i.   Plaintiff and M3 would use reasonable efforts to enter into and finalize a Partnership Agreement;

ii.  Plaintiff and M3 would purchase a plot of land, and would split the cost of the land, the cost of building infrastructure, and the cost of improvements, with Plaintiff paying 75% and M3 paying 25%;

iii. Plaintiff would provide M3 with a revolving line of credit in the amount of $2,000,000 over a 30-month term, with all funds being used for business expenses only; and

iv.  Plaintiff would lease the land to M3 under certain specified terms.

(*Id.* at 1-5).  Notably, the MOU stated that the terms of the document would "not constitute a binding obligation on the parties to enter a Partnership Agreement," and, further, that the parties "shall [not] be finally bound unless the Partnership Agreement is executed."  (*Id.* at 1).

On September 7, 2017, Plaintiff purchased a plot of land in California (the "Property") through a company he owned named Golden State Lion LLC ("Golden State").  (Am. Compl. ¶¶ 10-11).  Thereafter, on October 11, 2017, Plaintiff and M3 entered into a Line of Credit Agreement (the "LOC").  (Am. Compl. ¶ 17 & Ex. C).  The LOC provided that:

i.   Plaintiff would provide M3 with a line of credit with a maximum principal amount of $2,000,000;

3

ii.     Plaintiff would make disbursements to M3 under the LOC up to the maximum principal amount, so long as M3 was not in "Default";

iii.    As relevant here, an "Event of Default" would occur if M3 either admitted "in writing its inability to pay its debts as they become due," or failed to make interest payments within 10 days of the payment's due date;

iv.     Upon an "Event of Default", Plaintiff would notify M3 in writing of the event — if M3 failed to cure the deficiency within 30 days of receiving that notice, it would be deemed to be in "Default"; and

v.      Plaintiff and M3 would enter into a Promissory Note to confirm M3's obligations to repay the principal and interest due under the LOC.

(Am. Compl., Ex. C at 2).

The same day that the parties entered into the LOC, Plaintiff and M3 signed a Promissory Note. (Am. Compl. ¶ 19 & Ex. D). The Promissory Note provided the terms under which M3 would make principal and interest payments under the LOC. (*Id.*). Finally, on October 19, 2017, Golden State and M3 entered into a formal lease agreement, with M3 becoming the tenant of the Property in California. (Am. Compl. ¶ 21 & Ex. E).

### 2.     Defendants' Alleged Breaches of the Agreements

After the three agreements were finalized, Plaintiff advanced $800,000 to M3 under the LOC. (Am. Compl. ¶ 23). Plaintiff alleges that no portion of the funds advanced was used to cultivate or develop the Property. (*Id.* at ¶¶ 23-24). In or around March 2018, the "Executive Team" of M3 considered recommending to the Board of M3 that it remove Kietrys as CEO, due in part to his failure to develop the Property. (*Id.* at ¶¶ 25-27).

In or around April 2018, representatives of M3 told Plaintiff that "despite the substantial amount of money [M3] had taken and the lack of development of the Property, M3 [had] no money left and no means to obtain further funding." (Am. Compl. ¶¶ 28-29). Consequently, Plaintiff grew concerned about M3's financial outlook and requested access to M3's internal records. (*Id.* at ¶ 30). Plaintiff believed that he was entitled to these records under a provision of the MOU that granted Plaintiff access to "relevant company information for the purpose of completing the Partnership Agreement." (*Id.* at ¶ 31). M3 initially refused to provide Plaintiff with its financial information, but after several months provided select financial information in August 2018 without acknowledging an obligation to do so. (*Id.* at ¶ 32). This information, it is alleged, alerted Plaintiff to the fact that M3 had used the funds advanced under the LOC for the benefit of its own officers, directors, and shareholders, and not to develop the Property. (*Id.* at ¶¶ 32-34).

On April 26, 2018, M3 requested from Plaintiff $200,000 in additional funds pursuant to the LOC. (Countercl. ¶ 57; Answer to Countercl. ¶ 57; Countercl. Ex. E). On April 30, 2018, Plaintiff sent M3 a letter, rejecting M3's request for additional funds under the LOC. (Countercl. ¶¶ 60-61 & Ex. F; Answer to Countercl. ¶¶ 60-61). Plaintiff stated that it was rejecting M3's request for two reasons: (i) M3 had used the already-advanced $800,000 for improper purposes, because the funds should have been, and were not, used to develop the Property; and (ii) M3's "failure to provide their own funds to

contribute towards the [development of the Property led Plaintiff] to believe that M3 may be insolvent." (Countercl. ¶ 63 & Ex. F; Answer to Countercl. ¶ 63).[2]

## B.    Procedural Background

Plaintiff filed his Complaint in this action on September 14, 2018.  (Dkt. #1).  On November 30, 2018, Defendants filed their Answer to the Complaint, and asserted counterclaims against Plaintiff.  (Dkt. #10).  On that same date, Defendants requested leave to file a motion for judgment on the pleadings.  (Dkt. #11).  The Court held a pre-motion conference on December 18, 2018.  (Dkt. #14).  On December 28, 2018, the Court granted Plaintiff leave to amend his complaint, and he filed the Amended Complaint on January 7, 2019.  (Dkt. #22, 26).  Defendants filed an Answer to the Amended Complaint, again asserting counterclaims, on March 1, 2019.  (Dkt. #32).  Plaintiff filed an Answer to the Counterclaims on March 27, 2019.  (Dkt. #37).

Defendants moved for judgment on the pleadings on March 8, 2019.  (Dkt. # 33, 34, 35, 36).  Plaintiff filed an opposition brief on April 12, 2019.  (Dkt. #38).  This motion became fully briefed when Defendants filed their reply brief on May 1, 2019.  (Dkt. #39).

---

[2]     The Lease provided that M3 would contribute 25% of the costs of constructing a greenhouse on the Property.  (Am. Compl., Ex. F.).  Plaintiff claimed that M3 had stated an intention to use funds advanced under the LOC to pay its portion of the construction costs.  (Countercl. ¶ 63 & Ex. F).  Plaintiff has not alleged that Defendants violated the Lease by failing to pay their portion of the costs of constructing a greenhouse.

**DISCUSSION**

A. **Applicable Law**

    1. **Motions for Judgment on the Pleadings under Fed. R. Civ. P. 12(c)**

Courts apply the same procedure to evaluate motions for judgment on the pleadings under Rule 12(c) as for motions to dismiss under Rule 12(b)(6). *Altman* v. *J.C. Christensen & Assoc's, Inc.*, 786 F.3d 191, 193 (2d Cir. 2015); *Johnson* v. *Rowley*, 569 F.3d 40, 43 (2d Cir. 2009). This procedure requires courts to "draw all reasonable inferences in [the non-movant's] favor, 'assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief.'" *Faber* v. *Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (quoting *Selevan* v. *N.Y. Thruway Auth.*, 584 F.3d 82, 88 (2d Cir. 2009)). The non-movant is entitled to relief if he or she alleges "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007); *see also In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) ("While *Twombly* does not require heightened fact pleadings of specifics, it does require enough facts to nudge [the non-movant's] claims across the line from conceivable to plausible." (internal quotation marks and citation omitted)).

On a Rule 12(c) motion, the court considers "the complaint, the answer, any written documents attached to them, and any matter of which the court can take judicial notice for the factual background of the case." *Roberts* v. *Babkiewicz*, 582 F.3d 418, 419 (2d Cir. 2009). "A complaint is [also] deemed to include any written instrument attached to it as an exhibit, materials

incorporated in it by reference, and documents that, although not incorporated by reference, are 'integral' to the complaint." *Sira* v. *Morton*, 380 F.3d 57, 67 (2d Cir. 2004) (internal citations omitted) (quoting *Chambers* v. *Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002)).

If the allegations of a pleading "are contradicted by documents made a part thereof, the document controls and the court need not accept as true the allegations of the [pleading]." *In the Matter of the Trusteeships Created by Tropic CDO I Ltd.*, 92 F. Supp. 3d 163, 171 (S.D.N.Y. 2015) ("*Tropic CDO I*") (quoting *Sazerac Co.* v. *Falk*, 861 F. Supp. 253, 257 (S.D.N.Y. 1994); *see, e.g.*, *Feick* v. *Fleener*, 653 F.2d 69, 75 & n. 4 (2d Cir. 1981). Thus, motions for judgment on the pleadings are "particularly appropriate in breach of contract cases involving legal interpretations of the obligations of the parties." *Tropic CDO I*, 92 F. Supp. 3d at 171 (quoting *VoiceAge Corp.* v. *RealNetworks, Inc.*, 926 F. Supp. 2d 524, 529 (S.D.N.Y. 2013)). "If the contract is unambiguous, the Court may award judgment on the pleadings, assuming no material facts are in dispute." *Neopharm Ltd.* v. *Wyeth-Ayerst Int'l LLC*, 170 F. Supp. 3d 612, 615 (S.D.N.Y. 2016).

### 2. Contract Interpretation Under New York Law[3]

In interpreting a contract, the Court's primary objective "is to give effect to the intent of the parties as revealed by the language of their agreement."

---

[3] New York law governs the instant dispute pursuant to the choice of law provisions of the MOU, the LOC, and the Promissory Note. (Am. Compl., Ex. B, C, D). Additionally, both parties have relied upon New York law in their briefing. *See Celle* v. *Filipino Reporter Enters. Inc.*, 209 F.3d 163, 175 (2d Cir. 2000) ("Since no party has challenged the choice of New York [] law, all are deemed to have consented to its application." (citations omitted)).

*Compagnie Financiere de CIC et de L'Union Europeenne* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 232 F.3d 153, 157 (2d Cir. 2000). "The words and phrases in a contract should be given their plain meaning, and the contract should be construed so as to give full meaning and effect to all of its provisions." *Chesapeake Energy Corp.* v. *Bank of N.Y. Mellon Tr. Co., N.A.*, 773 F.3d 110, 114 (2d Cir. 2014) (internal quotation marks, citation, and alterations omitted).

"When analyzing the meaning of a contractual provision, a threshold question the Court [must] address is whether the contract is ambiguous." *U.S. Bank, N.A.* v. *Triaxx Asset Mgmt. LLC*, No. 16 Civ. 8507 (AJN), 2017 WL 3610584, at *7 (S.D.N.Y. July 26, 2017); *see also Alexander & Alexander Servs., Inc.* v. *These Certain Underwriters at Lloyd's, London, England*, 136 F.3d 82, 86 (2d Cir. 1998). If the contract is unambiguous, its meaning is a question of law that the Court may decide on a motion for judgment on the pleadings. *Id.* However, where the contract is ambiguous, "the Court must examine extrinsic evidence of the parties' intent — which means, in this posture, that the Court would have to deny both cross-motions [for judgment on the pleadings] and proceed to discovery." *Neopharm Ltd.*, 170 F. Supp. 3d at 615.

Ambiguity exists where a contract's terms "could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages[,] and terminology as generally understood in

9

the particular trade or business." *Law Debenture Tr. Co. of N.Y.* v. *Maverick Tube Corp.*, 595 F.3d 458, 466 (2d Cir. 2010) (internal quotation marks omitted). By contrast, a contract "is unambiguous when [the contract language] has 'a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion.'" *Revson* v. *Cinque & Cinque, P.C.*, 221 F.3d 59, 66 (2d Cir. 2000) (quoting *Hunt Ltd.* v. *Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir. 1989)). "[W]hen the terms of a written contract are clear and unambiguous, the intent of the parties must be found within the four corners of the contract[.]" *Howard* v. *Howard*, 740 N.Y.S.2d 71, 71 (2d Dep't 2002) (citations omitted).

New York courts emphasize that "[f]orm should not prevail over substance and a sensible meaning of words should be sought." *Kass* v. *Kass*, 91 N.Y.2d 554, 566 (1998) (quoting *Atwater & Co.* v. *Panama R.R. Co.*, 246 N.Y. 519, 524 (1927)). And under New York law, a contract may not be found to be ambiguous merely because litigants present alternative interpretations. *Maverick Tube Corp.*, 595 F.3d at 467. Rather, ambiguity requires that "the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings." *Goldman Sachs Grp., Inc.* v. *Almah LLC*, 924 N.Y.S.2d 87, 90 (1st Dep't 2011) (internal quotation marks and citation omitted); *see also Broder* v. *Cablevision Sys. Corp.*, 418 F.3d 187, 197 (2d Cir. 2005).

**B.      The Court Dismisses Plaintiff's Claims Against Defendants**

Plaintiff brings three claims against Defendants, each premised on misconduct relating to one or more of the agreements Plaintiff entered into with M3; the claims are for (i) breach of contract; (ii) anticipatory repudiation of contract; and (iii) fraudulent inducement.  Though Kietrys was not a signatory to any of these contracts, Plaintiff maintains that he is properly joined as a Defendant through piercing of the corporate veil.  Defendants move for judgment on the pleadings as to each of these claims and argue that piercing the corporate veil is inappropriate in this instance.  The Court concludes that the pleadings, even when read in the light most favorable to Plaintiff, do not support Plaintiff's claims.

**1.      Plaintiff Fails to State a Claim for Breach of Contract**

"To state a claim in federal court for breach of contract under New York law, a complaint need only allege [i] the existence of an agreement, [ii] adequate performance of the contract by the plaintiff, [iii] breach of contract by the defendant, and [iv] damages."  *Harsco Corp.* v. *Segui*, 91 F.3d 337, 348 (2d Cir. 1996).  In the Complaint, Plaintiff claims that Defendants breached both the MOU and the LOC by using the $800,000 advanced to M3 under the LOC for expenses which were unrelated to the cultivation and development of the Property.  (Am. Compl. ¶¶ 47-52).  Plaintiff reasons that Defendants' use of the advanced funds is restricted by a provision of the appendix to the MOU that contemplated a line of credit agreement — a document that had yet to be drafted when the MOU was signed — and provided that such line of credit

"would only be used for Business Expenses." (*Id.*; Pl. Opp. 12-15).  Plaintiff further contends that this language is binding on Defendants and requires them to spend all funds advanced under the LOC on the development of the Property for cultivation of marijuana, and for no other purpose.  (Pl. Opp. 12-15).[4]

---

[4]   If Plaintiff were correct, and Plaintiff did in fact seek enforcement of a contract that obligated Defendants to develop land, it is not readily apparent to the Court that it could enforce such a contract.  As the Second Circuit has unequivocally stated, "[m]arijuana remains illegal under federal law, even in those states in which medical marijuana has been legalized." *United States* v. *Canori*, 737 F.3d 181, 184 (2d Cir. 2013) (citing 21 U.S.C. § 903m, which provides "for preemption where 'there is a positive conflict between [a provision of the federal Controlled Substances Act ("CSA")] and that State law such that the two cannot consistently stand together'"); *see also* 21 U.S.C. §§ 812 (scheduling controlled substances), 844(a) (listing penalties).  "That the Department of Justice has chosen to prioritize certain types of prosecutions unequivocally does not mean that some types of marijuana use are now legal under the CSA." *Canori*, 737 F.3d at 185.

"Under both federal and [New York] state law, illegal agreements, as well as agreements contrary to public policy, have long been held to be unenforceable and void." *United States* v. *Bonanno Organized Crime Family of La Cosa Nostra*, 879 F.2d 20, 28 (2d Cir. 1989).  "The power of the federal courts to enforce the terms of private agreements is at all times exercised subject to the restrictions and limitations of the public policy of the United States as manifested in … federal statutes….  Where the enforcement of private agreements would be violative of that policy it is the obligation of courts to refrain from such exertions of judicial power." *Kaiser Steel Corp.* v. *Mullins*, 455 U.S. 72, 83-84 (1982) (quoting *Hurd* v. *Hodge*, 334 U.S. 24, 34-35 (1948)).  That said, "[t]he fact that a contract offends a federal statute or regulation does not, however automatically render it void or unenforceable.  Unless the enforcement of a contract would require directing the precise conduct that a statute or regulation makes unlawful, 'the courts are to be guided by the overriding general policy of preventing people from getting other people's property for nothing when they are purporting to be buying it.'" *Dervin Corp.* v. *Banco Bilbao Vizcaya Argentaria, S.A.*, No. 03 Civ. 9141 (PKL), 2004 WL 1933621, at *3 (S.D.N.Y. Aug. 30, 2004) (quoting *Kaiser Steel Corp.*, 455 U.S. at 80).

"As a general rule, New York courts will not enforce illegal contracts." *Schlessinger* v. *Valspar Corp.*, 686 F.3d 81, 85 (2d Cir. 2012) (citing *Stone* v. *Freeman*, 298 N.Y. 268, 271 (1948) ("It is the settled law of this State (and probably of every other State) that a party to an illegal contract cannot ask a court of law to help him carry out his illegal object, nor can such a person plead or prove in any court a case in which he, as a basis for his claim, must show forth his illegal purpose.")).

Had the LOC obligated Defendants to develop land for the cultivation of marijuana, enforcement of the contract might well put the Court in the position of directing Defendants to violate federal law.  Indeed, insofar as the cultivation of marijuana would not comply with New York's own medical marijuana laws, *see* N.Y. Pub. Health Law §§ 3360-3369, enforcement of the contract might require Defendants to violate New York law as well.  If enforcement of the contract would require an illegal action, the

At this stage in the proceedings, the Court must accept as true Plaintiff's allegation that Defendants used the $800,000 for purposes other than developing the Property. But the Court is not similarly constrained with respect to Plaintiff's proffered interpretations of the MOU and the LOC. *See Tropic CDO I*, 92 F. Supp. 3d at 171 ("[I]f the allegations of a pleading are contradicted by documents made a part thereof, the document controls and the court need not accept as true the allegations of the [pleading]." (internal quotation omitted)). If the operative contracts themselves unambiguously contradict Plaintiff's representations regarding the obligations they place on Defendants' use of the funds, the Court must reject Plaintiff's breach of contract claim.

Defendants contend that Plaintiff's interpretation of the MOU is plainly wrong and provide three arguments to support their contention. Though the Court ultimately agrees with Defendants that Plaintiff's breach of contract claim is premised on a faulty interpretation of the contracts, it disagrees with Defendants' first argument, and finds merit in their second and third arguments.

*First*, Defendants take issue with Plaintiff's interpretation of the phrase "business expense" as it appears in the MOU. Plaintiff claims that, in

---

contract would be unenforceable. *But see Mann* v. *Gullickson*, No. 15 Civ. 3630 (MEJ), 2016 WL 6473215, (N.D. Cal. Nov. 2, 2016) (finding that a contract for the sale of a website that dealt products related to marijuana cultivation was enforceable, because enforcement would only require defendant to pay a debt, and would not require defendant to "possess, cultivate, or distribute marijuana, or to in any other way require her to violate the CSA").

specifying that advanced funds be used only for "business expenses," the MOU prohibited Defendants from using the funds for anything other than developing the Property. (Pl. Opp. 12-15). Defendants contend that "business expenses" covers a much broader range of expenditures, including all costs that might be incurred during the normal course of business. (Def. Br. 13-14). Upon examination of the document itself, the Court concludes that the term "business expenses" as used in the memorandum is ambiguous. The MOU does not define "business expenses." And while the parties may have intended the provision to permit the use of advanced funds for any ordinary business expense, they may just as easily have intended it to limit the use of funds to further the parties' contemplated business endeavor: the establishment of the Property as a place to cultivate marijuana. Because the phrase "business expense" is susceptible to two reasonable interpretations, the Court must accept Plaintiff's interpretation as correct at this stage in the proceedings and may not grant judgment against Plaintiff's on this ground. *See Neopharm Ltd.*, 170 F. Supp. 3d at 615. Thus, the Court accepts, for now, Plaintiff's contention that the MOU reflected the parties' intent that funds advanced pursuant to the anticipated line of credit be used only for the development of the Property.

*Second*, Defendants argue in the alternative that, even if the terms of the MOU stated that the advanced funds were to be used for development of the Property, the MOU itself was non-binding. (Def. Br. 12-14). The Court agrees. The MOU merely "set forth the current intent of the parties" with respect to

14

terms to be included in a final Partnership Agreement.  (Am. Compl., Ex. B).

The MOU states that:

> It is expressly understood that the terms of this MOU do not constitute a binding obligation on the parties to enter into a Partnership Agreement.  Neither party shall be finally bound unless and until the Partnership Agreement is executed by the parties and delivered to each other.  It is contemplated that the Partnership Agreement shall contain such other terms, covenants, conditions, warranties, and representations as are customary or appropriate in transactions of this nature as well as the pre-negotiated agreed upon terms listed in Appendix A.

(*Id.*).  The MOU was thus, at most, an agreement to agree.  "[I]t is rightfully well settled in the common law of contracts in [New York] that a mere agreement to agree, in which a material term is left for future negotiations, is unenforceable." *Joseph Martin, Jr., Delicatessen, Inc.* v. *Schumacher*, 52 N.Y.2d 105, 109 (1981); *accord Brown* v. *Cara*, 420 F.3d 148, 154 (2d Cir. 2005) (affirming district court decision that a memorandum of understanding was a non-enforceable agreement to agree).  Furthermore, the MOU expressly states that its terms are non-binding until the parties enter into a Partnership Agreement.[5]  Plaintiff does not allege that the parties ever entered into such an agreement.  Thus, the MOU, including the provision relating to "business expenses," does not bind

---

[5]      The MOU further contemplated that an eventual Partnership Agreement would include the terms contained within the MOU and its accompanying exhibit.  (Am. Compl., Ex. B at 1-2).  This suggests that entry into a Partnership Agreement would not bind the parties to the MOU's terms, if those terms did not also appear in the Partnership Agreement.

Defendants and, by extension, does not require them to spend the advanced funds in any specific way.[6]

*Third*, even if the MOU were binding on the parties at the time it was entered into, Defendants argue that any requirement concerning how advanced funds could be spent was supplanted by the LOC itself. (Def. Br. 12-14). The LOC was signed on October 11, 2017, more than a month after the MOU, and, importantly, does not contain any provision restricting how funds advanced under the LOC can be used. Perhaps more significantly, the LOC contains a merger clause, which states that the LOC "constitutes the entire agreement of the parties hereto with respect to the subject matter hereof, and supersedes all prior agreements and understandings." (Am. Compl., Ex. C at 4).

Plaintiff urges that the merger clause does not supersede any promises made in the MOU because the proper use of advanced funds was not a "subject matter" of the LOC. (Pl. Opp. 13-14). Thus, according to Plaintiff, the MOU's requirement that the funds be spent on "business expenses" was not superseded by the LOC's mergers clause. (*Id.*). But Plaintiff's preferred interpretation of the LOC's merger clause is not plausible. *See Law Debenture*

---

[6]     To support his assertion that the MOU is binding on the parties to it, Plaintiff notes that M3 performed the majority of the terms contained within the MOU. (Pl. Opp. 12-13). Defendants contest the relevance of this information, noting that these terms appeared not just in the MOU, but in other, plainly binding contracts like the LOC, the Promissory Note, and the Lease. (Def. Reply 2-3). The Court agrees with Defendants and concludes that Plaintiff's partial-performance theory is irrelevant for yet another reason: "To determine whether a contract term is ambiguous, courts 'look[ ] within the four corners of the document [and] not to outside sources.'" *Fuller Landau Advisory Servs. Inc.* v. *Gerber Finance Inc.*, 333 F. Supp. 3d 307, 312 (S.D.N.Y. 2018) (quoting *JA Apparel Corp.* v. *Abboud*, 568 F.3d 390, 396 (2d Cir. 2009)). The MOU is unambiguously not a binding contract, and the Court shall not look beyond its four corners.

*Tr. Co. of N.Y.*, 595 F.3d at 466 ("Language whose meaning is otherwise plain does not become ambiguous merely because the parties urge different interpretations in the litigation … unless each is a 'reasonable' interpretation." (quoting *Hunt Ltd.* v. *Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir. 1989))).  The subject matter of the LOC was plainly the line of credit itself.  Any prior agreement between the parties concerning the line of credit — for example, agreements contained within the MOU — was superseded by the LOC.

Reading the operative contracts, which were appended to the Amended Complaint, in conjunction with the Amended Complaint itself, the Court concludes that Plaintiff has failed to state a claim for breach of contract. Plaintiff claims that Defendants breached their obligation to use the advanced-funds to develop the Property, but no such contractual obligation exists. Accordingly, the Court grants Defendants' motion for judgment on the pleadings with respect to Plaintiff's breach of contract claim.

### 2. Plaintiff Fails to State a Claim for Anticipatory Repudiation of Contract

"Anticipatory repudiation occurs when, before the time for performance has arisen, a party to a contract declares his intention not to fulfill a contractual duty."  *Lucente* v. *Int'l Bus. Machines Corp.*, 310 F.3d 243, 258 (2d Cir. 2002).  Anticipatory repudiation "can be either a statement by the obligor to the obligee indicating that the obligor will commit a breach that would of itself give the obligee a claim for damages for total breach or a voluntary affirmative act which renders the obligor unable or apparently unable to

17

perform without such a breach." *Princes Point LLC* v. *Muss Dev. L.L.C.*, 30

N.Y.3d 127, 133 (2017) (quoting *Norcon Power Partners* v. *Niagara Mohawk*

*Power Corp.*, 92 N.Y.2d 458, 463 (1998)).

"For an anticipatory repudiation to be deemed to have occurred, the

expression of intent not to perform by the repudiator must be 'positive and

unequivocal.'" *Princes Point LLC*, 30 N.Y.3d at 133 (quoting *Tenavision, Inc.* v

*Neuman*, 45 N.Y.2d 145, 150 (1978)). When confronted with an anticipatory

repudiation, the non-repudiating party has two mutually exclusive options. It

may either (i) "elect to treat the repudiation as an anticipatory breach and seek

damages for breach of contract, thereby terminating the contractual relation

between the parties," or (ii) "continue to treat the contract as valid and await

the designated time for performance before bringing suit." *Lucente*, 310 F.3d at

258.

Plaintiff alleges that Defendants anticipatorily repudiated the LOC and

Promissory Note, both of which required M3 to make payments to Plaintiff, by

"unequivocally and repeatedly" indicating that "M3 has no money left and is

insolvent." (Am. Compl. ¶ 43). Specifically, Plaintiff asserts that

"representatives of M3 advised [Plaintiff] in or about April 2018 that their

financial outlook was bleak" (*id.* at ¶ 28), and that "M3, through its

representatives, including but not limited to Kietrys, also represented to

Plaintiff that despite the substantial amount of money it had taken and the

lack of development of the Property, M3 currently has no money left and no means to obtain further funding" (*id.* at ¶ 29).[7]

Accepting these allegations as true, Plaintiff has still failed to plead a plausible claim for anticipatory repudiation. The Amended Complaint contains no allegation that Defendants positively and unequivocally expressed an intent not to make the payments required under the LOC and the Promissory Note. *See Princes Point LLC*, 30 N.Y.3d at 133. Defendants did not disavow any intention to make payments to Plaintiff; at most, they acknowledged that in or around April 2018, they were insolvent. That Defendants were insolvent in April 2018 does not clearly and unequivocally mean that they would be unable or unwilling to make payments to Plaintiff in October 2018, when payments began to be due. (Am. Compl. ¶ 40). *See St. Christopher's Inc.* v. *Forgione*, No. 17 Civ. 4757 (CS), 2019 WL 3035375, at *6 (S.D.N.Y. July 11, 2019) (concluding that notice to contracting party of possible litigation related to the contract and attempts to convince that party to back out of the contract did not amount to a clear and unequivocal statement of an intent not to perform under the contract). This is especially true here, where Defendants had a contractual right to the advancement of additional funds from Plaintiff under the LOC and made a request for such an advancement in April 2018. These funds could

---

[7] Defendants insist that, under the terms of the LOC and the Promissory Note, an admission of inability to pay debts as they become due must be made in writing for that admission to constitute an Event of Default. (Def. Br. 16-17). This may be true, but it is also true that failure to pay interest due and owing would constitute an Event of Default under the LOC. (Am. Compl., Ex. C at 3). Plaintiff's claim arises from an anticipatory repudiation — a failure to pay that had not yet occurred — rather than an actual Event of Default under the LOC or the Promissory Note. For such a claim, it is unnecessary for the repudiation to have been delivered in writing.

have been invested to make M3 profitable before October 2018 or, at the very least, used to pay interest as it became due under the Promissory Note until another source of funding was found.  In short, Plaintiff has failed to allege facts that permit a plausible inference that Defendants clearly and unequivocally expressed their intent to breach the LOC or the Promissory Note.[8]

Defendants have identified a second, independent ground for granting judgment on the pleadings as to Plaintiff's anticipatory repudiation claim:  "A plaintiff claiming anticipatory breach of contract must show … that the plaintiff was 'ready, willing, and able to perform its own obligations under the contract when performance was due." *Randolph Equities, LLC* v. *Carbon Capital, Inc.*, 648 F. Supp. 2d 507, 519 (S.D.N.Y. 2009) (quoting *United States* v. *Hon Yee-Chau*, 17 F.3d 21, 26 (2d Cir. 1994)), *cited in* Def. Br. 18.  The Amended Complaint contains no allegation that Plaintiff was ready, willing, and able to perform his obligations under the LOC but for Defendants' anticipatory repudiation.  Indeed, the letter Plaintiff sent on April 30, 2018, denying Defendants' request for an additional $200,000 advancement under the LOC, indicates that Plaintiff was unwilling to abide by the terms of the agreement. (Countercl., Ex. F).  There, Plaintiff wrote that he would not supply Defendants

---

[8]     Plaintiff cites to just one case to support his argument that the Amended Complaint states a claim for anticipatory repudiation: *Leventhal* v. *Franzus Co., Inc.*, No. 88 Civ. 3547 (MBM), 1988 WL 132868 (S.D.N.Y. Dec. 6, 1988).  There, the complaint alleged that defendant told plaintiff that payments due under a contract "will not be made." *Id.* at *5.  This is precisely the sort of allegation that the Amended Complaint lacks: a plain and unequivocal expression of an intent not to perform.

with additional funds, because he believed that Defendants had misused funds that had previously been advanced. (*Id.*). This letter establishes that Plaintiff refused to comply with his contractual obligations and was not otherwise willing to perform under the LOC for a reason entirely independent of Defendants' alleged insolvency.[9] For these reasons, the Court grants Defendants' motion for judgment on the pleadings with respect to Plaintiff's anticipatory repudiation claim.[10]

### 3. Plaintiff Fails to State a Claim for Fraudulent Inducement

To make out a claim of fraudulent inducement under New York Law, a plaintiff must show that: "[i] the defendant made a material false representation, [ii] the defendant intended to defraud the plaintiff thereby, [iii] the plaintiff reasonably relied upon the representation, and [iv] the plaintiff suffered damage as a result of such reliance." *Axginc Corp.* v. *Plaza Automall, Ltd.*, 759 F. App'x 26, 30 (2d Cir. 2018) (summary order) (quoting *Bridgestone/Firestone, Inc.* v. *Recovery Credit Servs., Inc.*, 98 F.3d 13, 19 (2d Cir. 1996)). In addition, allegations of fraud must "[i] specify the statements

---

[9] The Court notes that Plaintiff did not respond to Defendants' argument that he had failed to meet his obligation to plead readiness, willingness, and ability to perform under the contracts. A court may dismiss a claim as abandoned if a plaintiff fails to respond to arguments raised by a defendant in support of dismissal. *See Lipton* v. *Cty. of Orange*, 315 F. Supp. 2d 434, 446 (S.D.N.Y. 2004).

[10] Defendants argue that Plaintiff's claim fails for a third reason, but this reason is less convincing to the Court: "New York does not permit recovery for the anticipatory repudiation of an executory contract to pay money." (Def. Br. 16 (quoting *Leventhal*, 1988 WL 132868, at *3)). It is true that "when a plaintiff has completely performed, and merely awaits periodic payments from the defendant, plaintiff may not recover for anticipatory breach of the contract, but may only recover the payments due at the time of suit." *Leventhal*, 1988 WL 132868, at *3. However, Plaintiff's allegations do not suggest that Plaintiff had fully performed under the LOC or the Promissory Note when Defendants anticipatorily repudiated. Rather, Plaintiff claims that he was still bound to advance Defendants up to $1,200,000 at the time of the repudiation.

that the plaintiff contends were fraudulent, [ii] identify the speaker, [iii] state where and when the statements were made, and [iv] explain why the statements were fraudulent." *Nakahata* v. *N.Y.-Presbyterian Healthcare Sys., Inc.*, 723 F.3d 192, 197 (2d Cir. 2013) (citation omitted); *see also* Fed. R. Civ. P. 9(b).

Plaintiff claims that Defendants fraudulently induced Plaintiff to enter into the LOC[11] by falsely representing that they would (i) use funds advanced under the LOC to develop the Property and (ii) be in a financial position by October 2018 to make payments to Plaintiff under the Promissory Note. (Am. Compl. ¶¶ 53-62). The Court will address each of the alleged factual predicates for Plaintiff's fraudulent inducement claim in turn.

### a. Use of Funds Advanced Under the LOC to Develop the Property

*First*, Plaintiff alleges that, by "entering into the MOU, LOC, and Promissory Note," Defendants represented that they would use funds advanced under the LOC only to develop the Property for the cultivation of marijuana. (Am. Compl. ¶ 54). But the Court has already determined that neither the LOC nor the Promissory Note restricted M3's use of funds advanced under the LOC.

---

[11]    The Court notes that the Amended Complaint does not state with particularity which of the contracts Defendants are alleged to have fraudulently induced Plaintiff to enter into. Paragraph 56 of the Amended Complaint alleges that "Defendants knew of the falsity of their representations when making them to [Plaintiff] to induce [Plaintiff] to enter into the LOC." The Amended Complaint does not otherwise allege that Defendants intended to defraud Plaintiff to enter into any of the other contracts. Thus, the Court assumes that Plaintiff only intended to allege that Defendants fraudulently induced him to enter into the LOC. The Court's analysis would not be altered, however, if Plaintiff had intended to allege fraudulent inducement as to the MOU, the Promissory Note, or the Lease.

(*See supra* at 15).  Thus, the Court does not accept as true Plaintiff's allegation that Defendants made a representation concerning how they would use funds advanced under the LOC simply by entering into the LOC or the Promissory Note.

The Court is also unable to accept as true Plaintiff's alternative argument that, by entering into the MOU, Defendants represented that they would use all funds advanced under an anticipated line of credit agreement to develop the Property.  As the Court has found, the MOU specifically recites that it was nothing more than a reflection of the parties' "current intent" with respect to terms that would be included in a final Partnership Agreement and was not to be binding upon either of the parties.  (Am. Compl., Ex. B).  Because it was a mere agreement to agree, Defendants' entry into the MOU did not serve as a representation regarding any party's future conduct.  Plaintiff's allegation to the contrary is belied by the MOU, as appended to the Amended Complaint, and the document must control.  *Tropic CDO I*, 92 F. Supp. 3d at 171.

But even if the Court were to accept Plaintiff's allegation that, by signing the MOU, Defendants represented that they would use funds advanced under the yet-to-be-drafted line of credit agreement only for development of the Property, the claim would still fail.  Plaintiff's fraudulent inducement claim is premised on Defendants lacking the intent to abide by their representation at the time they entered into the MOU.  "Allegations that [a] defendant entered into a contract while lacking the intent to perform it are insufficient to support [a fraud] claim."  *Wall* v. *CSX Transp., Inc.*, 471 F.3d 410, 416 (2d Cir. 2006)

(quoting *N.Y. Univ.* v. *Cont'l Ins. Co.*, 87 N.Y.2d 308, 318 (1995)). "Indeed, '[i]t is a general rule that a claim of intentional misrepresentation cannot be predicated upon statements which are promissory in nature at the time they are made and which relate to future actions or conduct, because [m]ere unfulfilled promissory statements as to what will be done in the future are not actionable.'" *Exceed Holdings LLC* v. *Chicago Bd. Options Exchange Inc.*, No. 17 Civ. 8078 (RA), 2018 WL 4757961, at *4 (S.D.N.Y. Sept. 30, 2018) (quoting *Philips Credit Corp.* v. *Regent Health Grp., Inc.*, 953 F. Supp. 482, 520 (S.D.N.Y. 1997)).[12]

---

[12]     The Court observes that, even if Defendants had made a representation concerning how they would spend funds advanced under the LOC by entering into the MOU, a strong argument could be made that Plaintiff failed to plead facts that might plausibly suggest that Plaintiff's reliance on such a representation would be reasonable. Under New York law, courts may determine "as a matter of law that a party's reliance [is] unreasonable where the alleged misrepresentation is explicitly contradicted by the written agreement." *Robinson* v. *Deutsche Bank Tr. Co. Americas*, 572 F. Supp. 2d 319, 323 (S.D.N.Y. 2008). Here, Plaintiff's allegation that he relied upon representations contained within the MOU when entering into the LOC is explicitly contradicted by the LOC's merger clause.

It is true, however, that "an omnibus statement that the written instrument embodies the whole agreement, or that no representations have been made" is ordinarily insufficient to bar a claim of fraudulent inducement. *Mfrs. Hanover Tr. Co.* v. *Yanakas*, 7 F.3d 310, 315 (2d Cir. 1993). "When, however, the contract states that a contracting party disclaims the existence of or reliance upon specified representations, that party will not be allowed to claim that he was defrauded into entering the contract in reliance on those representations." *Id.* The "specificity requirement may be relaxed (or even altogether disregarded) when the clause and its surrounding contract were the product of arm's-length negotiations between sophisticated parties." *PetEdge, Inc.* v. *Garg*, 234 F. Supp. 3d 477, 488 (S.D.N.Y. 2017).

The LOC's merger clause states that it supersedes all prior agreements with respect to the subject matter of the LOC. (Am. Compl., Ex. C). Standing alone, this clause is arguably insufficiently specific to render reliance upon prior agreements unreasonable under New York law. And no allegations regarding Plaintiff's sophistication as a negotiator may be accepted at this point in the proceedings. As a result, the Court does not, and need not, address whether the merger clause is sufficiently specific to render reliance upon the MOU unreasonable.

### b. Ability to Make Payments Pursuant to the LOC and the Promissory Note

*Second*, Plaintiff alleges that, by "entering into the MOU, LOC, and Promissory Note," Defendants represented that they would "be in a financial position by October 11, 2018 to make payments to [Plaintiff] representing interest and the amortized portion of the outstanding balance." (Am. Compl. ¶ 54). As Defendants argue, the facts forming the basis of this fraud claim — Defendants' promise to make payments, coupled with their ultimate inability to do so — are identical to the facts undergirding Plaintiff's anticipatory repudiation claim. (Def. Br. 19-21). Under New York law, conduct that would violate a contract "will not give rise to a tort claim unless a legal duty independent of the contract itself has been violated." *Bayerische Landesbank, N.Y. Branch* v. *Aladdin Capital Mgmt. LLC*, 692 F.3d 42, 58 (2d Cir. 2012).[13] "Such a 'legal duty must spring from circumstances extraneous to, and not

---

[13]    The Court notes that certain cases say that "where a fraud claim arises out of the same facts as plaintiff's *breach of contract claim*, with the addition only of an allegation that defendant never intended to perform the precise promises spelled out in the contract between the parties, the fraud claim is redundant and plaintiff's sole remedy is for breach of contract." *Telecom Intern. Am., Ltd.* v. *AT&T Corp.*, 280 F.3d 175, 196 (2d Cir. 2001) (emphasis added) (quoting *Sudul* v. *Computer Outsourcing Servs.*, 868 F. Supp. 59, 62 (S.D.N.Y. 1994)). This might suggest that fraud claims may not be duplicative of breach of contract claims, and that no such proscription exists as between fraud and anticipatory repudiation claims.

But other cases speak more generally, stating that fraud claims may not be duplicative of contract claims, which would include anticipatory repudiation of contract claims. *See, e.g.*, *Bridgestone/Firestone, Inc.* v. *Recovery Credit Servs., Inc.*, 98 F.3d 13, 19 (2d Cir. 1996) ("However, these facts amount to little more than intentionally-false statements [] indicating [an] intent to perform under the contract. That is not sufficient to support a claim of fraud under New York law."). Because a claim for anticipatory repudiation of a contract is premised upon an eventual breach of contract, the Court concludes that case law barring fraud claims that are duplicative of breach-of-contract claims would also bar fraud claims that are duplicative of anticipatory repudiation claims.

constituting elements of, the contract, although it may be connected with and dependent on the contract.'" *Id.* (quoting *Clark-Fitzpatrick* v. *Long Island R.R. Co.*, 70 N.Y.2d 382, 389 (1987)). In other words, where a plaintiff pleads a tort claim in addition to a contract claim and the tort claim seeks the same benefit sought under the contract claim, the tort claim becomes duplicative of the contract claim and may not stand. *See id.* ("[W]here a party is merely seeking to enforce its bargain, a tort claim will not lie." (internal citations omitted) (citing *N.Y. Univ.* v. *Continental Ins. Co.*, 87 N.Y.2d 308, 316 (1995)).

Where, as here, a fraud claim is based on the "allegation that a party has made a contractual promise with no intention of performing it," it may be "sufficient to support an action for fraud, even where that statement relates to an agreement between the parties." *VTech Holdings Ltd.* v. *Lucent Techs., Inc.*, 172 F. Supp. 2d 435, 440 (S.D.N.Y. 2001) (quoting *Graubard Mollen Dannett & Horowitz* v. *Moskovitz*, 86 N.Y.2d 112, 122 (1995)). For such a claim to proceed, however, it must either "(i) demonstrate a legal duty separate from the duty to perform under the contract; ... (ii) demonstrate a fraudulent misrepresentation collateral or extraneous to the contract; or (iii) seek special damages that are caused by the misrepresentation and unrecoverable as contract damages." *Bridgestone/Firestone, Inc.*, 98 F.3d at 19-20.

In an effort to fit within one of these exceptions, Plaintiff states that Defendants' representation that M3 would be able to make payments owed under the LOC and the Promissory Note is collateral to the contracts themselves. (Pl. Opp. 19). Plaintiff's conclusory argument finds no traction

here. Defendants' alleged representation that M3 would be sufficiently solvent to make the required payments is not collateral to, but part and parcel of, Defendants' contractual obligation to make those payments. Read in this light, Plaintiff's fraud claim is that Defendants "made a promise [they] never intended to keep, and there[by] lulled [Plaintiff] into believing that [Defendants] would fulfill[] its contractual obligations. Under New York law, these allegations cannot suffice to state a fraud claim." *LiveIntent, Inc.* v. *Naples*, 293 F. Supp. 3d 433, 445-46 (S.D.N.Y. 2018).

Having examined the pleadings, accepted as true all of Plaintiff's well-pleaded factual allegations, and drawn all inferences in Plaintiff's favor, the Court determines that Plaintiff has failed to state a claim for relief for breach of contract, anticipatory repudiation of contract, or fraudulent inducement. Accordingly, the Court need not examine whether Plaintiff plausibly alleged facts that would support piercing the corporate veil under Delaware law.[14] Defendants' motion for judgment on the pleadings as to Plaintiff's claims is granted.

**C.    The Court Denies Defendants' Motion with Respect to Their Counterclaim**

Defendants have also moved for judgment on the pleadings in favor of one of their own counterclaims, asserting that Plaintiff breached the LOC.

---

[14]    "New York's choice of law rules provide that the law of the state of incorporation determines when the corporate form will be disregarded and liability will be imposed on shareholders." *VFS Fin., Inc.* v. *Falcon Fifty LLC*, 17 F. Supp. 3d 372, 381 (S.D.N.Y. 2014) (internal quotation marks and citation omitted). Because M3 is incorporated in Delaware (Am. Compl. ¶ 3), Delaware law would determine whether Plaintiff may pierce the corporate veil and name Kietrys as a defendant in this action.

(Countercl. ¶¶ 82-88). In particular, Defendants allege that M3 fully and satisfactorily performed its obligations under the LOC, and properly requested that Plaintiff provide a $200,000 advance on the LOC. (*Id.* at ¶¶ 84-85). Despite being contractually obligated under the LOC to provide the advance, Plaintiff refused to do so. (*Id.* at ¶ 86). For his part, Plaintiff admits that he refused to advance $200,000 to Defendants under the LOC, but denies that Defendants fully complied with their obligations under the LOC. (Answer to Countercl. ¶¶ 82-88).

The standard for reviewing motions for judgment on the pleadings is traditionally framed as if the reviewing court were reviewing a motion for judgment against an opposing party's claim. Thus, courts have stated that "[i]n deciding a Rule 12(c) motion, we apply the same standard as that applicable to a motion under Rule 12(b)(6), accepting the allegations contained in the complaint as true and drawing all reasonable inferences in favor of the nonmoving party," and "[w]e may dismiss the complaint only if 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Burnette* v. *Carothers*, 192 F.3d 52, 56 (2d Cir. 1999) (quoting *Conley* v. *Gibson*, 355 U.S. 41, 45-46 (1957)), *cert. denied*, 531 U.S. 1052 (2000). Here, however, Defendants move for judgment on the pleadings in favor of one of their own counterclaims. Thus, the Court may grant Defendants' motion only if it appears beyond doubt that they have alleged a set of undisputed facts in support of their claim that would entitle them to relief.

Defendants have alleged facts that, if true, would allow them to prevail on their breach of contract claim:  If Defendants did perform their obligations under the LOC, Plaintiff's refusal to advance the $200,000 would have breached that agreement.  However, Plaintiff denies that Defendants performed their contractual obligations.  In this unusual procedural posture, the Court must accept Plaintiff's denial as true.[15]  Accordingly, Defendants have failed to establish beyond doubt that they are entitled to relief on their breach of contract counterclaim.  Courts have observed that motions for judgment on the pleadings are "particularly appropriate in breach of contract cases involving legal interpretations of the obligations of the parties," as was the case with Defendants' motions against Plaintiff's claims.  *Tropic CDO I*, 92 F. Supp. 3d at 171.  In contrast, such motions are not well suited to breach of contract claims, like Defendants' counterclaim, where the parties' underlying conduct is in dispute.

## CONCLUSION

For the reasons set forth above, Defendants' motion for judgment on the pleadings is GRANTED with respect to Plaintiff's claims for breach of contract, anticipatory repudiation of contract, and fraudulent inducement.  Defendants' motion is DENIED with respect to Defendants' counterclaim for breach of

---

[15]    Though Plaintiff has failed to state a claim for breach of contract, anticipatory repudiation, or fraudulent inducement, it does not necessarily follow that Defendants have fully complied with their obligations under the LOC.  In his answer to the counterclaims, Plaintiff merely needed to "admit or deny the allegations asserted against [him]."  Fed. R. Civ. P. 8(b)(1).  Plaintiff was not required to provide detailed justification for his denials.  Thus, the Court must accept as true Plaintiff's short and plain denial of Defendants' claim that they complied with their contractual duties, even though Plaintiff has not yet substantiated that denial with affirmative allegations.

contract. The parties are hereby ORDERED to provide a joint letter and proposed case management plan, conforming with the requirements set forth in the Notice of Initial Pretrial Conference (Dkt. #5), on or before December 27, 2019.[16]

SO ORDERED.

Dated:    December 6, 2019
          New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge

---

[16] In his opposition brief to Defendants' motion for judgment on the pleadings, Plaintiff indicated that intends to move to amend his complaint to assert additional damages. (Pl. Opp. 15 n.5). At the time of the issuance of this Opinion, Plaintiff has not filed any such motion to amend, so the Court does not consider whether an amendment would be proper under Federal Rule of Civil Procedure 15(a)(2).